# APPENDIX C

In the Matter Of:

# *EQUAL EMPLOYMENT OPPORTUNITY COMMISSION*
## *vs*
# *ECOLOGY SERVICES, INC.*

---

*MARVIN GAITAN*

*February 15, 2019*

---



MARVIN GAITAN - 02/15/2019

```
 1        IN THE UNITED STATES DISTRICT COURT
 2           FOR THE DISTRICT OF MARYLAND
 3              Baltimore Division
 4
 5   EQUAL EMPLOYMENT            *
 6   OPPORTUNITY COMMISSION,     *
 7        Plaintiff,    * Civil Action No.
 8     vs.              * 1:18-CV-01065-ELH
 9   ECOLOGY SERVICES, INC.,     *
10        Defendant.    *
11
12
13        Oral Deposition of MARVIN GAITAN
14             Columbia, Maryland
15           Friday, February 15, 2019
16                 9:05 a.m.
17
18
19
20   Job No.: WDC-207940
21   Pages 1 - 96
22   Reported by: Vicki L. Forman
```

Page 2

1        Oral Deposition of MARVIN GAITAN, held at
2   the offices of:
3
4        Ecobgy Services, Inc.
5        Suite 200
6        9135 Guilford Road
7        Columbia, Maryland 21046
8        (301) 362-6700
9
10
11
12       Pursuant to agreement, before Vikki L.
13  Forman, Court Reporter and Notary Public in and for the
14  State of Maryland.

Page 3

1   APPEARANCES
2
3   ON BEHALF OF THE PLAINTIFF:
4   ERIC S. THOMPSON, ESQUIRE
5   United States Equal Employment
6   Opportunity Commission
7   Suite 300
8   10 South Howard Street
9   Baltimore, Maryland 21201
10  (410) 209-2232
11
12
13
14  ON BEHALF OF THE DEFENDANT:
15  HARRIET E. COOPERMAN, ESQUIRE
16  Saul Ewing, Arnstein & Lehr, LLP
17  Suite 900
18  500 East Pratt Street
19  Baltimore, Maryland 21202
20  (410) 332-8974

Page 4

1   ON BEHALF OF THE DEFENDANT:
2   RUSSELL B. BERGER, ESQUIRE
3   Offit Kurman
4   Suite 2010
5   300 East Lombard Street
6   Baltimore, Maryland 21202
7   (410) 209-6400
8
9
10
11  ALSO PRESENT: Timothy Osborne

Page 5

1                      CONTENTS
2   EXAMINATION OF MARVIN GAITAN            PAGE
3       By Mr. Thompson                      7
4       By Ms. Cooperman                     74
5       By Mr. Thompson                      91
6
7
8
9                      EXHIBITS
10              (Attached to the Transcript)
11  GAITAN DEPOSITION EXHIBIT                PAGE
12  Exhibit 1   Ecobgy Services Employee Handbook   28
13  Exhibit 2   7/10/07 Disciplinary Action, 011    43
14  Exhibit 3   4/1/09 Disciplinary Action, 012     44
15  Exhibit 4   5/19/16 Employee Disciplinary Form 003   46
16  Exhibit 5   5/5/17 Employee Disciplinary Form, 004   48
17  Exhibit 6   10/12/15 Employee Termination Form 039   49
18  Exhibit 7   6/25/16 Employee Disciplinary Form 100   74
19  Exhibit 8   7/9/16 Employee Disciplinary Form, 103   77
20  Exhibit 9   7/15/16 Employee Disciplinary Form 104   78
21  (Exhibits continued on next page.)

Page 6

1  Exhibit 10  8/11/16 Employee Disciplinary Form 105  82
2  Exhibit 11  8/18/16 Employee Disciplinary Form 106  84
3  Exhibit 12  9/1/16 Employee Disciplinary Form, 107  85
4  Exhibit 13  9/30/16 Employee Disciplinary Form 108  86
5  Exhibit 14  11/7/16 Employee Disciplinary Form 109  87

Page 7

1        PROCEEDINGS
2        MARVIN GAITAN
3    having been duly sworn, testified as follows:
4        EXAMINATION BY COUNSEL FOR THE PLAINTIFF
5  BY MR. THOMPSON:
6  Q   Good morning.
7  A   Good morning.
8  Q   My name is Eric Thompson. I'm an attorney
9  for the United States Equal Employment Opportunity
10 Commission and I'm here to take your deposition today in
11 the case of EEOC versus Ecology Services, Inc.
12      Could you state your full name for the
13 record?
14 A   Marvin Gaitan.
15 Q   Have you ever had your deposition taken
16 before?
17 A   No.
18 Q   Well, there's some ground rules for having a
19 deposition taken. The first is that I'll ask you
20 questions and then it's important that you answer out
21 loud and with words. Pointing, shaking your head,
22 nodding, making hand gestures, things like that aren't

Page 8

1  appropriate responses because it's not possible for the
2  court reporter to take them down.
3       Can you agree to answer questions out loud
4  and with words?
5  A   Yes.
6  Q   The next rule is that it's important that you
7  don't answer questions with the words uh-huh or uhn-uhn
8  because they're spelled essentially the same in the
9  transcript and it can be very confusing later.
10      Can you agree to not say uh-huh and uhn-uhn?
11 A   Yes.
12 Q   The next important ground rule is that it's
13 important that you let me finish the question before you
14 begin an answer. If I'm asking the question and you
15 start answering while I'm still asking it becomes
16 impossible for the court reporter to take down what
17 we're both saying at the same time.
18      Can you agree to let me finish the questions?
19 A   Yes.
20 Q   The final ground rule is if I ask a question
21 and you don't answer or you don't understand it you're
22 entitled to ask for clarification before beginning your

