IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

U.S. EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,

    *Plaintiff,*

    v.

ECOLOGY SERVICES, INC.,

    *Defendant.*

Civil Action No. ELH-18-1065



## MEMORANDUM OPINION

This suit concerns claims of unlawful employment practices. In an Amended Complaint (ECF 19), the U.S. Equal Employment Opportunity Commission ("EEOC") filed suit against Ecology Services, Inc. ("Ecology" or the "Company") "to correct unlawful employment practices" and to obtain "appropriate relief" for Kristen Hamilton, a former employee of Ecology. *Id.* at 1. The suit is predicated on Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and Title I of the Civil Rights Act of 1991, 42 U.S.C. § 1981 ("Title I").

In particular, the EEOC alleges that Hamilton was subjected to a hostile work environment as a result of repeated sexual harassment by a co-worker, and also alleges that she was constructively discharged from her employment. ECF 19, ¶ 13. The EEOC seeks, *inter alia*, back pay and punitive damages. *Id.* at 4-5. Ecology disputes the claims. Among other things, it contends that Hamilton voluntarily quit after she was disciplined for chronic tardiness and a performance issue. *See* ECF 20 (Answer); *see also* ECF 49-1 at 7.[1] Several motions are pending.

---

[1] The Court cites to the electronic pagination, which does not always correspond to the page number imprinted on the submission.

Ecology has moved for partial summary judgment as to the claim of constructive discharge, as well as the EEOC's claims for back pay, front pay, and pecuniary damages. ECF 49. The motion is supported by a memorandum of law (ECF 49-1) (collectively, the "Ecology Motion") and numerous exhibits. ECF 49-2 to ECF 49-22. However, the EEOC has since abandoned some of its monetary claims, stating: "EEOC no longer seeks front pay, the value of employee benefits or pecuniary expenses." ECF 51-1 at 8 n.1.

The EEOC has filed a combined cross-motion for partial summary judgment and opposition to the Ecology Motion (ECF 51), supported by a memorandum of law (ECF 51-1) (collectively, the "EEOC Motion") and many exhibits. ECF 51-2 to ECF 51-11. Notably, the EEOC concedes that, in light of disputed facts, it is not entitled to summary judgment with respect to the claim of hostile work environment. ECF 51-1 at 18. Instead, it seeks summary judgment as to the fourth element, *i.e.*, that the conduct of sexual harassment on the part of Hamilton's co-worker is imputable to Ecology. *See id.* In addition, the EEOC seeks summary judgment with respect to Ecology's Tenth Affirmative Defense, the so called *Faragher-Ellerth* defense, claiming it is not available to Ecology. ECF 51 at 1; *see* ECF 20 at 10; *see also Faragher v. Boca Raton*, 524 U.S. 775 (1998); *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998) (establishing a framework to determine an employer's liability for a hostile work environment). Ecology has since abandoned that defense. It asserts, ECF 52 at 6 n.2: "Ecology does not intend to pursue that defense, and thus, the EEOC's motion [on this issue] is moot."

In response to the EEOC Motion, Ecology has filed a combined opposition as well as a reply in support of the Ecology Motion (ECF 52, the "Ecology Opposition"), along with additional exhibits. ECF 52-1 to ECF 52-22. And, the EEOC has filed a reply in support of the EEOC Motion (ECF 53, the "EEOC Reply"), along with additional exhibits. ECF 53-1 to ECF 53-7. In

addition, the EEOC filed a pleading titled "Plaintiff's Surreply To Defendant Ecology Services, Inc.'s Response In Opposition To Plaintiff's Motion For Partial Summary Judgment And In Reply To The EEOC's Opposition To Ecology's Motion For Partial Summary Judgment (ECF No. 52)." ECF 57 (the "Surreply").[2] And, the EEOC also submitted additional exhibits. ECF 57-1 to ECF 57-2.

The motions are fully briefed and no hearing is necessary to resolve them. *See* Local Rule 105.6. I will grant the Ecology Motion with respect to the damages claims abandoned by the EEOC. And, I will grant the EEOC Motion as to the Tenth Affirmative Defense, because Ecology has abandoned that defense. For the reasons that follow, I shall otherwise deny the motions.

## I.  Factual Background[3]

Ecology is a trash collection company that provides refuse and recycling collection services to residential and commercial customers in Maryland. ECF 49-8 (Dep. of Mel Morales, Ecology Operations Mgr.), at 6, Tr. 10-11. The Company, which has at least 15 employees (ECF 19, ¶ 4), employs CDL-licensed drivers to operate trash collection trucks, as well as helpers who ride in or on the trucks to assist in the collection of curbside waste. ECF 49-9 (Dep. of Marvin Gaitan, Hamilton's supervisor) at 7, Tr. 24-25; *id.* at 9, Tr. 37; ECF 51-2 (Hamilton Dep.) at 9. The number of helpers assigned to a driver varies with the type of route, but there are usually one to two helpers assigned to each driver. ECF 49-9 at 9, Tr. 36-37.

---

[2] The title is quite confusing. A surreply is filed in response to a reply, not in response to an opposition. Nor does a party file a reply to its own opposition. In any event, the Court granted leave to file a surreply. ECF 56.

[3] The parties' citations to the record are not always helpful. For example, the EEOC frequently cites to depositions without referencing a page or ECF pagination. *See, e.g.*, ECF 51-1 at 8 (citing, *e.g.*, Hamilton Deposition at "123:7-9"). Ecology does the same. *See, e.g.*, ECF 49-1 at 8 (citing, *e.g.*, Hamilton Deposition at "128:4-129:11."

Hamilton commenced employment with Ecology on May 25, 2016, and was based in Frederick, Maryland. ECF 49-1 at 8; ECF 51-1 at 8; ECF 51-2 at 9. She left employment with Ecology on November 7, 2016. ECF 51-11 (Hamilton Decl.), ¶ 6. The parties vigorously dispute whether Hamilton's departure constituted a voluntary resignation or a constructive discharge.

While Hamilton worked at Ecology, she drove a recycling or garbage truck with respect to various waste collection routes; the routes were assigned on a daily basis. ECF 51-3 (Morales Dep.) at 8; ECF 51-2 at 12-13. She worked five days per week, and earned $150 per day. ECF 49-3 (Hamilton Dep.) at 17, Tr. 122. Hamilton earned a total of $3,000 per month. ECF 49-15 (EEOC responses to interrogatories) at 16.

Hamilton's supervisor, Marvin Gaitan, assigned the routes and the helpers. ECF 51-2 at 11. Gaitan frequently assigned a helper named Carlos Paz to work with Hamilton. *Id.* at 20-21. Paz primarily speaks Spanish. ECF 51-4 (Paz Dep.) at 3. But, he also speaks some English. ECF 49-9 at 7, Tr. 24. And, Gaitan indicated that he (Gaitan) is able to speak in Spanish. ECF 49-9 at 7, Tr. 24.

Paz was fired from Ecology in 2015, but he was subsequently rehired. ECF 49-9 at 13, Tr. 68-69. Paz testified that he was typically assigned to work with Hamilton twice a week, on Mondays and Thursdays, because those were "short routes," which Gaitan typically assigned to women. ECF 51-4 at 11. According to Paz, this was because men drive faster and because "it's difficult for [women] to reverse and get the vehicles out" of roundabouts. *Id.* at 11-12. He attributed these views to Gaitan. *Id.* at 13.

The helpers generally rode on the back of the truck and emptied the garbage cans and recycling containers into the truck. ECF 51-3 (Morales Dep.) at 9. When it was raining, or when

eating, the helpers rode in the cab of the truck while traveling to and from the collection routes. *Id.* at 10; *see also* ECF 51-2 at 14-15; ECF 51-4 at 9.

Hamilton testified that she was subjected to repeated sexual harassment by Paz. She claims that, beginning about one month after she began working at Ecology, Paz began to make lewd and graphic remarks about her body. ECF 51-2 at 24-26. Further, she asserts that Paz made obscene gestures to her, which included pantomiming oral sex. ECF 51-2 at 23, 31, 33. According to Hamilton, on several occasions, Paz offered Hamilton money for sex. *Id.* at 23. Moreover, she claims that Paz sometimes grabbed her body, including her breasts. On one occasion, when Paz "reached from behind and grabbed" Hamilton's left breast, Hamilton said: "Don't ever do that again." *Id.* at 36-37.

Hamilton also testified that on more than one occasion, Paz exposed himself to her while she was driving, and forcibly pulled her hand onto his penis. *Id.* at 23, 27, 35, 36, 38, 39, 41, 42. For example, she recounted that in September 2016, while she was driving and Paz was in the cab with her, Paz "grabbed [her] hand and put it on his penis." *Id.* at 38-39. Hamilton "immediately took [her] hand away when [she] realized what was happening" and she "punched" Paz. *Id.* at 39. She also told Paz not to do that again. *Id.* Paz responded by laughing. *Id.* According to Hamilton, in October 2016, Paz again grabbed Hamilton's hand and put it over his partially exposed penis. *Id.* at 40-41. On that occasion, Hamilton "slapped him across the face." *Id.* at 40. After this second incident, Hamilton "didn't say anything right away," because she was "embarrassed" and "didn't know how to say anything." *Id.* at 43. However, she claimed that eventually she did "go to Marvin." *Id.*

On or about September 15, 2016, Hamilton texted Gaitan to report that another helper, Videl Veltran, urinated in the truck. *Id.* at 44-45, 47-48; ECF 49-9 at 7, Tr. 22. Hamilton

5

understood that urinating in the truck was "grounds for immediate dismissal." ECF 51-2 at 45. Later, when Hamilton "happened to be in the office," and because Veltran was "still working" at the Company, she asked Gaitan, "so what's going with [Veltran]?" *Id.* at 45. Gaitan told her he could not discuss the matter with another employee. *Id.* at 46.

Hamilton testified that, in the course of that conversation with Gaitan, she reported Paz's conduct. *Id.* Hamilton stated, *id.*:

> [W]ell, I said, on another note, you know, [Paz] exposed himself and made me, you know, put my hand on his penis. And [Gaitan] was like—you know, kind of like, wow, you know, shocked or whatever. And I was like, I just don't want to work with him by myself. I don't want to be riding in a truck by myself with him.

According to Hamilton, Gaitan responded that he would talk to Paz. *Id.* Hamilton testified that she did not make "a full blown. . . statement" because she was afraid she would lose her job. *Id.* at 46-47.

Hamilton claimed that in October 2016, after Paz exposed himself to her for the second time, she again spoke to Gaitan. *Id.* at 49. Hamilton testified, *id.* at 49-50:

> . . . I told him, I said, you know, I don't know if you talked to [Paz] the last time, but he exposed himself again to me. And, you know, I don't want to—I don't want to work with him anymore, you know, because he put him with me again obviously by himself when I told him I didn't want to work with him. . . . I don't want to ever be alone with him in a truck again.