Page 9

1  answer.
2       Will you agree to ask for clarification if
3  you don't understand a question?
4  A   Yes.
5  Q   What is your residential address?
6  A   258 Frederick Street, Hagerstown, Maryland.
7  Q   Are there any people over 18 who live with
8  you?
9  A   My wife.
10 Q   What's her name?
11 A   Marian.
12 Q   Gaitan?
13 A   Yeah.
14 Q   Anybody else besides her?
15 A   My son.
16 Q   Is he over 18?
17 A   No.
18 Q   Anybody else over 18?
19 A   No.
20 Q   What's your business address?
21 A   What does that mean, business address?
22 Q   What's the address of the place where you

Page 14

1  plus two mechanics?
2     A   Yeah, it was that for like two years. Before
3  that we don't have that many people there because we
4  don't have Frederick County contract and that was --
5  before that was less people.
6     Q   Which county?
7     A   Frederick County.
8     Q   So when did the Frederick County contract
9  start?
10    A   That was pretty much three years ago -- two
11 or three years ago so 2016.
12    Q   Do you remember working with a woman named
13 Kristen Hamilton?
14    A   Yes.
15    Q   Was she working there when the Frederick
16 County contract started?
17    A   No.
18    Q   The Frederick County contract was after she
19 left?
20    A   We started Frederick contract before she
21 started and we still have the Frederick contract after
22 she left.

Page 15

1     Q   And it's when the Frederick County contract
2  started that it jumped up to 50 to 60 employees?
3     A   (Witness nods.)
4     Q   Were you the only supervisor on site?
5     A   There was another guy at that time helping
6  me. Mel, he was there too.
7     Q   Is that Mel Morales?
8     A   Yeah.
9     Q   Was he your boss?
10    A   He was my general manager, yeah.
11    Q   He was your manager?
12    A   Yeah.
13    Q   And what was the physical location you worked
14 at?
15    A   Frederick.
16    Q   And did Kristen Hamilton work in Frederick
17 too?
18    A   That was the Frederick yard, yes.
19    Q   What was the name of the company you worked
20 for?
21    A   Ecology.
22    Q   Was it Ecology Services, Inc., do you

Page 16

1  remember?
2     A   I don't remember.
3     Q   You just called it Ecology?
4     A   Ecology. We always call it Ecology.
5     Q   Does Ecology have other locations?
6     A   In Maryland, yes.
7     Q   Do you know what the other locations are?
8     A   Not the physical address but I know we have
9  yards in Gaithersburg. We have another yard in
10 Sykesville. They have another yard in Howard County.
11    Q   Do you know where the Howard County yard is,
12 like which part of Howard County?
13    A   No.
14    Q   So Gaithersburg, Sykesville, Howard County.
15        Anyplace else?
16    A   Not that I remember now.
17    Q   As a manager was one of your duties
18 disciplining employees?
19    A   Yes.
20    Q   What type of things would employees be
21 disciplined for?
22    A   Tardiness, not making sure that the route was

Page 17

1  done on every single house.
2     Q   Anything else?
3     A   Not that I remember now.
4     Q   If you had to discipline an employee what
5  types of discipline would you use?
6     A   We have write-ups, the write-ups. The first
7  one was kind of verbal, talking to the employee doing
8  something wrong then it was a first write-up, second
9  write-up and third write-up and then was suspension and
10 then termination.
11    Q   When you were a manager at Ecology in
12 Frederick would you ever send employees to other
13 locations?
14    A   Yes.
15    Q   Under what circumstances would you do that?
16    A   If you have extra employees and the other
17 yard was short on employees, we send drivers to do a
18 route or helpers.
19    Q   Did you ever receive employees from other
20 locations?
21    A   Yeah.
22    Q   When would you receive employees from other

Page 22

1  A   With Carlos Paz?
2  Q   Yes.
3  A   Yes.
4  Q   Does Ecology employ other -- when you were
5  there and Kristen Hamilton was there, did Ecology employ
6  other people who didn't speak English or didn't speak
7  English well?
8  A   Yeah.
9  Q   Do you know about what percent didn't speak
10 English very well?
11 A   Probably at our yard it's like ten percent.
12 Q   Did Kristen Hamilton work with a man named
13 Vidal?
14 A   Yes.
15 Q   Do you know what Vidal's last name was?
16 A   Veltran I think it is.
17 Q   Do you know how to spell that?
18 A   V-E-L-T-R-A-N.
19 Q   Was he still there when you left Ecology?
20 A   Yeah, he's still there.
21 Q   Do you keep in touch with him?
22 A   Yeah.

Page 23

1  Q   So you know he still works for the company?
2  A   Yes.
3  Q   Did you know Vidal before he started working
4  for Ecology?
5  A   Yes.
6  Q   How do you know him?
7  A   He's from the same place where I am from.
8  Q   Where is that?
9  A   El Salvador.
10 Q   Did you guys grow up in the same town?
11 A   Same town, yes. He's younger than me but
12 yeah, in the same town.
13 Q   Do your families know each other?
14 A   Back in the country, yeah.
15 Q   Did you know Carlos Paz before?
16 A   No.
17 Q   Is Carlos Paz from El Salvador?
18 A   No.
19 Q   Do you know where he's from?
20 A   Colombia.
21 Q   Did Vidal speak English?
22 A   A little bit.