According to Hamilton, Gaitan again responded that he would talk to Paz and that he would "take care of it." *Id.* at 50. Hamilton testified that she did not complain about Paz to anyone else at Ecology, because she was embarrassed. *Id.* at 52. She added that she felt "stupid" and "cheap" and "wanted to forget it." *Id.*

Further, Hamilton recounted that in October 2016, Paz again attempted to grab her breasts while she was driving. *Id.* at 28-29. Hamilton pulled herself away from Paz so he could no longer

6

reach her. *Id.* at 29. Randy Sellers, another helper, was in the truck with Paz and Hamilton, but Hamilton did not think he saw what happened. *Id.* at 29.

Sellers testified that he witnessed Paz make a gesture to Hamilton "like he was masturbating . . . ." ECF 51-10 (Sellers Dep.) at 4. Then, when Sellers was riding on the back of the truck, and Paz was in the passenger seat, he observed through the back of the cab that Paz was "reaching for" Hamilton. *Id.* at 4-5. Sellers then "took it upon [himself] to go ahead and hop up in the cab." *Id.* He again witnessed Paz "act[] like he was masturbating on her a couple of times and then he reached for [Hamilton's] breast," while Hamilton was driving. *Id.* at 6. According to Sellers, Paz said: "We joke, we joke, or something to that effect." *Id.* Sellers also said Paz "would go smooch, smooch and try to smooch on her cheek or something like—just you could tell she didn't want it." *Id.*

Zoe Hicks worked at Ecology for two weeks in October 2016. ECF 51-9 (Zoe Hicks Dep.) at 3. She testified that Paz would make "ignorant remarks" and "sexual remarks" about Hamilton. *Id.* at 7-8. Hicks stated, *id.* at 8: "He'd talk about her weight, he'd talk about her butt, talk about her boobs." *Id.* at 8. In addition, she recalled that Paz made lewd hand gestures when "Kristen wasn't looking." *Id.* On other occasions, Paz made these gestures so that Hamilton could see them, and then Hamilton "would tell him to stop." *Id.* According to Hicks, Paz sexually propositioned Hamilton. *Id.* at 9. Further, Hicks witnessed Paz grab his crotch around Hamilton. *Id.* at 14-15. She also witnessed Paz touch Hamilton's breast. *Id.* at 16. And, according to Hicks, Paz "told many people that [Hamilton] gave him oral stimulation." *Id.* at 18.

Hicks testified that she personally overheard Hamilton approach Gaitan on October 21, 2016. *Id.* According to Hicks, Hamilton told Gaitan "that [Paz] was making passes and that she's asked him to stop and he won't stop." *Id.* at 11. She also heard Hamilton inform Gaitan that Paz

7

made obscene gestures towards her and that Paz had grabbed her breast. *Id.* at 18. And, Hamilton told Gaitan that Paz had exposed himself to her. *Id.* Hicks heard Gaitan say he would talk to Paz. *Id.* at 11.

Gaitan recalled that Hamilton complained to him via text message about Veltran urinating in the truck. ECF 49-9 at 12, Tr. 62-63. He claimed that he issued a verbal warning to Veltran and wrote up the incident. *Id.*, Tr. 62. However, Gaitan denied witnessing Paz sexually harass Hamilton; denied that Hamilton had reported the sexual harassment to him; and denied that anyone else had reported the sexual harassment to him. ECF 52-2 at 11, Tr. 54-57.

Moreover, Paz denied that he harassed Hamilton. ECF 52-2 at 15, Tr. 34-35.[4] Rather, he testified that he was "frustrated" with Hamilton because she was a bad driver. *Id.*, Tr. 36. And, he told Gaitan that she should be replaced. *Id.* at 16, Tr. 51. According to Paz, Gaitan never discussed his behavior with him while Hamilton worked for Ecology. ECF 51-4 at 14.

During Hamilton's employment with Ecology, Hamilton was written up several times for tardiness. According to Gaitan, drivers were supposed to report to work around 6:00 a.m. or 6:15 a.m. so they could have their routes underway by 7:00 a.m. ECF 49-9 at 15, Tr. 79-80. On July 15, 2016, Hamilton reported to work at 8:00 a.m. ECF 49-10 (Employee Disciplinary Form) at 2. On August 11, 2016, she arrived at 7:15 a.m. ECF 49-11 at 2. And, on August 18, 2016, Hamilton did not report to work until 8:09 a.m. ECF 49-12 at 2. Then, on September 1, 2016, she did not report to work until 8:27 a.m. ECF 49-13 at 2. And, on November 7, 2016, Hamilton did not report to work until 7:35 a.m. ECF 49-14 at 2. She was suspended by Gaitan for two days and told to return on November 9, 2016. *Id.* Hamilton explained that "two of these or three of these

---

[4] Paz appears to have testified through a Spanish interpreter. *See, e.g.*, ECF 52-2 at 16, Tr. 51.

8

were [due to] issues with [her] son and [her] sitter." ECF 49-3 at 23, Tr. 247. But, she acknowledged that the number of warnings she received could have triggered a suspension, and that Gaitan had been lenient with her. *Id.*

Hamilton contends that on November 4, 2016, while she was out on a trash route, she got into a dispute with a helper named Henry (ECF 51-2 at 67), who "threw a garden hose in the back" of the truck. ECF 49-9 at 24, Tr. 251-52. Hamilton thought she could not collect garden hoses as trash, because they were supposed to be recycled, and she believed that if they took the hose, they would be fined. *Id.* at 252. She called Gaitan, but he did not answer the phone. *Id.* So, she left a message and also texted him. *Id.*; *see* ECF 49-19. She also sought advice from another driver, who confirmed that she should not take the hose. ECF 49-3 at 24, Tr. 252. And, she called Steve Porter, a supervisor, who agreed with her decision in not taking the hose. *Id.*

However, Hamilton's helper refused to remove the hose, *id.* at 25, Tr. 253, and "walked off." *Id.* At that point, Hamilton parked the truck, because she had no helper. *Id.* Gaitan then called Hamilton back and told her she had to move her truck. *Id.*, Tr. 253-54. He also informed her that the county dump would accept garden hoses. *Id.*, Tr. 253. And, Gaitan told her that if she did not arrive at the dump by 5:00 p.m., there would be "problems" and that she would only get half a day's pay. *Id.*, Tr. 254. The helper eventually returned, and they "hustled" to finish the route on time. *Id.* Hamilton did not interact with Gaitan that day when she returned to the Frederick yard. *Id.* at 26, Tr. 257.

Hamilton next reported to work on Monday, November 7, 2016. *Id.* As previously indicated, Hamilton was late reporting to work on that date. *Id.* She recalled that Gaitan "brought up the hose thing with the helper." *Id.* at 258. Hamilton began to explain what had happened, and Gaitan became frustrated. *Id.*, Tr. 258-59. He instructed her to get a truck. *Id.*, Tr. 259. When

Hamilton asked about her helper, Gaitan responded that Paz was assigned to her. *Id.* Hamilton testified that she asked if there was anyone else, and Gaitan stated, *id.*: "No, everybody is gone. You got here late." *Id.*

Hamilton told Gaitan she was "not working alone with [Paz]." *Id.* She claimed that Gaitan was "mad at that," but Hamilton reminded Gaitan that she had told him she would not work with Paz, and "nothing ha[d] been done" to address the problem. *Id.* Gaitan responded: "Well, maybe you need to go home for two days." *Id.* When Hamilton asked, "Why?," Gaitan responded, "because of just everything." *Id.* Hamilton replied: "I come to you and tell you that he's done what he's done, and you don't seem to have done anything. You don't seem to care." *Id.*, Tr. 260. Of import here, Hamilton testified, *id.* at 27, Tr. 261: "So I said, You know what? I said, If you're going to tell me to take two days, I was like, I quit, because I'm not working with [Paz], and you're telling me now to take two days because I don't want to work with him. And I just walked – I got in my car and I left. I was like, I quit." Later that day, she sent Gaitan a text message. *Id.* at 27, Tr. 262. At her deposition, Hamilton did not recall the substance of the text, but she claimed that she said she quit. *Id.*[5]

Gaitan maintained that Hamilton was not fired. ECF 49-9 at 13, Tr. 66. Nor had he planned to suspend her for being late. *Id.*, Tr. 67. However, Gaitan decided to suspend Hamilton because "she was acting up in the office" during their discussion about the garden hose incident. *Id.* He also denied that he assigned Hamilton to work with Paz, claiming "Paz was gone that day." *Id.* Moreover, he denied that Hamilton had ever asked him not to work with Paz. *Id.*

---

[5] At that point during the deposition, counsel discussed production of text messages and forensic examinations of the mobile phones. ECF 49-3 at 27, Tr. 263-64.

On November 7, 2016, at about 8:40 a.m., Hamilton sent a text message to a co-worker named Chris.[6] She stated: "It was nice working with you Chris, I QUIT this morning cause [Gaitan] is an asshole!" ECF 49-18 at 2. After Chris responded, Hamilton replied, stating, *id.* at 3:

> Too many inconsistencies around there n favoritism, yes I was late n I was written up but he said I had one more chance but then started on me about Friday when I stopped the truck to call n text a supervisor about the garden hoses n whether we take them or not n cause I argued that I did nothing wrong cause we r supposed to not text n talk on the fone when we r driving I pulled over ye [sic] said we do take garden hoses n I shouldn't have stopped so he then suspended me for 2 days n I said forget it I quit.[7]

In a Declaration dated July 15, 2019 (ECF 51-11), Hamilton stated: "On November 7, 2016, shortly after I left the job site, I called Robin Reach, who worked in the human resources department, to let her know I quit because of sexual harassment." *Id.* ¶ 7. Reach is a "Human Resource Assistant" with Ecology. ECF 51-2 at 68. However, "Reach did not answer . . . ." ECF 51-11, ¶ 9. Hamilton said, *id.*: "I left a voicemail message stating that I quit because Carlos Paz sexually harassed me." Reach returned Hamilton's call on November 9, 2016. *Id.* ¶ 10.

---

[6] Ecology claims that the text message to Chris was sent within 30 minutes of when Hamilton quit. ECF 49-1 at 10. However, the exhibit (ECF 49-18) reflects a date of "07/11/2016." Presumably, the month and date are transposed.

[7] Counsel for Ecology contends that, despite a document subpoena requesting "communications. . . concerning any of the facts, transactions, matters, allegations, issues, and/or claims raised in [the] Charge. . ." (ECF 52-9, ¶ 3), the EEOC failed to produce these text messages until Ecology insisted on a forensic search of Hamilton's cell phone. ECF 52-9, ¶ 8.