Page 24

1  Q   About the same as Paz?
2  A   Probably a little bit more.
3  Q   When you spoke to Vidal did you speak to him
4  in Spanish?
5  A   Yes.
6  Q   When did you first meet Carlos Paz?
7  A   The first time that I met him was at
8  Frederick station working for Ecology.
9  Q   When was the last time you spoke with him?
10 A   With Carlos Paz probably a year and a couple
11 months ago.
12 Q   Have you spoken to him since you left
13 Ecology?
14 A   No.
15 Q   Does Ecology do any kind of orientation for
16 drivers?
17 A   Yes.
18 Q   What is the orientation process?
19 A   Orientation process is, you know, we show to
20 the guys, to the drivers how to fill out paperwork, how
21 to go to the landfill and dump the trucks, how to drive
22 trucks with helpers. They have their CDL license but

Page 25

1  they don't have experience driving the trucks. We give
2  another driver experience probably the first week or two
3  going to the new drivers and drive around routes.
4  Q   Anything else as part of the orientation
5  process?
6  A   Not that I remember now.
7  Q   What was your role in the orientation
8  process?
9  A   Normally when we hire some new driver I have
10 somebody else doing the training and my part was very
11 little.
12 Q   Did Kristen Hamilton complete the orientation
13 process?
14 A   Yes.
15 Q   What is your understanding of what sexual
16 harassment is?
17 A   My understanding for sexual harassment
18 probably is somebody having dirty looks at someone or
19 speaking some sex language to someone or sign language
20 probably.
21 Q   Is there anything else you can think of that
22 would be sexual harassment?

Page 26

1   A   Touching someone.
2   Q   Did Ecology take any steps to prevent sexual
3 harassment when Kristen Hamilton worked for the company?
4   A   Can you say that again, please?
5   Q   Did Ecology take any steps to prevent sexual
6 harassment when Kristen Hamilton worked for the company?
7   A   If we take any steps to prevent sexual
8 harassment when Kristen Hamilton works there?
9   Q   Yes.
10   A   Well, we do everything the same. I don't
11 have any -- no, I don't --
12       MS. COOPERMAN: Do you understand the
13 question?
14   A   I don't understand the question.
15 BY MR. THOMPSON:
16   Q   Did Ecology have any kind of policies,
17 programs or procedures to stop sexual harassment from
18 happening at the company?
19   A   Yes, it's in the handbook.
20   Q   Does the company have any policies, programs
21 or procedures or anything like that outside of what's in
22 the handbook?

Page 27

1   A   Like I don't have any issues when I was
2 working there. I don't have any problem with sexual
3 harassment before. This is the first time that we have
4 something like that there at this particular location.
5   Q   When you say this was the first time that you
6 had something like this at that particular location, do
7 you mean Kristen Hamilton's claim of sexual harassment?
8   A   She was not claiming that.
9   Q   What was she claiming?
10       MS. COOPERMAN: Objection.
11   A   What was she claiming?
12       MR. THOMPSON: Yes.
13       MS. COOPERMAN: Objection. I'm objecting. I
14 think the question is confusing. There's no foundation.
15 You can ask him if she was claiming anything.
16       MR. THOMPSON: Okay, I'll back up.
17 BY MR. THOMPSON:
18   Q   Other than having the sexual harassment
19 language in the handbook, did Ecology do anything as a
20 company to prevent sexual harassment from happening?
21   A   I never done anything to prevent any sexual
22 harassment.

Page 28

1   Q   What was your understanding of what you
2 should do if an employee reported sexual harassment to
3 you?
4   A   If someone reports something like that to me
5 probably I'm going to call Mel, my manager and tell him
6 what's going on.
7   Q   Is there anything else you were supposed to
8 do if sexual harassment --
9   A   We can call probably Human Resources and ask
10 for solutions.
11   Q   Was it acceptable for you to talk to the
12 alleged harasser on your own without reporting it to
13 anyone?
14   A   No.
15   Q   Did you ever hear about an incident of sexual
16 harassment or a claim of sexual harassment that occurred
17 at the Gaithersburg facility?
18   A   No.
19       MR. THOMPSON: I'd like to have this marked
20 as Gaitan 1.
21       (Gaitan Deposition Exhibit 1 was marked for
22 identification and attached to the transcript.)

Page 29

1 BY MR. THOMPSON:
2   Q   I've handed you what's been marked as
3 Gaitan 1.
4       Is this Ecology's Employee Handbook?
5   A   Yes.
6   Q   Do you see at the top where it says Ecology
7 Services Refuse & Recycling, LLC?
8   A   Uh-huh.
9   Q   And do you see below that where it says
10 Ecology Services, Inc. 07?
11   A   Uh-huh, yes.
12   Q   Thank you. Which one did you work for?
13   A   I don't know the location's own numbers, the
14 series.
15   Q   Is there something called Ecology Services,
16 Inc. 06?
17   A   06 probably that's Frederick.
18   Q   Do you know which one Ecology Services, Inc.
19 07 is?
20   A   No.
21   Q   Did you receive a pay stub?
22   A   Yes.

Page 34

1  A  Okay.
2  Q  Are you familiar with the term "flirting"?
3  A  Flirting, yeah.
4  Q  Did you understand that sexual flirtations,
5  advances or propositions could constitute sexual
6  harassment?
7  A  Yes.
8  Q  At the time you supervised Kristen Hamilton
9  did you understand that verbal commentary about an
10 individual's body characteristics could constitute
11 sexual harassment?
12 A  Yes.
13 Q  The next one says "sexually degrading words
14 used to describe individuals."
15    Do you see where I read that from?
16 A  Yes.
17 Q  At the time you supervised Kristen Hamilton
18 did you understand that sexually degrading words used to
19 describe individuals could constitute sexual harassment?
20 A  Yes.
21 Q  Then the next one is "use of
22 sexually-oriented or degrading gestures or other

Page 35

1  nonverbal communications."
2     Do you see where I read that from?
3  A  Yes.
4  Q  At the time you supervised Kristen Hamilton
5  did you understand that the use of sexually-oriented or
6  degrading gestures or other nonverbal communications
7  could constitute sexual harassment?
8  A  Yes.
9  Q  Last one is "intentional physical contact."
10    Do you see where I read that from?
11 A  Yeah.
12 Q  At the time you supervised Kristen Hamilton
13 did you understand that intentional physical contact
14 could constitute sexual harassment?
15 A  Yes.
16 Q  At the time you supervised Kristen Hamilton
17 did you understand that sexual harassment was a
18 violation of federal law?
19 A  I was not sure at that time there was a
20 violation of federal law.
21 Q  Did you know if it was a right protected by
22 federal law?