On April 5, 2019, the Court approved an extension of discovery in order to permit the forensic search. *See* ECF 45. As a result of the search, Ecology obtained the first text message on April 26, 2019, but it did not obtain the second until May 10, 2019, when it followed up with counsel for the EEOC. ECF 52-9, ¶¶ 9-11.

On November 10, 2016, Reach sent an email to Margaret Gibbs, Ecology's Director of Human Resources and Office Administration. ECF 51-2 at 67-68; ECF 51-5 (Gibbs Dep.) at 3-4. In her email, Reach stated that she spoke with Hamilton on November 9, 2016, and recounted that Hamilton told her about the incident with the garden hose and the conversation with Gaitan on November 7, 2016. ECF 51-2 at 67. Reach also related the description of Gaitan as "angry" and the two-day suspension and said, *id.*: "[Hamilton] was upset and angry so she sent Marvin [sic] stating that she didn't think the suspension was fair and she was quitting." *Id.* Reach added, *id.*:

> During this conversation, [Hamilton] went on to tell me the following-
>
> A helper, Carlos Paz, would make comments to her such as "lets you and me get in the back of the truck and have sex" He would make blow job gestures to her. She stated that she told Marvin and Carlos would still be assigned to her truck. These comments were made on numerous occasions and other helpers, who are no longer employed, witnessed Carlos asking her to have sex.

At her deposition, Hamilton recalled that she also told Reach during the call that Paz had exposed himself to her. ECF 51-2 at 59. And, she claimed that she had informed Reach that she told Gaitan about the incident, and then "it happened a second time." *Id.* Hamilton testified that in her conversation with Reach on November 9, 2016, she also reported as follows, *id.*:

> [W]hen I told [Gaitan] the second time or the first time, I didn't feel anything was done because [Paz] did it a second time. And then the second time I told him I don't ever want to be alone with him. And that day that this all happened is when he wanted me to work alone with him, and I said I wasn't. And then he got, you know, angry with me and said that I should take the two days. So that part was missing [from Reach's email]. And then down here is nothing that says anything about that, that he—that he exposed himself, made me touch his penis. So not everything that I told her is in here [*i.e.*, the email].

Hamilton explained that after she left employment with the Company, she did not file for unemployment because she did not "have enough quarters." *Id.* at 60. She "immediately started working as an independent contractor driving a cab for Community Taxi, a local cab company."

ECF 51-11, ¶ 12. Her fares ranged from $7 to $60. ECF 57-1 at 7. She got 40% of the day's earnings and contributed to fuel expenses. *Id.* at 5. During this time, she earned "roughly $1,200 in cash a month doing this work." ECF 51-11, ¶ 13.

In her Declaration (ECF 51-11), Hamilton stated that she "signed up with Workforce West Virginia, a State Agency that would call [her] if it came across work for which [she] was suited." *Id.* ¶ 14. But, Workforce West Virginia only referred her to jobs that "required a class A commercial driver's license," and she has a class B commercial driver's license. *Id.* ¶ 15.

Hamilton located a job "working for Chris Duran, an acquaintance, who was a subcontractor for United Van Lines." *Id.* ¶ 16. Although Hamilton accepted the job in November 2016, there "was a delay in starting work because Duran was having difficulty finding insurance." *Id.* ¶ 17. There were also delays because Hamilton was required to undergo testing to ensure she was a qualified subcontractor. *Id.* ¶ 19. This testing included a written test and a drug test, which Hamilton completed in December 2016. *Id.* ¶ 20. While Hamilton waited for work with Duran, she continued to work for Community Taxi. *Id.* ¶ 18.

Hamilton began working full time for Duran in late December 2016. *Id.* ¶ 21. However, the volume of work was not what Duran had promised. *Id.* ¶ 22. Hamilton earned $100 per day, and worked four days per week (ECF 51-2 at 4), with maximum earnings of about $1,600 per month, in cash. ECF 51-11, ¶ 23. She was paid in cash by Duran, who was, in turn, paid by United Van Lines. ECF 51-2 at 4.

In February 2017, Hamilton decided to look for other work. ECF 51-11, ¶ 24. She applied for positions with Apple Valley Waste and TruckMovers. *Id.* ¶ 25-26. She had considered applying in December 2016 to the position with Apple Valley Waste, but at the time understood

them only to be hiring drivers with class A licenses. *Id.* ¶ 25. Hamilton found the job posting for TruckMovers through an internet search. ECF 51-2 at 65-66.

On March 9, 2017, Hamilton began employment with TruckMovers. ECF 51-11, ¶ 27. In March 2017, Hamilton earned a total of $1,294.76. *Id.* ¶ 31. Hamilton's 1099-MISC for 2017 reflects "Nonemployee Compensation" of $48,890.45. ECF 49-5 at 2. Her 2018 income, according to an itemized email titled "Kristen Hamilton 2018 1099 Detail," was $104,115.40. ECF 49-7 at 2.[8]

It is undisputed that Ecology has an Employee Handbook, about 25 pages in length. ECF 51-5 at 20 (the "Handbook"). However, the parties dispute matters concerning the Handbook.

In a section of the Handbook titled "*Unlawful Harassment*," it states, in part, *id.* at 23:

> We are committed to maintaining a work environment that is free from unlawful harassment. In keeping with this commitment, we will not tolerate harassment of employees by anyone, including any co-worker, vendor, or other person who comes into contact with our employees while on the job.
>
> Harassment consists of unwelcome conduct, whether verbal, physical, or visual, that is based upon a person's sex, color, race, ancestry, religion, national origin, age, veteran status, physical or mental disability, or any other legally protected characteristic. We will not tolerate harassment that affects tangible job benefits, interferes with an individual's work performance, or creates an intimidating, hostile, or offensive working environment.
>
> Sexual harassment deserves special mention. Unwelcome sexual advances, requests for sexual favors, and other physical, verbal, or visual conduct based on sex constitutes sexual harassment when (1) submission to the conduct is an explicit or implicit term or condition of employment, (2) submission to or rejection of the conduct is used as the basis for an employment decision, or (3) the conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment. Sexual harassment may include, but is not limited to: explicit sexual discussions;

---

[8] As noted, while at Ecology, Hamilton earned $150 per day. ECF 49-3 at 17, Tr. 122. She worked five days per week, for a total of $3,000 per month. ECF 49-15 at 16.

sexually suggestive comments; sexually-oriented "kidding" or "teasing"; "practical jokes"; jokes about gender-specific sexual traits; foul or obscene language or gestures; displays of foul or obscene printed or visual material; sexual flirtations, advances or propositions; verbal commentaries about an individual's body characteristics; sexually degrading words used to describe individuals; use of sexually-oriented or degrading gestures or other non-verbal communications; or intentional physical conduct, such as patting, pinching, or brushing against another's body.

We are committed to the idea that unlawful harassment should not occur in the workplace. If you feel that you have experienced or witnessed unlawful harassment, either sexual or of any other type, you are to notify your supervisor. If you do not feel comfortable speaking with your supervisor, you are to notify the Human Resources Manager. Any supervisor or manager who becomes aware of possible sexual or other unlawful harassment must immediately advise the Human Resources Manager. We forbid retaliation against anyone who reports unlawful harassment.

We will seriously investigate all such complaints . . . .

Mel Morales, the Operations Manager for Ecology (ECF 51-3 at 3), testified that the Company's sexual harassment policy consists of the policy contained in the Handbook. *Id.* at 6. He claimed that Ecology had no posters or hand-outs about sexual harassment. *Id.* However, Gibbs testified at her deposition that there was a poster on harassment "hanging up in each. . . area where employees clock in and clock out." ECF 51-5 at 9. And, according to Gibbs, this poster was displayed at the Frederick location. *Id.* at 10. Gibbs described the poster as "talk[ing] about harassment, discrimination" and it provided "contact information for the EEOC." *Id.*

Gibbs testified that as part of a new employee's orientation, the new hire is furnished with a copy of the Handbook. ECF 51-5 at 7-8. She stated that the sexual harassment policy "was given to all the employees," although there was no training about sexual harassment for employees or managers. *Id.* at 14. Gibbs estimated that the workforce of Ecology is 20 percent Hispanic or Latino. *Id.* at 5. But, she confirmed that the Handbook was only available in English. *Id.* at 19.

Susan Looney was the office manager at Ecology's Frederick office. ECF 51-8 (Looney Dep.) at 3. She testified that many of the Company's employees spoke "broken English," but the Handbook was not available in Spanish. *Id.* at 5. Although Looney had asked the "head of the office" for a Spanish version of the Handbook, because "they hire so many people who speak Spanish," Looney "never got a response." *Id.*

Nevertheless, Looney recalled that she explained the policies in the Handbook to Spanish-speaking employees via a translation "app" on her phone. *Id.* And, she claimed that Gaitan would sometimes "go over it with them" in Spanish. *Id.* at 6. She noted that employees who speak Spanish signed the Handbook, claiming they understood "based off of the app" that she used, *id.* at 6, or because Gaitan "would come in . . . ." *Id.* at 6. But, she thought some signed it without understanding its contents. *Id.* at 6-7. She drew this conclusion based on their facial expressions. *Id.* at 7.

Paz knew of the rule against urinating in the back of the trucks; he received training about the rule, in Spanish. ECF 51-4 at 15. But, Paz could not recall if he had been given a Handbook. ECF 51-4 at 7. When he was shown a copy, he did not recognize it. *Id.* Moreover, he was unable to read the document because it is in English. *Id.* at 8. Nor was Paz familiar with the term "sexual harassment"; he claimed he was never trained about sexual harassment. *Id.* at 14-15.

Hamilton could not recall if she had ever been provided with a copy of the Handbook. ECF 51-2 at 8. Morales had never seen the signature page for Hamilton's Handbook, and did not know if she had signed it. ECF 51-3 at 8. Gibbs testified that, to the best of her knowledge, Hamilton had received the Handbook, because she "believed she had seen the acknowledgment form" that Hamilton signed. ECF 53-3 at 4-5.