Page 36

1  A  The rights are protected by federal law?
2  Q  Yes.
3  A  Yes.
4  Q  What were Kristen Hamilton's job duties?
5  A  Driver.
6  Q  Was it her job to drive the garbage truck so
7  that the residential trash could be collected?
8  A  Yes.
9  Q  Did she have any duties beyond that?
10 A  No.
11 Q  When she drove the truck was she accompanied
12 by helpers?
13 A  Yes.
14 Q  What were the helpers responsible for?
15 A  To grab the can and put the trash in the back
16 of the truck.
17 Q  How many helpers did she work with at a time?
18 A  It depends on what route she's doing.
19 Sometimes worked one. Sometimes they worked two
20 helpers.
21 Q  When would they work with just one helper?
22 A  Normally it's when we send a driver to

Page 37

1  collect missed collections.
2  Q  So when it was a regular route where you were
3  actually collecting the trash and not just getting the
4  missed locations, would that tend to be two drivers?
5  A  For one route?
6  Q  Yes.
7     MS. COOPERMAN: Two drivers?
8     MR. THOMPSON: Not two drivers. Two helpers.
9  A  If they have a regular route and that route
10 was heavy or big there was two helpers. If they were
11 sending a driver to pick up misses it was a helper and
12 driver.
13 BY MR. THOMPSON:
14 Q  So when Kristen Hamilton was doing her job
15 she would be out on the road with one or two helpers; is
16 that right?
17 A  Probably.
18 Q  And there was no supervisor present with her;
19 is that right?
20 A  When she was doing the route?
21 Q  Yes.
22 A  Not the whole time. Not all the time.

Page 42

1　Q　Does the Mack truck need a sign on it for a
2　wide load?
3　A　If they got a sign for wide load?
4　Q　Yeah. I mean is it wider than other trucks?
5　　　MS. COOPERMAN: Objection.
6　A　I don't understand the question.
7　BY MR. THOMPSON:
8　Q　Have you ever been on the highway and seen a
9　vehicle that's marked Wide Load and they've got a
10　vehicle following them?
11　A　Wide load, that's the truck who is taking
12　care making sure that nobody drive too close to that
13　truck, oversized load?
14　Q　Yes.
15　A　Yeah.
16　Q　Is the Mack truck an oversized load truck
17　like that?
18　A　I don't think it's an oversized load but it's
19　wider than regular cars.
20　Q　But it fits in one lane of traffic; is that
21　right?
22　A　Yes.

Page 43

1　Q　When you supervised Carlos Paz was he ever
2　disciplined?
3　A　No, not that I remember.
4　　　MR. THOMPSON: I'd like to have this marked
5　as Gaitan 2.
6　　　(Gaitan Deposition Exhibit 2 was marked for
7　identification and attached to the transcript.)
8　BY MR. THOMPSON:
9　Q　I've handed you what's been marked as
10　Gaitan 2.
11　　　Where it says Supervisor's Signature do you
12　know whose signature that is?
13　A　No.
14　Q　And if you look under Remarks it says "This
15　is first written warning for failing to return to the
16　yard with the truck as told to do and not punching your
17　timecard out as told to do."
18　　　Do you see where it says that?
19　A　Yes.
20　Q　Returning to the yard and punching the
21　timecard out, are those things he would have learned to
22　do in orientation?

Page 44

1　　　MS. COOPERMAN: Objection. I'm going to
2　object. Just so it's clear, this exhibit looks like
3　2002.
4　　　MR. THOMPSON: No, seven.
5　　　MS. COOPERMAN: Seven, yeah so the question I
6　think may be -- is the question at this time or is the
7　question when --
8　　　MR. THOMPSON: The question is about
9　orientation.
10　　　MS. COOPERMAN: At that time?
11　　　MR. THOMPSON: Let's just see what the answer
12　is.
13　A　I don't know about this time because 2007 but
14　when I was there it was mandatory that everybody have to
15　clock in and out every time.
16　　　MR. THOMPSON: I'd like to have this marked
17　as Gaitan 3.
18　　　(Gaitan Deposition Exhibit 3 was marked for
19　identification and attached to the transcript.)
20　BY MR. THOMPSON:
21　Q　Showing you what's been marked as Gaitan 3
22　I'll give you a moment to look it over.

Page 45

1　　　(Pause in the proceedings.)
2　　　Have you had a chance to look it over?
3　A　Yes.
4　Q　Do you see where it says Supervisor's
5　Signature?
6　A　Uh-huh, yes.
7　Q　Is that Mel Morales's signature?
8　A　Yes.
9　Q　And under Remarks it says "Failure to
10　complete your route"?
11　A　Yes.
12　Q　Would failure to complete your route be
13　something that a person could be disciplined for when
14　you were a supervisor?
15　A　When I was, yes.
16　Q　And up at the top there's an X for
17　Suspension?
18　A　Yes.
19　Q　Is that something you would have suspended
20　someone for, failing to complete their route?
21　A　If they have more than three write-ups, yes.

Page 50

1   Gaitan 6. I'll give you a moment to look it over.
2   A   Yeah, this is the time that I was talking
3   about.
4   Q   Gaitan 6 is the time you were talking about
5   when Paz was fired?
6   A   Yes.
7   Q   If you look up at the Company Code it says
8   ESRR?
9   A   Yes.
10  Q   What does ESRR stand for?
11  A   Ecology Services Refuse & Recycling.
12  Q   Is that a different company than ESI?
13  A   That was the -- this is the company for
14  private routes and then for the County they have ESI 06.
15  Q   So why was the Termination Form written up
16  with Ecology Services Refuse & Recycling?
17  A   Because back in those days we don't have
18  Frederick County contract yet and this is the company
19  that we use at that time.
20  Q   Did Ecology Services Refuse & Recycling still
21  exist at the time he left the company?
22  A   At that time, yes.