16

In August 2019, Ecology claimed to have located Hamilton's signature page. ECF 52-3 (Gibbs Decl., September 5, 2019), ¶ 9. The signature page is dated May 25, 2016; it is signed by both Hamilton and Looney; and it bears Bates stamp ESI_01015. ECF 52-5 at 2. However, the EEOC maintains that the signature page produced by Ecology does not bear the same page number as the signature page in the Handbook that Ecology claims was in effect during Hamilton's employment. ECF 53 at 5-6. The page produced by Ecology is numbered "Page 23," and reflects that it was revised on March 4, 2013 (ECF 52-5), whereas the Handbook initially produced in discovery by Ecology has an acknowledgment page marked "Page 27," indicates that it was revised on February 20, 2013, and bears the Bates stamp range of ESI_0055-81. ECF 51-5 at 47. Because of this discrepancy, the EEOC claims that the newly produced signature page "is simply not the acknowledgment form for [the Company's] employee handbook which it has consistently represented to have produced as ESI_00055-81." ECF 53 at 6. The EEOC insists that "[t]here is no evidence that Hamilton signed for receipt" of the Handbook. *Id.*

The text of the two signature pages appears to be largely the same. Both versions indicate that the signer received the Handbook and acknowledged responsibility to "read and familiarize [himself or herself] with the policies and procedures contained in the Handbook. . . ." ECF 51-5 at 47; ECF 52-5 at 2. The only difference between the two documents appears to be the following parenthetical phrase in the last paragraph of the signature page of the February 20, 2013 version, stating: "(listed on pages 25 and 26 of his handbook)." The parenthetical was not included in the revision of March 4, 2013. *Compare* ECF 51-5 at 47 and ECF 52-5 at 2.

Timothy Osborne, Ecology's Chair of the Board of Directors, was only made aware of Hamilton's complaint after Gibbs "related to [him] a memorandum she received from Robin Reach in the HR department, which related to a conversation she had with Kristen Hamilton after. . . she

left the company." ECF 51-6 (Osborne Dep.) at 4-5. He testified that the sexual harassment policy is contained in the Handbook. *Id.* at 7. He also testified that he was not aware if any employee training included sexual harassment, but he had not been trained on it, apart from receipt of the Handbook. *Id.*

Gaitan stated that he had "never done anything to prevent any sexual harassment." ECF 49-9 at 8, Tr. 27. He understood that if someone reported sexual harassment to him, he could call his boss, Morales, or call Human Resources. *Id.*, Tr. 28.

Morales testified that Gaitan did not conduct any sexual harassment training while he was supervisor at the Frederick location. ECF 53-5 at 5. Looney also testified that she received no training on sexual harassment, and was not aware of any for either drivers or helpers. ECF 53-6 at 3-6. However, Jon Cade, a helper at Ecology, testified that his work orientation consisted of a "one-on-one thing." ECF 53-4 at 3. He also thought there was "training" on sexual harassment, directing employees "don't just let it continue" if they saw something "wrong." *Id.* at 4. At his orientation, which was conducted by a woman named Lisa, he was told sexual harassment could result in termination. ECF 52-2 at 8, Tr. 27.

Gibbs described the procedure at Ecology for the investigation of claims of sexual harassment. ECF 52-2 at 4, Tr. 23. At the outset, there is a conversation with the person making the accusation. Gibbs testified that they would "take down notes and find out if there was any witnesses to the claims, who the allegation was against, and notify them at that point in time that . . . until this is concluded they wouldn't in no way have to work with that person." *Id.* Gibbs stated that sometimes a manager or supervisor would be asked to assist in gathering information. *Id.* She stated that human resources preferred supervisors to report allegations directly to HR, rather than conduct their own investigations. *Id.*, Tr. 24.

When Gibbs was presented with the email written by Reach, describing her phone call with Hamilton, Gibbs stated that she did not know the potential witnesses described by Hamilton. ECF 51-5 at 17. Moreover, no attempt was made to locate them. *Id.* Gibbs also stated that Paz still worked for Ecology, and she did not know if he still worked with female drivers or if any effort had been made to separate him from female drivers. *Id.* Ecology took no action against Paz as a result of Hamilton's complaint. *Id.* Nor did Ecology investigate Hamilton's allegations. *Id.* at 18.

Gaitan testified that Paz was assigned to work with other women after Hamilton left the Company. ECF 49-9 at 12, Tr. 63. Gaitan claimed that he first learned of Hamilton's accusations of harassment about "a week or two after she quit." ECF 52-8 at 4, Tr. 59. He spoke either to Morales or Gibbs, who asked him if he had been aware of any harassment. *Id.*, Tr. 59-60. He told them he knew "nothing." *Id.*, Tr. 60-61. He also spoke to Gibbs. *Id.* at 61. But, Gaitan was unaware if Paz was interviewed. *Id.*

According to Paz, days after Hamilton quit, Gaitan told him that Hamilton had accused him of sexual harassment. ECF 51-4 at 14. As noted, Paz maintained that Gaitan had never discussed his behavior with him while Hamilton worked at Ecology. *Id.*

On December 15, 2016, Hamilton submitted "an initial charge" with the EEOC. ECF 52-19 at 2. In her letter, Hamilton stated that she had "suffered a hostile work environment created by a co-worker" named Paz. *Id.* She claimed that she had "reported the harassment to [her] supervisor. . . on two occasions and was told that he would take care of it." *Id.* Nevertheless, Gaitan continued to assign Paz to work with her, stating "we have to get the job done." *Id.* She described Paz's conduct, and noted that she "was placed on routes with [Paz] up through the last

week that I worked there." *Id.* Hamilton asserted that she "was unable to continue working for the company due to the hostile work environment and [she] quit on November 7, 2016." *Id.*[9]

On January 23, 2018, the EEOC found reasonable cause to believe that Ecology violated Title VII. ECF 19, ¶ 8.

Additional facts are included, *infra.*

## II. Legal Standards

### A. Summary Judgment

Both sides have moved for partial summary judgment under Fed. R. Civ. P. 56. Under Rule 56(a), summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986); *see also Iraq Middle Mkt. Dev. Found. v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017) ("A court can grant summary judgment only if, viewing the evidence in the light most favorable to the non-moving party, the case presents no genuine issues of material fact and the moving party demonstrates entitlement to judgment as a matter of law."). To preclude the award of summary judgment, the nonmoving party must demonstrate that there are disputes of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986).

The Supreme Court has clarified that not every factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment;

---

[9] Hamilton's formal EEOC charge does not appear in the record. In the Amended Complaint, the EEOC contends: "More than 30 days prior to the institution of this lawsuit, Hamilton filed a charge with the [EEOC] alleging violations of Title VII by Defendant." ECF 19, ¶ 7.

the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248. There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see Sharif v. United Airlines, Inc.*, 841 F.3d 199, 204 (4th Cir. 2016); *Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [its] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 514 U.S. 1042 (2004); *see also Celotex*, 477 U.S. at 322–24. Moreover, in resolving a summary judgment motion, a court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *accord Roland v. U.S. Citizenship & Immigration Servs.*, 850 F.3d 625, 628 (4th Cir. 2017); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013). However, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252. And, "the mere existence of a scintilla of evidence in support of the [movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [movant]." *Id.*

The judge's "function" in reviewing a motion for summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *accord Guessous v. Fairview Prop. Inv., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). Thus, in considering a summary judgment motion, the court may not make credibility determinations. *Wilson v. Prince George's Cty.*, 893 F.3d 213, 218-19 (4th Cir. 2018);

*Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007). Moreover, in the face of conflicting evidence, such as competing affidavits, summary judgment ordinarily is not appropriate because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644–45 (4th Cir. 2002).

When, as here, the parties have filed cross-motions for summary judgment, the court must consider "each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (citation omitted), *cert. denied,* 540 U.S. 822 (2003) (citation omitted); *see Mellen v. Bunting*, 327 F.3d 355, 363 (4th Cir. 2003). Merely because both sides have moved for summary judgment, this does not mean that summary judgment to one party or another is necessarily appropriate. If there is a genuine issue of material fact, both motions must be denied. *See* 10A Wright, Miller & Kane, *Federal Practice & Procedure* § 2720, at 336-37 (3d ed. 1998, 2012 Supp.).

## B. Title VII

Title VII prohibits an employer from discriminating against "any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). *See, e.g., Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 212 (2015); *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 207-08 (4th Cir. 2019); *Ray v. Int'l Paper Co.*, 909 F.3d 661, 666 (4th Cir. 2018); *Netter v. Barnes*, 908 F.3d 932, 937 (4th Cir. 2018); *Strothers v. City of Laurel*, 895 F. 3d 317, 326-27 (4th Cir. 2018); *DeMasters v. Carilion Clinic*, 796 F.3d 409, 416 (4th Cir. 2015); *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 298 (4th Cir. 2015) (en banc); *Freeman v. Dal-Tile Corp.*, 750 F.3d 413, 420

(4th Cir. 2014). The phrase "terms, conditions or privileges of employment" is "an expansive concept." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986) (cleaned up). Title VII also states, in part: "Except as otherwise provided in this subchapter, an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e–2(m).

The statutory language of Title VII makes clear that it prohibits only certain kinds of employment actions, and only actions taken against an employee on a prohibited basis. *See* 42 U.S.C. §§ 2000-e2(a).

First, "the existence of some adverse employment action is required." *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004). An "adverse employment action" is one that "'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 337 (4th Cir. 2011) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)). Second, the intentional discrimination must be on the basis of the plaintiff's "race, color, religion, sex, or national origin." *See* 42 U.S.C. §§ 2000-e2(a)(1).

The EEOC seeks summary judgment, in part, as to its claim of hostile work environment. Of relevance here, single acts that may not be cognizable as adverse actions on their own may, over time, cumulatively amount to an unlawful employment practice by creating a hostile work environment. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002); *see also Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993); *Hoyle*, 650 F.3d at 333-34. And, as discussed in more detail, *infra*, a hostile work environment exists "'[w]hen the workplace is permeated with

discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Boyer-Liberto*, 786 F.3d at 281 (quoting *Harris*, 510 U.S. at 21 (alterations in *Boyer-Liberto*)).

To show that a hostile work environment was created on the basis of sex, a plaintiff must establish that the offending conduct (1) was unwelcome, (2) it was based on sex, (3) it was sufficiently severe or pervasive to alter the conditions of employment and create an abusive work environment, and (4) the conduct was imputable to the employer. *See, e.g.*, *Boyer-Liberto*, 786 F.3d at 278; *see Vance v. Fall State Univ.*, 570 U.S. 421, 423 (2013).

The EEOC does not seek summary judgment as to the entirety of its hostile work environment claim. Rather, it seeks summary judgment only as to the fourth element of such a claim, *i.e.*, that the offensive conduct was imputable to Ecology.

For its part, Ecology seeks summary judgment as to the EEOC's claim of constructive discharge. A claim of constructive discharge arises when an employee resigns because the "circumstances of discrimination" made the employee's working conditions "'so intolerable that a reasonable person in the employee's position would have felt compelled to resign.'" *Green v. Brennan*, —— U.S. ——, 136 S. Ct. 1769, 1776 (2016) (quoting *Pa. State Police v. Suders*, 542 U.S. 129, 148 (2004)). To establish a claim of constructive discharge, a claimant "must prove first that [s]he was discriminated against by [her] employer to the point where a reasonable person in [her] position would have felt compelled to resign" and then show that she actually resigned. *Green*, 36 S. Ct. at 1777; *see also Perkins v. Int'l Paper Co.*, 936 F.3d at 211-12; *Crockett v. SRA Int'l*, 943 F. Supp. 2d 565, 576 (D. Md. 2013); *Lopez v. BMA Corp.*, DKC-13-2406, 2013 WL 6844361 (D. Md. Dec. 24, 2013).