Page 51

1   Q   Do you know how many people worked for
2   Ecology Services Refuse & Recycling?
3   A   No, I don't remember.
4   Q   Did Ecology Services Refuse & Recycling have
5   different facilities than ESI?
6       MS. COOPERMAN: Objection.
7   BY MR. THOMPSON:
8   Q   You can go ahead.
9   A   If they have different facilities?
10  Q   Yes.
11  A   Like a different yard?
12  Q   Yes.
13  A   I don't know if that's a different facility
14  because I was calling this -- every single -- every
15  private route they have this company so some yards like
16  Sykesville and I think this company and Frederick is
17  ESI 06.
18  Q   So did people work for ESRR and ESI 06 at the
19  same time?
20      MS. COOPERMAN: If you know.
21  A   No, they don't work at the same time for
22  those companies -- for the same company.

Page 52

1   BY MR. THOMPSON:
2   Q   So you're saying ESRR and ESI 06 are the same
3   companies?
4       MS. COOPERMAN: Objection.
5   A   I was not saying that.
6   BY MR. THOMPSON:
7   Q   How would you describe the relationship
8   between ESRR and ESI 06?
9   A   ESI 06 is just Frederick County. That's for
10  the County so ESRR is just private routes.
11  Q   Was Mel Morales the supervisor for ESI 06 and
12  ESRR?
13  A   He's the general manager.
14  Q   So is he the manager for both of those
15  entities?
16  A   Yes.
17  Q   Did Carlos Paz and Kristen Hamilton ever work
18  together?
19  A   Yes.
20  Q   Do you know how often they worked together?
21  A   I don't remember that, how often it was.
22  Q   Did a driver work with the same helpers

Page 53

1   everyday?
2   A   When they have the -- when they have their
3   routes assigned to the driver, yes, but when they don't
4   have a route they drive different routes every time and
5   different helpers.
6   Q   Did Kristen Hamilton drive different routes
7   with different helpers every time?
8   A   Yes.
9   Q   Were Paz and Hamilton friends?
10  A   I don't know.
11  Q   Did you ever see Paz hug Hamilton?
12  A   No.
13  Q   Do you know if Paz and Hamilton had a
14  romantic relationship?
15  A   I don't know.
16  Q   Do you know if Paz and Hamilton ever had a
17  sexual relationship?
18  A   Not that I know.
19  Q   Did you ever see Paz expose himself to
20  Hamilton?
21  A   No.
22  Q   Did you ever see Paz expose himself to

Page 62

1  Q  Did Hamilton ever complain to you about
2  Vidal?
3  A  Yes.
4  Q  What did she complain about?
5  A  She complained about -- one time she sent me
6  a text saying that Vidal was doing -- urinating inside
7  the truck. Not in the cab but in the box where the
8  trash is. Those trucks normally have a blade inside the
9  box where they move back -- all the way back in the
10 morning when they start working and Vidal -- I think he
11 got in and Hamilton was complaining for that.
12 Q  What did you do when you received that
13 complaint?
14 A  I talked to Vidal about it.
15 Q  Did you report it to Human Resources?
16 A  I make a write-up for him and write-up should
17 be here, yeah.
18 Q  What type of write-up was it?
19 A  It was a verbal warning. I think it was a
20 verbal warning. I'm not sure.
21 Q  Did she come into your office to complain
22 about him?

Page 63

1  A  No, she text me.
2  Q  When she got back from her route that day did
3  she come into your office to complain?
4  A  No.
5  Q  Is there a rule against urinating in the back
6  of the truck?
7  A  Not that I remember now.
8  Q  Is urinating in the back of the truck
9  supposed to be grounds for immediate termination?
10 A  I don't know.
11 Q  After Kristen Hamilton left did Paz work with
12 any women at Ecology?
13 A  After she quit?
14 Q  Yes.
15 A  Yes.
16 Q  Do you know the names of those women?
17 A  I have Maria Amaya. I have Jacqueline
18 Ferguson and Paige. She works in the office all the
19 time. I don't remember if it was Paige or Ellie. Ellie
20 was after Paige so I don't remember who was there at
21 that time.
22 Q  Do you know Ellie's last name?

Page 64

1  A  Westerbeck.
2  Q  Do you know how to spell that?
3  A  W-E-S-T-E-R-B-E-C-K I think.
4  Q  What was Ellie Westerbeck's job title?
5  A  She was in the office.
6  Q  And Paige Looney was in the office; is that
7  correct?
8  A  She was before Ellie, yes.
9  Q  Did they do the same job?
10 A  Yes.
11 Q  What were they responsible for?
12 A  They were responsible for getting on track
13 with the mileage of the truck, fuel, tickets, all that
14 stuff. Office paperwork.
15 Q  Did Kristen Hamilton quit working for ESI or
16 Ecology?
17 A  She quit, yes.
18 Q  Do you know why she quit?
19 A  She quit -- I don't know why exactly was the
20 reason why she quit but the day or the reason -- well,
21 the day. I remember the day. We have a little argument
22 with her because the week before on Friday she was doing

Page 65

1  one route over there in Westminster, Carroll County.
2  She had stopped the truck and she was refusing to drive
3  the truck until the helper removed a water hose that was
4  in the back of the truck. She called me that day to
5  complain that the helper -- the helper that ride the can
6  or the bin and they just dump it in the truck and she
7  was complaining that day one of those bins got a water
8  hose in there and the helper just grab it and dump it
9  into the truck and she was saying that that was not
10 recyclable.
11      So that was on Friday. Then the next day I
12 think was a Monday and she was late for work. She
13 called me in the morning and she told me I'm going to be
14 there late, probably 30 minutes late and she was like an
15 hour or so minutes late. When she show up to work I
16 called her to the office and I started talking to her
17 about tardiness and she was kind of mad. She was angry
18 and I take the point from the week before that she was
19 refusing to drive the truck and I told her that we are
20 not responsible to choose what is recyclable and what is
21 not recyclable. We just go there and grab the thing and
22 dump it into the truck. That day I believe we were