Regarding the "intolerability" of the work environment, the Fourth Circuit recently instructed in *Perkins*, 936 F. 3d at 211-12 (internal quotation marks and citations omitted):

> "Intolerability" is not established by showing merely that a reasonable person, confronted with the same choices as the employee, would have viewed resignation as the wisest or best decision, or even that the employee subjectively felt compelled to resign. Instead, intolerability is assessed by the objective standard of whether a reasonable person in the employee's position would have felt compelled to resign, ... that is, whether he would have had no choice but to resign.

"In assessing intolerability, the frequency of the conditions at issue is important." *Evans v. Int'l Paper Co.*, 936 F.3d 183, 193 (4th Cir. 2019) (citing *Amirmokri v. Balt. Gas & Elec. Co.*, 60 F.3d 1126, 1132 (4th Cir. 1995)). "The more continuous the conduct, the more likely it will establish the required intolerability. On the other hand, when the conduct is isolated or infrequent, it is less likely to establish the requisite intolerability." *Evans*, 936 F.3d at 193.

Intolerability is a high bar. As the Fourth Circuit has emphasized, "difficult or unpleasant working conditions and denial of management positions, without more, are not so intolerable as to compel a reasonable person to resign." *Id.*; *see also Booz-Allen & Hamilton, Inc.*, 368 F.3d at 378 ("[M]ere 'dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign.'" (quoting *Carter* v. *Ball*, 33 F.3d 450, 459 (4th Cir. 1994))). Notably, to establish a claim for constructive discharge, "the plaintiff must show 'something more' than the showing required for a hostile work environment claim." *Evans*, 936 F.3d 183, 193 (quoting *Suders*, 542 U.S. at 147); *see also Nnadozie v. Genesis HealthCare Corp.*, 730 F. App'x 151, 162 (4th Cir. 2018) ("The 'intolerability' standard governing constructive discharge claims is more stringent than the 'severe and pervasive' standard for hostile work environment claims.").

### III. Discussion

#### A. The Ecology Motion

#### 1. The Sham Affidavit Rule

As a preliminary matter, Ecology challenges Hamilton's Declaration of July 15, 2019 (ECF 51-11).[10] In this regard, Ecology points out that several averments conflict with Hamilton's earlier sworn testimony. ECF 52 at 15. Therefore, Ecology urges the Court to disregard the Declaration, on the ground that it constitutes a sham affidavit. *Id.*

In particular, Ecology contends that the Declaration "contains new 'facts' that directly conflict with Hamilton's prior deposition testimony, her contemporaneous written text message, and Answers to Interrogatories submitted by the EEOC. . . ." *Id.* It points out that Hamilton did not testify at her deposition that she told Reach she resigned because of sexual harassment. *Id.* at 19-20. Yet, in the Declaration, Hamilton states for the first time that she told Reach on November 7, 2016, via a voice mail, that she quit because of Paz's sexual harassment. *Id.* at 19. *See* ECF 51-11, ¶ 7. The evidence of the voicemail, Ecology claims, cannot be confirmed, and "cannot be used to create a dispute of material fact." ECF 52 at 20.

In addition, Ecology complains that, in the EEOC's interrogatory responses, the EEOC did not identify Reach as someone with knowledge. *Id.* Further, as to the text message that Hamilton sent to her co-worker, Ecology asserts, *id.* at 19: "Most critically, the declaration does not state that the reason she gave Chris for quitting was not true. In fact there is absolutely nothing in the record where Hamilton contradicts or discusses her text message to Chris.[]"

---

[10] It is perplexing that the Declaration is titled "Declaration of Kristine Hamilton." ECF 51-11 at 2. Yet, in the suit and elsewhere, Ms. Hamilton's first name is spelled "Kristen."

Ecology also argues that Hamilton's Declaration contradicts her deposition testimony with respect to the amount she was paid when she worked for Community Taxi and Duran after quitting her job at Ecology. *Id.* at 24-25. Ecology contends that Hamilton had "absolutely no knowledge of the dates she worked or the amounts she earned at Community Taxi" and with Duran and United Van Lines. *Id.* at 24. Yet, in her Declaration, she claims she made $1,200 per month with Community Taxi and $1,600 per month with Duran, and the Declaration "makes no effort to explain [the] discrepancy with her deposition testimony. . . ." *Id.* at 25.

And, Ecology casts doubt on Hamilton's Declaration that she registered with Workforce West Virginia. ECF 52 at 28. According to Ecology, Hamilton never disclosed during her deposition that she had done so, and the EEOC had not disclosed her registration with the job referral service in its answer to Ecology's interrogatory concerning Hamilton's efforts to obtain employment. *Id.*

The EEOC disputes the characterization of Hamilton's Declaration as a "sham affidavit." ECF 57 at 1. It contends that the "'sham affidavit' rule is applied at the summary judgment stage only where there are 'flat contradictions of material fact between the affidavit and the deposition testimony." *Id.* (citing *Mandengue v. ADT Sec. Sys., Inc.*, ELH-09-3102, 2012 WL 892621, at *18 (D. Md. Mar. 14, 2012)).

The "sham affidavit rule" was articulated by the Second Circuit in *Perma Research & Development Co. v. Singer*, 410 F.2d 572, 578 (2d Cir. 1969). There, the court considered an affidavit in which Perma's president averred that a representative of Singer had told him that Singer never had any intention of performing on the contract at issue in the case. *See id.* at 577. At summary judgment, Perma advanced the affidavit. recounting this conversation as evidence of Singer's fraud. However, Perma's president had not previously mentioned the alleged conversation

in four days of deposition testimony, even though he had been directly questioned as to any evidence he possessed of Singer's intention not to perform the contract. *Id.* The Second Circuit affirmed the trial court's award of summary judgment to the defendant, stating that the trial court "could properly conclude that the statement made in the affidavit was less reliable than the contradictory statements in the deposition, and that it did not raise a triable issue of fraud." *Id.* (internal citation omitted). It reasoned: "If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Id.* at 578.

The Fourth Circuit adopted the rationale of *Perma* in *Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir. 1984), reasoning that a "genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct." Later, in *Cleveland v. Policy Management Systems Corp.*, 526 U.S. 795 (1999), the Supreme Court provided the following formulation of the sham affidavit rule, stating: "[A] party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity." *Id.* at 806 (emphasis added).

The Fourth Circuit has since reaffirmed that a party "may not avoid summary judgment by submitting contradictory evidence" with regard to earlier assertions. *Williams v. Genex Services, LLC*, 809 F.3d 103, 110 (4th Cir. 2015). Allowing a party to do so would "'greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.'" *Id.* (citing *Barwick*, 736 F.2d at 960).

Notably, "'[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'" *Okoli v. City of Baltimore*, 648 F.3d 216, 231 (4th Cir. 2011) (quoting *Anderson*, 477 U.S. at 255). In order to avoid infringing upon the province of the fact finder, application of the sham affidavit rule at the summary judgment stage must be carefully limited to situations involving flat contradictions of material fact. What the Ninth Circuit said in *Van Asdale v. International Game Technology*, 577 F.3d 989, 998-99 (9th Cir. 2009) (internal citation omitted), is salient:

> [T]he inconsistency between a party's deposition testimony and subsequent affidavit must be clear and unambiguous to justify striking the affidavit. Thus, "the non-moving party is not precluded from elaborating upon, explaining or clarifying prior testimony elicited by opposing counsel on deposition [and] minor inconsistencies that result from an honest discrepancy, a mistake, or newly discovered evidence afford no basis for excluding an opposition affidavit."

Hamilton stated in her Declaration that she left a voicemail for Reach, telling her that she quit because of sexual harassment. The EEOC points out that in Hamilton's deposition, she disclosed that she left a voicemail, but defense counsel never asked Hamilton about the content of the voicemail. ECF 57 at 2; *see* ECF 57-1 at 10. Thus, the EEOC insists that there is no contradiction. ECF 57 at 2. It also argues that its failure to include Reach in its interrogatory response "in no way prejudiced" Ecology, because Ecology itself had identified Reach as a person with knowledge. *Id.*

Further, the EEOC contends that "Hamilton's testimony regarding her earnings is consistent with the record as a whole." *Id.* In its view, Ecology bases its argument on "several short passages from Hamilton's deposition which are taken out of context," and concerned her employment with Community Taxi prior to her job at Ecology. *Id.* at 2-3.

The EEOC also argues that Workforce West Virginia is a job referral service, and Hamilton had not been asked at her deposition about registration with job referral services. Rather, she was

asked only if she applied for jobs. ECF 57 at 4. Therefore, the EEOC maintains that the Declaration is not contradictory. *Id.*

As indicated, the sham affidavit rule is directed, *inter alia*, at preventing a party from contradicting earlier sworn deposition testimony. Hamilton's Declaration and her deposition testimony are not flatly contradictory. The Declaration states that Hamilton left Reach a voicemail, "stating that [she] quit because Carlos Paz sexually harassed [her]." ECF 51-11, ¶ 12. The following exchange at Hamilton's deposition is pertinent, ECF 57-1 at 10:

> Q: You previously mentioned Robin from human resources. Did you ever talk to Robin from human resources about the fact that you had resigned your employment?
>
> A: I called that day and left a message.
>
> Q: And did Robin call you back?
>
> A: I can't remember if she did or not.

Defense counsel then refreshed Hamilton's memory by showing her Reach's email to Gibbs, in which Reach memorialized her conversation with Hamilton. ECF 51-2 at 58-60. However, counsel did not ask Hamilton about the content of the voicemail. Therefore, there is no contradiction between Hamilton's Declaration and her deposition testimony that would trigger application of the sham affidavit rule. Any discrepancy is a matter for the jury to weigh.

Nor does Hamilton's Declaration contradict her deposition testimony with respect to her pay when she worked for Community Taxi and Duran. At her deposition, Hamilton testified that she worked for Community Taxi "five days, Monday through Friday." ECF 51-2 at 61. She testified that she stopped working for Community Taxi in December 2016. *Id.* at 62. Her fares ranged from $7 to $60, and she kept 40%. ECF 57-1 at 7. She also contributed to the cost of fuel.

30

*Id.* In the Declaration, Hamilton averred that she "earned roughly $1,200 in cash a month" driving for Community Taxi. ECF 51-11, ¶ 13.