Page 66

1  doing a write-up for her because she was super late and
2  she was mad. She start driving her car and went home.
3  Q  So she wasn't fired; is that correct?
4  A  No.
5  Q  I phrased that wrong.
6     Was she fired?
7  A  Can you say that again?
8  Q  Was Kristen Hamilton fired from Ecology?
9  A  No, she was suspended that morning. Yeah, I
10 remember she was suspended that morning. I told her
11 you're late today and she got a couple write-ups
12 already. I don't remember how many but probably more
13 than three. I told her take a two-day suspension and
14 come back on Wednesday and then she was mad saying that
15 was not right and she went home and then she quit.
16 Q  Were you arguing with her before she was
17 suspended?
18 A  If there was argument with her before she was
19 suspended?
20 Q  Yes.
21 A  I don't remember that.
22 Q  When did you decide to suspend her?

Page 67

1  A  When she was acting up in the office.
2  Q  So when she walked in that day you weren't
3  planning on a suspension at that point?
4  A  Not in the morning, no.
5  Q  So when she came in in the morning were you
6  planning to send her out on a route?
7  A  I think I have everybody out that day and she
8  was -- I don't remember if I was planning to send her
9  home that day or put her to help someone. I don't
10 remember that.
11 Q  Do you remember if she was supposed to work
12 with Carlos Paz that day?
13 A  No, Carlos Paz was gone that day.
14 Q  Did she ever ask you to not work with Carlos
15 Paz?
16 A  No.
17 Q  Kristen Hamilton was suspended for two days,
18 correct?
19 A  That was the -- yeah, she was -- I was trying
20 to suspend her for two days.
21 Q  After Kristen Hamilton quit did anyone from
22 H.R. have a conversation with you about disciplining

Page 68

1  employees?
2  A  No.
3  Q  Did anybody ever talk to you about equal
4  discipline, disciplining employees on equal levels?
5  A  I was doing that for everybody, not just for
6  her.
7  Q  But no one had a specific talk with you about
8  that after Hamilton left?
9  A  Who?
10 Q  Like Margaret Gibbs or Robin Reach.
11 A  Not that I remember now.
12    MR. THOMPSON: I would like to take a break.
13    MS. COOPERMAN: Sure. Actually why don't we
14 take ten minutes.
15    MR. THOMPSON: Yeah, that will work.
16    (A brief recess was taken.)
17 BY MR. THOMPSON:
18 Q  I have a few more questions.
19    When Carlos Paz was fired do you know where
20 he went to work after that?
21 A  Back in 2015?
22 Q  Yes.

Page 69

1  A  No, I think he went to Canada or Alaska or
2  somewhere like that.
3  Q  Did he apply for work again with Ecology?
4  A  Yeah, I think he reapplied.
5  Q  Did you make the decision to hire him back?
6  A  No.
7  Q  Do you know who hired him back?
8  A  No.
9  Q  Do you know when he reapplied?
10 A  I don't remember dates.
11 Q  Do you know what month it was?
12 A  No.
13 Q  Was it before the spring of 2016?
14 A  I have no idea.
15 Q  Were you surprised to see him back?
16 A  Yes.
17 Q  Were you disappointed that he was back?
18 A  I was not really disappointed because he was
19 a hard worker person and on this day that he was fired
20 he was not following my order that I give to him so it's
21 something that you have to do but other than that he was
22 good doing his job.

Page 70

1  Q  Did he also work as a mechanic?
2  A  I think he's like a helper, mechanic helper.
3  Q  What was your impression of Kristen Hamilton
4  as an employee?
5  A  As an employee was disappointed.
6  Q  In what way?
7  A  She was not responsible. She was always
8  late. She was that kind of person that if you say
9  something to her she'll tell you something back.
10 Q  How would you describe her appearance
11 physically?
12 A  What do you mean?
13 Q  How tall is she?
14 A  Probably she's a little taller than me,
15 5'7" probably.
16 Q  Do you know what color hair she had?
17 A  She has blond hair.
18 Q  Do you know what color eyes she had?
19 A  Blue eyes.
20 Q  How would you describe her build?
21 A  Build?
22 Q  Yeah, her build.

Page 71

1  A  Ability?
2  Q  Her physical build, her body type.
3  A  I don't know. Her body type? She was kind
4  of big, tall.
5  Q  Was Kristen Hamilton ever disciplined when
6  she worked there?
7  A  If she was disciplined?
8  Q  Yes.
9  A  Couple times.
10 Q  What for?
11 A  Being late.
12 Q  Anything else?
13 A  I think for a miss, a missed collection one
14 time I think. She was directed to pick up a miss and
15 she said that she went there and she said that the miss
16 was not there and then the County called me back and
17 said that by 3:00 p.m. the miss is still there so she
18 have discipline issued for that.
19 Q  Anything besides that?
20 A  Not that I can remember now.
21 Q  You mentioned that ESI employed a woman named
22 Paige Looney?

Page 72

1  A  Uh-huh.
2  Q  Were you Paige Looney's supervisor?
3  A  Yeah, I was in charge for the whole yard,
4  yes.
5  Q  Did you ever ask Paige Looney to go on a date
6  with you?
7  A  No.
8  Q  Did you ever ask her to have sex with you?
9  A  No.
10 Q  Do you know why she left ESI or Ecology?
11 A  No.
12 Q  Did she ever tell you she was going to leave?
13 A  No.
14 Q  Was she fired?
15 A  No, she quit.
16 Q  Did she put in any notice before she quit?
17 A  Like a week before, no.
18 Q  Did she tell anybody she was going to quit
19 before she quit?
20 A  I don't know.
21 Q  If she was going to quit who would she have
22 told about it?