Hamilton testified that she stopped working for Community Taxi because she was "promised that [she was] going to work with United Van Lines with [Duran]." ECF 51-2 at 62. She began work with Duran in January 2017. *Id.* at 63. Hamilton worked "a couple of days" per week, *id.*, for which she was paid $100 per day. *Id.* at 4. This does not contradict her Declaration, however, in which she said that her "maximum earnings were $1600 a month." ECF 51-11, ¶ 23. And, while Hamilton stated twice at her deposition that she did not know how much money she earned while driving for Community Taxi, she appeared to be referring to the period when she drove for Community Taxi before working at Ecology. *See* ECF 57-1 at 7, 9. The Declaration, in which Hamilton discusses what she earned while working for Community Taxi after leaving Ecology, does not contradict these statements.

Hamilton's assertion in her Declaration that she registered with Workforce West Virginia (ECF 51-11, ¶ 14) does not flatly contradict her deposition testimony or the EEOC's response to Ecology's interrogatory. At her deposition, Hamilton stated that she was not actively looking for work while she waited to begin working for Duran. ECF 51-2 at 63-64. According to the EEOC, Workforce West Virginia did not require Hamilton to search for jobs; it contacted her if one became available. ECF 57 at 4.

Ecology's Interrogatory 11 asked, ECF 52-20 at 3-4:

Identify all efforts Hamilton has made to obtain employment (whether as an employee, independent contractor, or any other work arrangement) since the termination of her employment with ESI, and with respect to each such effort, identify the prospective employer/business entity/person, the date(s) of contact and/or application with each such employer/entity/person, the nature of each contact, the position sought and/or applied for, whether any offers of employment/engagement were extended to her, and, with respect to each such offer, describe the substance of the offer (i.e. employer/business/person, date of offer,

position, compensation, and benefits offered), whether Hamilton accepted the offer, and if she did not accept the offer, state the reason(s) why she did not accept the offer.

In its response, the EEOC stated: "Hamilton sought and obtained work as an independent contractor with a local cab company, a United Can Lines contractor and through Truck Movers." *Id.* at 4. The EEOC did not disclose Hamilton's efforts with Workforce West Virginia. But, the EEOC contends that because Workforce West Virginia did not result in any contacts with employers, such disclosure was not responsive to Ecology's interrogatory. ECF 57 at 4.

The interrogatory specified the information it sought with respect to Hamilton's job search: the names of prospective employers that were contacted, the dates of contact, the positions, whether any offers resulted, and whether Hamilton accepted those offers. According to the EEOC, registration with Workforce West Virginia resulted in no contact with employers. ECF 57 at 4. Therefore, Hamilton's statement in her Declaration is not squarely at odds with the EEOC's response to the interrogatory.

With respect to EEOC's failure to include Reach in its interrogatory responses as a person with knowledge of the facts of the case, Fed. R. Civ. P. 26(e) states, in relevant part:

(e) SUPPLEMENTING DISCLOSURES AND RESPONSES.
(1) *In General.* A party who has made a disclosure under Rule 26(a)—or who has responded to an interrogatory, request for production, or request for admission—must supplement or correct its disclosure or response:
(A) in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process in writing[.]

On August 13, 2018, Ecology responded to the EEOC's first set of interrogatories. ECF 57-2. In its response, Ecology identified Reach as a person "likely to have personal knowledge of any fact alleged in the Complaint or in [the] Amended Answer to the Complaint. . . ." *Id.* at 4-5.

32

Ecology indicated that Reach "has knowledge that Ms. Hamilton never complained to or notified her of any alleged sexual harassment by Carlos Paz until after Ms. Hamilton had resigned her employment, and that no complaint of any alleged sexual harassment of Ms. Hamilton was ever brought to her attention by Mr. Gaitan or any other manager, supervisor or employee of [Ecology]." *Id.* at 5. Therefore, it is difficult to see how the information Reach possessed had "not otherwise been made known" to Ecology during the discovery process. *See* Rule 26(e).

To be sure, many of the concerns identified by Ecology will provide very fertile ground for cross-examination of Hamilton at trial. However, in regard to the motions, I see no basis to apply the sham affidavit doctrine.

### 2. Constructive Discharge

As noted, a claim of constructive discharge arises when an employee resigns because the "circumstances of discrimination" made the employee's working conditions "'so intolerable that a reasonable person in the employee's position would have felt compelled to resign.'" *Green*, 136 S. Ct. at 1776 (quoting *Suders*, 542 U.S. at 148). To prove a claim for constructive discharge, the plaintiff must establish first that her working conditions were intolerable and, second, that she resigned because of those conditions. *Perkins*, 936 F.3d at 211-12 (citing *Green*, 136 S. Ct. at 1776).

Ecology seeks summary judgment as to the claim of constructive discharge. It argues that "there is absolutely no probative evidence. . .that the alleged harassment caused Hamilton to quit her job with Ecology." ECF 49-1 at 17. In its view, "the undisputed material facts unequivocally establish that Hamilton quit in anger over Gaitan's decision to suspend her for chronic tardiness and arguing with him over the prior workday's garden hose incident." *Id.*

In this regard, Ecology points to the text message that Hamilton sent to her co-worker, Chris, shortly after her conversation with Gaitan on November 7, 2016. There, she volunteered that she quit because Gaitan suspended her over her tardiness and the garden hose incident; she never mentioned Paz or any form of sexual harassment. *Id.* at 18. According to Ecology, Hamilton's contemporaneous text to Chris provided the true reason for which she left employment with Ecology, which was unrelated to sexual misconduct by Paz. *Id.* at 22-23. It also points to Gaitan's testimony that Hamilton quit because "she was mad" about being written up for her tardiness and the garden hose incident. *Id.* at 19.

According to Ecology, Hamilton "changed her story at her deposition in a transparent attempt to salvage a meritless claim." *Id.* at 20. The Company insists that "plaintiff's own conflicting accounts of operative facts cannot be used to create a genuine issue of material fact." *Id.*

In support of its position, Ecology relies, *inter alia*, on *Bello v. Bank of America*, 320 F. Supp. 2d 341 (D. Md. 2004), and *Church v. Maryland*, 180 F. Supp. 2d 708 (D. Md. 2002), *aff'd*, 53 Fed. App'x 673 (4th Cir. 2002) (per curiam). These cases are distinguishable, however.

In *Bello*, the plaintiff sued his former employer under Title VII and the Age Discrimination in Employment Act. At his deposition, the plaintiff asserted for the first time that he was told he had been "laid off" due to his age. *Bello*, 320 F. Supp. 2d at 349. Yet, on the day of his discharge, he had told his wife that he was given "'no reason'" for his termination. *Id.* The *Bello* Court (Davis, J.) concluded that the plaintiff's "report to his wife, as recounted in her affidavit, must be given controlling effect in this case" and thus plaintiff did generate a genuine dispute of material fact. *Id.*

*Church* involved claims of hostile work environment/sexual harassment and retaliation. The court (Davis, J.) granted the defendants' summary judgment motion. Of relevance here, the court noted that there were "glaring inconsistencies among the sworn EEOC testimony, the three deposition transcripts, and [the plaintiff's] affidavit." *Church*, 80 F. Supp. 2d at 743. As a result of the plaintiff's contradictory testimony and the plaintiff's lack of explanation for the inconsistencies, the *Church* Court concluded that her "story is 'internally inconsistent' and 'implausible' on its face so that a reasonable factfinder would not credit it." *Id.* (internal citation omitted). And, the *Church* Court noted that "'documents. . . composed before litigation would carry more conviction than a deposition, even though a deposition is given under oath.'" *Id.* (quoting *Seshardri v. Kasraian*, 130 F.3d 798, 801, 804 (7th Cir. 1997)).

Ecology argues that because the text message was virtually contemporaneous with Hamilton's resignation, it should be given "controlling weight." ECF 52 at 18. Further, Ecology characterizes EEOC's position that Hamilton omitted any reference to the sexual harassment in her text message because she felt "stupid," "embarrassed," and "cheap" as "[u]nsworn attorney argument." *Id.* Hamilton's Declaration, according to Ecology, fails to explain why she did not tell her co-worker about the alleged harassment. *Id.* at 19.

The EEOC contends that there is a genuine dispute of material fact concerning the claim of constructive discharge. In particular, it argues that unlike the disclosure of a husband to a wife in *Bello*, "Hamilton had good reason to keep the harassment private while saying good-bye to a co-worker." ECF 51-1 at 25. It points out that Ecology's Handbook recognizes that complaints of harassment should be kept confidential to the extent possible. *Id.* It also argues that "Hamilton complained of harassment to Defendant's human resources department shortly after she left the job site." *Id.* And, as noted, it submitted an email from Reach memorializing the conversation

with Hamilton on November 9, 2016, just two days after Hamilton's departure, in which Hamilton told Reach about the sexual harassment and claimed that she had reported it to Gaitan. ECF 51-2 at 67-68.

*Bello* is distinguishable. There, the court credited the contemporaneous assertion of Bello's wife, rather than Bello's subsequent, contradictory deposition testimony. 320 F. Supp. 2d at 349. In effect, the wife's assertion corroborated the denial of the defendants that they had discriminated against Bello due to his age. Bello's subsequent deposition testimony was found insufficient to create a genuine issue of material fact. In this case, however, the email from Reach supports Hamilton's claim that she promptly reported that she left the Company due to sexual harassment.

This case is also distinguishable from *Church*. There, the court noted that "testimony can and should be rejected without a trial if, in the circumstances, no reasonable person would believe it." 180 F. Supp. 2d at. 741-42. But, it is plausible that a person who had quit a job after being sexually harassed might not disclose the basis for leaving to a co-worker.

To be sure, the text message sent by Hamilton to her co-worker at the time of her departure from the Company is material. Ultimately, however, the fact-finder must decide its significance. Only the fact-finder can determine whether Hamilton failed to mention the sexual harassment in the text because it did not happen, or because it had nothing to do with her decision to quit, or, instead, whether to credit her explanation for her decision not to mention Paz's conduct. A jury could certainly conclude that Hamilton failed to mention Paz's conduct because it was not the basis for her decision to quit. But, it could also conclude otherwise.

Because there is a genuine dispute of material fact over the reason Hamilton quit on November 7, 2016, I will deny the Ecology Motion as to the claim of constructive discharge.

## 2.    Back Pay and Mitigation

Ecology deploys two arguments that Hamilton is not entitled to back pay. First, it contends that Hamilton is not entitled to back pay prior to March 9, 2017, "because the EEOC is unable to prove her monetary loss with even a modicum of reliability." ECF 49-1 at 25. According to Ecology, "even if Hamilton is found entitled to back pay, there are no figures to use in the formula to calculate any lost earnings during this period. . . In fact, with these two jobs combined, for which she was paid 'under the table,' Hamilton could have made more than she would have earned had she remained at Ecology." *Id.* at 26. Second, it posits that Hamilton failed to mitigate damages from the time she quit working at Ecology through March 8, 2017, when she started at TruckMovers. *Id.* at 27.