Page 73

1      MS. COOPERMAN: Objection. You may answer.
2  A  I believe she called -- she called this
3  office. I did not hire her so she was pretty much
4  not -- I believe she called this office to alert them
5  that she's going to quit.
6  BY MR. THOMPSON:
7  Q  When you say "this office" do you mean the
8  company headquarters in Columbia?
9  A  Yeah.
10 Q  Is this the company headquarters here in
11 Columbia?
12 A  Yes.
13 Q  On Guilford Road?
14 A  Yes.
15 Q  Does the company have any other offices?
16 A  Not that I know.
17 Q  Where is Mel Morales's office?
18 A  I think it's here.
19 Q  Have you ever been to his office?
20 A  Yeah.
21 Q  Where was it?
22 A  Somewhere back there (indicating).

Page 78

1  warning when she already had --
2  A   Probably I just make a mistake. I don't
3  check her file on time on pretty much the first one.
4  Probably she was new here. I don't remember how many
5  months she worked there but probably she was new at this
6  time, 6/25.
7  Q   So when you say she was new, what impact
8  would that have on you in terms of deciding what kind of
9  discipline to give her?
10 A   We have three months probation on employees
11 all the time. Every employee who get there got three
12 months probation and this definitely affect the
13 employees to do their work. When you have a lot of
14 paperwork in there you can fire them without problems.
15     (Gaitan Deposition Exhibit 9 was marked for
16 identification and attached to the transcript.)
17 BY MS. COOPERMAN:
18 Q   I'm showing you what's been marked as Exhibit
19 Number 9 and ask you if you would tell us what this
20 document is?
21 A   This is an Employee Disciplinary Form for
22 Kristen Hamilton. I think this was the first verbal

Page 79

1  warning for her showing up at 8:00 a.m. to work.
2  Q   And this was on July 15th?
3  A   July 15th, yes.
4  Q   2016?
5  A   Yes.
6  Q   Now, as you just stated you gave her a verbal
7  warning for this lateness.
8      Is there a reason -- since she had the two
9  other written warnings is there a reason why you gave
10 her a verbal warning as opposed to a more severe
11 discipline?
12 A   This one is before or after the other ones?
13 Q   It was after.
14 A   So I don't remember the excuse she was giving
15 me that date. Probably because she say something about
16 her son was sick or something like that and just give
17 her a verbal warning but I put it on paper saying that
18 she was super late on this date.
19 Q   Now, you indicate that she was super late.
20     What time was she supposed to report to work?
21 A   I wanted my employees there everyday between
22 6:00 and 6:15.

Page 80

1  Q   What time are the trucks supposed to go out
2  to start their routes?
3  A   They got to be in their route by 7:00.
4  Q   What happens if they're not in the route --
5  strike that and let me ask you this.
6      When you say "in the route" do you mean they
7  have to be over at the location where the route starts?
8  A   On the location where it will be at 7:00 a.m.
9  to start collection. Frederick County requires --
10 that's mandatory for Frederick County. The trucks have
11 to be in the route by 7:00 a.m.
12 Q   To get on the route by 7:00 a.m. what time do
13 the trucks need to leave the Frederick yard?
14 A   It depends where they're going. If they're
15 going to Emmitsburg, from Frederick to Emmitsburg it's
16 like 45 minutes driving, 30 minutes driving so they have
17 to be in the route by 6:00 a.m. They got to do pretrip
18 inspection of the trucks and then they got to head to
19 Emmitsburg by 6:15, 6:20.
20 Q   What would be the latest time a truck could
21 leave the yard to get to the route in time?
22 A   To get to the route? Like I say, it depends

Page 81

1  on where they're going.
2  Q   The one that has the shortest distance.
3  A   Shortest distance? We start some routes --
4  close to the yard they got to be -- just getting off the
5  yard they're on the route so they got to be out of the
6  yard by 7:00.
7  Q   Do you recall what routes those were?
8  A   No, they have numbers. I don't remember the
9  numbers.
10 Q   And when an employee arrives at the route at
11 8:00 a.m. -- excuse me, arrives at work at 8:00 a.m.
12 would they be able to go out on their regular route?
13 A   No, I have to -- if they are late like this
14 on this date that change everything for me to handle the
15 operation because I have everybody assigned to every
16 route and if somebody don't show up on time that means I
17 have to change everything in the morning to make sure
18 everybody is on the route on time.
19 Q   So when you say you have to change everything
20 what would that involve?
21 A   That involved drivers, helpers because I was
22 counting on her to be on misses that day or going to

Page 82

1  Clover Hill that day so that mean that I have to put
2  somebody else there and then change the plan to this
3  driver. If not, I have to call another yard saying I
4  don't have a driver for this route. I need someone to
5  help me over here.
6    Q  And if you have a helper that -- or a helper
7  that does not report to work either at all or comes in
8  too late, do you have to find another helper for the
9  truck?
10   A  We have to find another helper.
11   Q  Are there ever times that only one helper
12 goes out because of absenteeism, lateness?
13   A  Sometimes they have to be out. There was
14 this one helper that we wait to find somebody else. We
15 call Carroll County yard or Frederick yard saying on
16 this truck I only have one helper and this route is big.
17 I need someone to help him or if there's not, I jump in
18 the truck and help the guy to finish the route.
19       (Gaitan Deposition Exhibit 10 was marked for
20 identification and attached to the transcript.)
21 BY MS. COOPERMAN:
22   Q  I'm showing you what's been marked as Exhibit

Page 83

1  Number 10 and ask if you can explain what this document
2  is?
3    A  This is another Disciplinary Form for Kristen
4  Hamilton, the second written warning, show up at 7:15.
5       This is pretty much one hour late on this
6  date.
7    Q  And this was on August 11th?
8    A  August 11, 2016.
9    Q  Since this was after the truck was supposed
10 to be there on the route, was she able to -- would she
11 have been able to handle the route -- drive the route
12 that you had planned on assigning -- or that you had
13 assigned her on that day?
14   A  Yes, sometimes they finish the route but they
15 finish the route late. Normally the helper is there by
16 6:00 a.m. waiting for the driver. The driver show up
17 late. That means they're going to be finishing the
18 whole operation super late.
19   Q  Did you have any conversations with
20 Ms. Hamilton about her lateness?
21   A  Yeah, all this written warning was
22 conversation to her saying you have to be responsible