Back pay in Title VII cases is awarded at the discretion of the district court, "tested against" the statutory purposes of Title VII. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 421-22 (1975). The back pay provision of Title VII was meant to "give the courts wide discretion in exercising their equitable powers to fashion the most complete relief possible." *Id.* at 421.

The Fourth Circuit explained in *Dennis v. Columbia Colleton Medical Center, Inc.*, 290 F.3d 639, 651 (4th Cir. 2002):

> As a general rule, back pay is to be awarded to successful Title VII plaintiffs. *See Albemarle [Paper Co. v. Moody]*, 422 U.S. [405] at 421–22 [1975]. Back pay is awarded in furtherance of the objectives of Congress in enacting Title VII to create employer incentives to ensure equality of employment opportunities and to make persons whole for injuries suffered on account of unlawful discrimination. *Id.* at 418–19. Back pay "should be denied only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination." *Id.* at 421.

The "central statutory purposes" of Title VII include achieving equality of employment opportunities for those who are subjected to discrimination. *See Albermarle*, 422 U.S. at 418. An

award of back pay is meant to provide the "spur or catalyst which causes employers. . . to self-examine and to self-evaluate their employment practices. . . ." *Id.* And, a back pay award under Title VII is meant to "make persons whole for injuries suffered on account of unlawful employment discrimination." *Id.*; *see Crump v. United States Dept. of Navy*, 205 F. Supp. 730, 742 (E.D. Va. 2016) (collecting cases describing the remedy of back pay).

Hamilton testified that when she worked for Community Taxi, she was paid in cash and had no documentation of her earnings. ECF 57-1 at 8. Similarly, Hamilton was paid in cash and did not receive any tax documents detailing her earnings when she worked for Duran and United Van Lines. *Id.* at 4. Ecology characterizes the "lack of probative evidence regarding Hamilton's interim earnings from these jobs" as "fatal to the EEOC's request for back pay for the period from her voluntary resignation through March 8, 2017," when Hamilton began working for TruckMovers. ECF 49-1 at 27.

The EEOC maintains that "Hamilton's testimony is adequate proof of back pay." ECF 51-1 at 28. It also asserts that exact documentation is not required. And, it contends that Hamilton should be "permitted to testify on the subject of interim earnings and be subjected to cross examination on the issue." *Id.*

Hamilton's deposition testimony and her Declaration constitute evidence of her earnings during the time period between when she left Ecology and when she began working at TruckMovers. In awarding back pay damages, "exactitude is not required." *Hairston v. McLean Trucking Co.*, 520 F. 2d 226, 233 (4th Cir. 1975). To the contrary, Hamilton's testimony, if credited, is sufficient evidence, and it is certainly adequate to withstand summary judgment.

Ecology also disputes that Hamilton was diligent in her search for comparable work from the time she quit working at Ecology to when she was hired by TruckMovers. In its view, the position she obtained with Duran was not comparable to her job at Ecology.

According to Ecology, "after Hamilton quit her job with Ecology on November 7, 2016," and despite the lack of steady hours from either Community Taxi or Duran, Hamilton "made absolutely no effort to look for any steady employment comparable to Ecology until mid-February, 2017, when she submitted two applications—one with TruckMovers and the other Apple Valley Waste." ECF 49-1 at 29. Ecology Posits: "Hamilton cannot rely on the Duran position as mitigation of her damages because that casual work provided her only a fraction of the hours and wages she earned at Ecology, and thus, was not a comparable position." *Id.* Further, Ecology contends that Hamilton accepted the position with Duran before she "conducted any search for a position that would have been substantially equivalent to her job at Ecology." *Id.* at 29-30. Therefore, Ecology argues: "Hamilton did not engage in reasonable diligence to find a substantially equivalent position. . ." ECF 52 at 27. Further, Ecology insists that by registering with Workforce West Virginia, without other efforts to find comparable work, Hamilton did not "satisfy the duty to mitigate." *Id.* at 28-29.

The EEOC counters that Hamilton made reasonable, diligent efforts to obtain comparable employment after she ceased employment with Ecology. ECF 51-1 at 29. It notes that she has been continuously employed since she left Ecology. *Id.* By accepting the job with Duran in November 2016 and driving for Community Taxi while she waited for that work to begin, the EEOC maintains that Hamilton "continued to make arrangements for higher paying work while she was working at the cab company." *Id.* And, she had registered with Workforce West Virginia

in the hope that that agency would find suitable work. *Id.* at 30. These efforts, in the EEOC's view, satisfy Hamilton's duty to mitigate her damages. *Id.*

It appears undisputed that, ultimately, Hamilton found comparable employment. She was hired by TruckMovers in March 2017, where she appears to earn more than she did at Ecology. *See, e.g.*, ECF 49-5 at 2; ECF 49-7 at 2.

In terms of mitigation, the Fourth Circuit said in *Wagner v. Dillard Dept. Store, Inc.*, 17 F. App'x 141, 152-153 (4th Cir. 2001) (alteration in *Wagner*):

> The victim of an unlawful employment practice under Title VII may be entitled to back pay; however, "[i]nterim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable." 42 U.S.C.A. § 2000e–5(g)(1). Thus, a successful Title VII claimant has "a statutory duty to mitigate employer damages." *Brady v. Thurston Motor Lines, Inc.*, 753 F.2d 1269, 1273 (4th Cir. 1985). This duty requires the plaintiff to "make a reasonable effort to find other suitable employment." *Id.* A plaintiff who remains idle instead of seeking employment forfeits his right to back pay for the period during which plaintiff did not seek employment. *See id.*; *Miller v. AT & T Corp.*, 250 F.3d 820, 838 (4th Cir.2001). A failure to mitigate claim is an affirmative defense for which the employer bears the burden of proof. *See Miller*, 250 F.3d at 838.

When determining whether employment is comparable, courts assess factors such as salary, status, and opportunity for advancement. *Williams v. Albemarle City Bd. of Ed.*, 508 F.2d 1242, 1243 (4th Cir. 1974). An employer ordinarily must come forward with evidence that comparable work is available, unless the employer can demonstrate that the plaintiff "made no reasonable attempt to find work." *Wagner*, 17 F. App'x at 153–54. However, "[o]btaining a part-time job ... satisfies Plaintiff's obligation to mitigate damages absent a showing by [the defendant] that this action was not in good faith." *Ford v. Rigidply Rafters, Inc.*, 984 F.Supp. 386, 390 (D. Md. 1997) (citing *Donnelly v. Yellow Freight Sys., Inc.*, 874 F.2d 402, 411 (7th Cir.1989)).

The record reflects that Hamilton immediately started stop-gap work with Community Taxi. This mitigated her losses. *See Ford*, 984 F. Supp. at 390. And, she accepted the job with Duran on the understanding that it would be comparable to her job at Ecology. When Hamilton realized she was not getting the volume of work from Duran that she had expected, she again began applying for suitable employment and quickly obtained another position.

Ecology points to jobs available in the relevant time frame that it contends would have been comparable. ECF 52-22. But, it overlooks the evidence that Hamilton thought she had already obtained a comparable job. I cannot conclude, as a matter of law or fact, that Hamilton's efforts to obtain comparable employment were not reasonable, or that she was idle in searching for comparable work. Again, this is a jury question.

Therefore, I will deny Ecology's motion for summary judgment as to back pay and mitigation.

## B. The EEOC Motion

The EEOC contends that Ecology discriminated against Hamilton "with respect to. . . terms, conditions, or privileges of employment, because of [her] sex." 42 U.S.C. § 2000e–2(a)(1). It has moved for summary judgment as to the fourth element of its Title VII sexual harassment claim, *i.e.*, that Paz's harassment of Hamilton is imputable to Ecology. ECF 51-1 at 18. It has also moved for summary judgment on Ecology's tenth affirmative defense, the *Faragher-Ellerth* defense. *Id.* at 22. But, Ecology has abandoned that defense.

In the years since Title VII's enactment, the Supreme Court has made clear that discrimination on the basis of sex may be manifest in a variety of ways. An employer discriminates on the basis of sex, for example, when it has different hiring criteria for men and women that are not related to a bona fide occupation qualification. *See Phillips v. Martin Marietta Corp.*, 400 U.S.

542, 544 (1971) (per curiam) ("The Court of Appeals therefore erred in reading [Title VII] as permitting one hiring policy for women and another for men—each having pre-school-age children."). Sexual harassment, such as "'[u]nwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature'", may also constitute sex-based discrimination. *Meritor Sav. Bank, FSB*, 477 U.S. at 65 (quoting 29 CFR § 1604.11(a) (1985)). This is so regardless of whether the harasser and the victim are of the opposite or same sex. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 82 (1998) ("[S]ex discrimination consisting of same-sex sexual harassment is actionable under Title VII ...).

In this case, the EEOC asserts a claim for hostile work environment based on sexual harassment. As discussed earlier, the plaintiff "must prove that (1) the subject conduct was unwelcome; (2) it was based on the sex of the [employee]; (3) it was sufficiently severe or pervasive to alter the [employee's] conditions of employment and to create an abusive work environment; and (4) it was imputable on some factual basis to the employer." *Spicer v. Com. Of Va., Dept. of Corrections*, 66 F.3d 705, 710 (4th Cir. 1995) (citing *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 20 (1993)); *see Perkins*, 936 F.3d at 207-08 (citing *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003)); *accord Ray*, 909 F.3d at 667; *Irani v. Palmetto Health*, 767 F. App'x 399, 416 (4th Cir. 2019) (per curiam); *Strothers*, 895 F.3d at 328; *Boyer-Liberto*, 786 F.3d at 277.

The first element, unwelcome conduct, does not present "a high hurdle." *Strothers*, 895 F.3d at 328. The Fourth Circuit has explained that "an employee can demonstrate that certain conduct is unwelcome simply by voicing her objection to the alleged harasser or to the employer." *Id.* at 328-29. Moreover, "the nature of the conduct may indicate whether or not the conduct is unwelcome." *Id.* at 329.

42

To satisfy the second element of a hostile work environment claim, the plaintiff must demonstrate that she was harassed or otherwise discriminated against "because of" her protected class. 42 U.S.C. § 2000e–2; *see also Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 331 (4th Cir. 2003) (en banc), *cert. denied*, 540 U.S. 1177 (2004); *Smith v. First Union Nat. Bank*, 202 F.3d 234, 242 (4th Cir. 2000). The plaintiff may satisfy this burden by showing that, "but for" her protected class, she would not have suffered discrimination. *Smith*, 202 F.3d at 242. But, "harassment due to personality conflicts will not suffice. Some persons, for reasons wholly unrelated to [the plaintiff's protected class], manage to make themselves disliked." *Ziskie v. Mineta*, 547 F.3d 220, 226 (4th Cir. 2008).