Page 84

1  and be here on time so we put it on paper to prove.
2    Q  When you had this conversation did you
3  indicate to her what could happen to her if she
4  continued to be late?
5    A  Yeah, I told her about the three chances that
6  they have, three warnings and then it's suspension and
7  then termination.
8       (Gaitan Deposition Exhibit 11 was marked for
9  identification and attached to the transcript.)
10 BY MS. COOPERMAN:
11   Q  I'm showing you what's been marked as Exhibit
12 Number 11 and ask if you can tell us what this document
13 is?
14   A  This is another Disciplinary Form for Kristen
15 Hamilton on 8/18/2016 and it was for excessive
16 tardiness. Employee did not clock in until 8:00 a.m.
17   Q  And you gave her a third written --
18   A  This was the third one and this was probably
19 in less than six months.
20   Q  Did you have a conversation with Ms. Hamilton
21 at this time about her lateness?
22   A  Yeah, every time that she would sign this

Page 85

1  there was a conversation to her about being late.
2    Q  What was her response as to why she was late
3  sometimes?
4    A  Like I said before, she was that kind of
5  person. If you say something to her she was saying two
6  words back.
7    Q  Such as?
8    A  She was like I overslept. I'm tired or I got
9  to take my son to -- my son was awake all night, all
10 that stuff. All kinds of excuses.
11      (Gaitan Deposition Exhibit 12 was marked for
12 identification and attached to the transcript.)
13 BY MS. COOPERMAN:
14   Q  I'm showing you what's been marked as Exhibit
15 Number 12 and ask you if you can tell us what this
16 document is?
17   A  This is another Disciplinary Form for
18 unexcused tardiness again clocking in at 8:27 a.m. on
19 9/1/2016.
20   Q  And this indicates -- I see handwritten it
21 says 4th Written Warning.
22   A  This one was the fourth one, yeah.

**Page 86**

1  Q   And can you tell us why you gave her a fourth
2  written warning instead of a suspension?
3  A   I don't remember at this time why I was doing
4  that but probably was because I was taking -- I was
5  trying to give her more chances to be -- to have a job
6  since she was complaining all the time that her car was
7  broke. She don't have money to fix her car so I was
8  giving her another chance.
9       (Gaitan Deposition Exhibit 13 was marked for
10 identification and attached to the transcript.)
11 BY MS. COOPERMAN:
12 Q   I'm showing you what's been marked as Exhibit
13 Number 13 and ask if you would tell us what this
14 document is?
15 A   I put this on paper because I believe Kristen
16 Hamilton called this date saying that her son was sick
17 and that she's going to take off this date. I put it on
18 paper just to prove that she was off on 9/30/2016.
19 Q   This says Employee Disciplinary Form. You
20 documented this absence?
21 A   I just documented, yeah, because I don't mark
22 any first one, second one. I don't say suspension,

**Page 87**

1  nothing like that. I just put it on paper and put it in
2  her file to -- if in two years you go back to her file
3  and check you got this paper saying okay, she take off
4  this date and here is the reason. She said her son was
5  sick.
6  Q   So you didn't discipline her for that?
7  A   No, this was not any discipline thing.
8  Q   So you accepted that absence and you gave her
9  an excuse?
10 A   Yeah, this is pretty much an excuse.
11      (Gaitan Deposition Exhibit 14 was marked for
12 identification and attached to the transcript.)
13 BY MS. COOPERMAN:
14 Q   I'm showing you Exhibit Number 14 and can you
15 tell us what this document is?
16 A   This is another Disciplinary Form for Kristen
17 Hamilton, 2016, 11/7. Employee show up for work at
18 7:35 a.m.
19 Q   And then --
20 A   This is the day when I sent her to home.
21 Employee show up at 7:35. She called me around 6:00
22 a.m. saying that she was going to be there probably a

**Page 88**

1  half hour late for work and she show up at 7:35 so I
2  decide to -- after we have the discussion and everything
3  I decide to send her home on the 7th and 8th.
4  Q   So that was really a two-day suspension,
5  right?
6  A   Two-day suspension.
7  Q   At the top it indicates 5th Written Warning
8  as opposed to suspension.
9  A   Yeah.
10 Q   Is there a reason why you wrote that in as
11 opposed to checking Suspension if you know?
12 A   Probably because I was trying to do a warning
13 for her but after she just start acting out for her
14 behavior, I just decide to send her home.
15 Q   Now, you just mentioned that she started
16 acting out when you were disciplining her for again
17 being late on November 7th.
18 A   Uh-huh.
19 Q   And you've testified to that before.
20      At any time during that conversation did she
21 complain to you or say anything that Carlos Paz had been
22 sexually harassing her during work?

**Page 89**

1  A   No.
2  Q   And now you said that she got angry at you at
3  that time, right?
4  A   Yeah.
5  Q   And she left the office angry?
6  A   Yes.
7  Q   And drove off, correct?
8  A   She was driving her -- yeah.
9  Q   How did you learn that she -- when did you
10 learn that she quit her job?
11 A   When did I know she quit her job?
12 Q   Yeah, when did you first learn that she quit?
13 A   I don't remember at this time.
14 Q   Was it that day?
15 A   I think it was that day but I don't remember
16 if it was. She text me something or somebody else tell
17 me something like Paige, the lady in the office telling
18 me she was quitting or I believe she text me something
19 and say she was quitting the job.
20 Q   And do you recall what she said in the text?
21      MR. THOMPSON: Objection. You can go ahead
22 and answer.