As to the third element of a hostile work environment claim, a hostile work environment exists when the "'workplace [is] permeated with discriminatory intimidation, ridicule, and insult[.]'" *Boyer-Liberto*, 786 F.3d at 281 (some quotations and citation omitted) (quoting *Jordan v. Alt. Res. Corp.*, 458 F.3d 332, 339 (4th Cir. 2006)); *see Harris*, 510 U.S. at 21; *Nnadozie*, 730 F. App'x at 158. The Fourth Circuit has stated that the plaintiff must allege that "the environment would reasonably be perceived, and is perceived, as hostile or abusive." *Boyer-Liberto*, 786 F.3d at 277 (citing *Harris*, 510 U.S. at 22).

The "severe or pervasive" requirement has both subjective and objective components. *See Harris*, 510 U.S. at 21-22; *Perkins*, 936 F.3d at 207-08; *Strothers*, 895 F.3d at 331; *EEOC. v. Cent. Wholesalers Inc.*, 573 F.3d 167, 175 (4th Cir. 2009). And, "[w]hether the environment is objectively hostile or abusive is 'judged from the perspective of a reasonable person in the plaintiff's position.'" *Boyer-Liberto*, 786 F.3d at 277 (quoting *Oncale*, 523 U.S. at 81); *see Irani*, 767 F. App'x at 416; *Nnadozie*, 730 F. App'x at 158. However, the plaintiff does not need to

demonstrate that the work environment is "psychologically injurious." *Boyer-Liberto*, 786 F.3d at 277.

Notably, "viable hostile work environment claims often involve repeated conduct. . . . because, 'in direct contrast to discrete acts, a single act of harassment may not be actionable on its own.'" *Boyer-Liberto*, 786 F.3d at 277 (citation omitted); *see Irani*, 767 F. App'x at 416. But, "an 'isolated incident[]' of harassment can 'amount to discriminatory changes in the terms and conditions of employment,' if that incident is 'extremely serious.'" *Boyer-Liberto*, 786 F.3d at 277 (alterations in original) (citation omitted).

The Court stated in *Perkins*, 936 F.3d at 208: "'[W]hen determining whether the harassing conduct was objectively severe or pervasive, we must look at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" (alteration in original) (quoting *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315-16 (4th Cir. 2008)). However, "'simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.'" *Perkins*, 936 F.3d at 208 (quoting *Faragher*, 524 U.S. at 788). Likewise, the "'[m]ere utterance of an . . . epithet which engenders offensive feelings in an employee' does not sufficiently affect the conditions of employment[.]" *Boyer-Liberto*, 786 F.3d at 277 (quoting *Harris*, 510 U.S. at 21) (other citations omitted). And, "complaints premised on nothing more than rude treatment by [co-workers], callous behavior by [one's] superiors, or a routine difference of opinion and personality conflict with [one's] supervisor, are not actionable under Title VII." *Sunbelt Rentals*, 521 F.3d at 315-16 (internal quotation marks and citations omitted); *see Nnadozie*, 730 F. App'x at 161-62.

44

Moreover, "[i]n measuring the severity of harassing conduct, the status of the harasser may be a significant factor—e.g., a supervisor's use of [a racial epithet] impacts the work environment far more severely than use by co-equals." *Boyer-Liberto*, 786 F.3d at 278 (citation omitted); *see also E.E.O.C. v. Fairbrook Med. Clinic, P.A.*, 609 F.3d 320, 329 (4th Cir. 2010) ("When evaluating the context in which harassment takes place, we have often focused on the 'disparity in power between the harasser and the victim.'") (citation omitted); *Jennings v. Univ. of N.C.*, 482 F.3d 686, 697 (4th Cir. 2007) (en banc) ("Any age disparity between the harasser and his victim is also relevant to gauging whether there was a hostile or abusive sexual environment.").

At bottom, the determination as to "severe and pervasive" is not, and "'by its nature cannot be, a mathematically precise test.'" *Boyer-Liberto*, 786 F.3d at 277 (quoting *Harris*, 510 U.S. at 22). Consequently, "no single factor is dispositive, as the real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Sunbelt Rentals*, 521 F.3d at 315 (quoting *Harris*, 510 U.S. at 23, and *Oncale*, 523 U.S. at 81-82) (cleaned up).

The EEOC concedes that there are disputes of material fact as to the first three elements of the hostile work environment claim. But, it seeks summary judgment as to the fourth element. In the EEOC's view, Ecology had an affirmative duty to prevent harassment. ECF 53 at 2. And, the EEOC insists that Ecology "was negligent as a matter of law" because it "took no meaningful steps to prevent harassment." ECF 51-1 at 18. Therefore, the EEOC insists that there is no dispute of material fact as to whether Paz's conduct is imputable to Ecology because Ecology was "negligent in controlling the working conditions." *Id.*

In support of this contention, the EEOC argues that Ecology did not provide Hamilton with a copy of the Handbook. *Id.* at 19. It also contends that Ecology was negligent because it did not provide its Spanish-speaking employees with a Spanish translation of the Handbook. *Id.* at 20. And, the EEOC posits that Ecology was negligent because it provided no training to its managers and supervisors regarding sexual harassment. *Id.* at 21.

"'If the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions.'" *Boyer-Liberto*, 786 F.3d at 278 (quoting *Vance*, 570 U.S. at 424); *see also Ocheltree*, 335 F.3d at 333-34 ("In a case where an employee is sexually harassed by a coworker, the employer may be liable in negligence if it knew or should have known about the harassment and failed to take effective action to stop it."). Under this standard, an employer may be charged with constructive knowledge of co-worker harassment when it fails to provide reasonable procedures for victims to register complaints. *Ocheltree*, 335 F.3d at 333–34 (citing *Richardson v. N.Y. State Dep't of Corr. Serv.*, 180 F.3d 426, 441 (2d Cir.1999); *Wilson v. Tulsa Junior Coll.*, 164 F.3d 534, 540–42 (10th Cir.1998)).

The EEOC points to the following dicta in *Vance*, 570 U.S. at 448-49, in which the *Vance* majority addressed the dissent of Justice Ginsburg, stating:

> Assuming that a harasser is not a supervisor, a plaintiff could still prevail by showing that his or her employer was negligent in failing to prevent harassment from taking place. Evidence that an employer did not monitor the workplace, failed to respond to complaints, failed to provide a system for registering complaints, or effectively discouraged complaints from being filed would be relevant.

This language, the EEOC argues, supports its contention that employers have an affirmative duty to prevent harassment. ECF 53 at 3. It maintains that because Ecology failed to distribute the Handbook effectively and failed to train its managers, it breached that duty and was therefore negligent, regardless of its actual or constructive knowledge of the harassment.

46

According to the EEOC, because of this affirmative duty, the standard is the same as in cases of harassment by a supervisor, and Ecology can be held liable for its negligence in failing to prevent the sexual harassment. ECF 53 at 4.

Ecology agrees that the standard here is one of negligence. ECF 52 at 6. However, Ecology contends that the standard for negligence in cases where there are allegations of co-worker harassment is only triggered once the employer has notice of the harassment. *Id.* at 8. The Company asserts that the "negligence standard for coworker harassment focuses only on the employer's *response* to harassment that has occurred, and whether, after actual or constructive knowledge of the harassment, the employer took prompt and adequate action to stop it." *Id.* at 9 (emphasis in brief).

The Fourth Circuit's recent decision in *Clehm v. Bae Systems Ordnance Systems, Inc.*, 786 F. App'x 391 (4th Cir. 2019) (per curiam), is instructive. There, the trial court awarded summary judgment to the employer as to Title VII retaliation and hostile work environment claims. *Id.* at 393. In affirming, the *Clehm* Court stated: "[Plaintiff] has not made the showing—required because she was sexually assaulted and harassed by her co-workers, rather than supervisors—that [the employer] 'knew or should have known about the harassment and failed to take effective action to stop it.'" *Id.* at 394 (citing *Ocheltree*, 335 F.3d at 333-334). The well established standard in the Fourth Circuit is that the employer must have actual or constructive knowledge of the harassment.

Whether Ecology had actual or constructive knowledge of Hamilton's harassment claims is a material matter and one that is vigorously disputed. Hamilton claims she reported the harassment to Gaitan twice; Gaitan denies that she did so. Paz denies the wrongful conduct. This

presents a quintessential credibility determination, which is not appropriate for resolution by the court on summary judgment.

Moreover, Ecology issued an express written policy, contained in the Handbook, which prohibits sexual harassment. *See* ECF 51-5 at 20. The distribution of an anti-harassment policy provides "compelling proof" that the company exercised reasonable care in preventing and correcting harassment. *Barrett v. Applied Radiant Energy*, 240 F.3d 262, 266 (4th Cir. 2001). To refute this evidence, a plaintiff must show, by a preponderance of the evidence, that the policy was administered in bad faith or that it was otherwise defective or dysfunctional. *Id.*

Ecology did not make the Handbook available in Spanish to its Spanish-speaking employees, who comprised a minority of the work force. However, there is evidence that the workers who spoke Spanish were provided with the use of a translation app in order to understand the content of the Handbook. Moreover, Gaitan, who is able to speak Spanish, sometimes reviewed the Handbook with those employees who spoke Spanish. In addition, there is conflicting evidence as to signage posted by the employer concerning harassment.

There is also a dispute of fact surrounding Ecology's distribution of the Handbook as to Hamilton. Ecology points to the signature page it produced in August 2019 as evidence that Hamilton was given a copy of the Handbook when she began working for the Company. Conversely, the EEOC contends that there is no evidence in the record to support Ecology's contention that Hamilton received the Handbook, because Ecology has not produced a signed acknowledgment page for the correct version of the document. ECF 53 at 6. This dispute is not particularly significant.

Even if Hamilton did not receive the Handbook, she certainly understood that the conduct was inappropriate. And, if her version of events is credited, she would have known to report such

conduct, because she claims that she twice reported the conduct to Gaitan, her supervisor. As for Ecology's alleged failure to train, it does not bear on whether Ecology had actual knowledge of the alleged harassment by Paz.

Accordingly, I shall deny the EEOC's motion for summary judgment as to the fourth element of the hostile work environment claim.

## IV. Conclusion

For the aforementioned reasons, I shall grant the Ecology Motion in part and deny it in part. And, I shall grant the EEOC Motion in part and deny it in part.

An Order follows.

Date: March 19, 2020                          /s/
                                    Ellen L. Hollander
                                    United States District Judge