IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
BALTIMORE DIVISION

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) ) ) ) | Civil Action: 1:18-cv-01065-ADC |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| ECOLOGY SERVICES, INC., | ) ) | |
| Defendant. | ) ) | |
| _____ | ) | |

## PRETRIAL ORDER

The parties to this action, through their undersigned counsel, have submitted this pretrial

order pursuant to Local Rule 106.4(a).

### I. EEOC's Statement of Facts and Legal Theories Regarding EEOC's Claims

### A. Statement of Facts

Kristen Hamilton began working for Defendant, Ecology Services Inc., (ESI or

Defendant) as a garbage truck driver on May 25, 2016. Defendant contracts with local

governments and other entities to collect residential trash, yard waste and recycling. Hamilton's

job was to drive a garbage truck through collection routes and deliver the collected materials to a

county landfill at the end of the day.

When driving her routes, Hamilton worked with one or two, but on rare occasions three,

helpers who rode on the back of the truck and emptied the garbage cans and recycling containers

into the truck. When the truck is on the highway between routes the helpers ride in the cab of the

truck. The helpers are generally male. Many of the helpers are Hispanic, and speak only Spanish, not English.

Defendant does not provide training on sexual harassment. Its sole mechanism for preventing harassment is to distribute an employee handbook with a sexual harassment policy and to put up a poster. The policy is not available in Spanish even though many of the helpers cannot read English. Other work rules are explained in English and Spanish. Defendant's sexual harassment policy states that employees should report harassment to a supervisor. Employees may also report harassment to human resources but Defendant' policy does not contain the necessary contact information. Managers, though designated by the policy to receive complaints, are not trained on harassment other than receiving a reiteration of the policy. The managers are, however, aware that sexual harassment is a violation of federal law.

Hamilton's manager, Marvin Gaitan, assigned her to a Mack truck because he believed that women could not handle large trucks and it was smaller than the other trucks Defendant operated. Gaitan usually assigned Hamilton to work with Carlos Paz, an experienced helper who, unlike Hamilton, knew all the turns for the collection routes. Paz speaks limited English. He never saw the employee handbook, and in any event could not read it because it was in English. He received no training on sexual harassment and is not familiar with the English term "sexual harassment." Nevertheless, at Defendant's request Paz executed a signature page falsely stating that he understood the sexual harassment policy.

Hamilton frequently worked alone with Paz and initially experienced no problems with him. In fact, he had even lent her money, which she repaid. Shortly thereafter, Paz began

remarking to Hamilton about her body, commenting on her breasts and buttocks at least two to three times a week.

Because Hamilton was unfamiliar with the collection routes, Defendant assigned her to work with Paz who knew the routes. Hamilton relied on Paz to use hand signals to tell her where to turn and so was routinely watching Paz in her mirrors. Paz took advantage of the situation, making, on a daily basis, obscene gestures at Hamilton through the mirrors. Paz made additional gestures at Hamilton while they rode together in the cab of the truck. When Hamilton repeatedly told Paz to stop, he simply laughed.

Following Hamilton's repayment of her loan from Paz, beginning in July 2016, Paz offered her money for sex on several occasions. His behavior soon escalated to physical acts when he began touching Hamilton's breasts, sometime in July or August 2016. The physical acts intensified when, in early September 2016, Paz and Hamilton were driving alone on Route 15 in Frederick County, Maryland. Paz was in the passenger seat, separated from the driver's seat by a hump which is roughly as wide as the driver's seat and is slightly higher than the bottom of the steering wheel. Paz climbed onto the hump, exposed his penis, grabbed Hamilton's right hand off the wheel and put her hand on his penis. Hamilton punched Paz and knocked him off the hump.

Roughly a week later on September 15, 2016, Hamilton witnessed a different helper urinate in the back of the garbage truck she was driving. She reported this incident via text to her supervisor Gaitan and followed up in person a few days later. During this in-person conversation she also reported to Gaitan Paz's harassment. Hamilton advised that she did not want to be assigned to work alone with Paz. Gaitan assured her that he would talk to Paz. Hamilton, who

had not been trained on Defendant's sexual harassment policy, did not press the issue further because she was concerned that she would lose her job by complaining too much. Further, she trusted in Gaitan's assurance that he would address the matter.

Defendant's sexual harassment policy states that employees should report harassment to a supervisor. Although Hamilton did not know this, Defendant's claimed practice after receiving a complaint of harassment is to separate the complainant and the alleged harasser while the matter is investigated. After Hamilton's first complaint, however, Gaitan continued to assign her to work alone with Paz, and Paz continued to make sexual comments and gestures. Hamilton would tell Paz to stop but he would just laugh. Paz exposed his genitals and forced Hamilton to touch his penis a second time in the second week of October 2016. The second exposure was nearly identical to the first. After the second genital exposure Hamilton slapped Paz across the face.

During the third week of October 2016, Randy Sellers and Zoe Hicks, both friends of Hamilton, began working as helpers for Defendant. During his first week, Sellers was assigned to work with Paz and Hamilton. While riding in the cab with Paz and Hamilton he saw Paz make a gesture like he was masturbating onto Hamilton and then he saw him try to grab her breast. Sellers confronted Paz when they returned to the yard, but Paz acted like it was a joke.

On October 21, 2016, Hamilton again complained to Gaitan about Paz's sexual harassment. Hicks, who was waiting on Hamilton for a ride home, was nearby and overheard Hamilton's complaint and its details to Gaitan. Gaitan again stated that he would talk to Paz and take care of it, but Hamilton's assignment to work with Paz continued. On October 26, 2016 Hicks was assigned to work with Hamilton and Paz. While riding in the cab, Hicks witnessed

38757471.2

Paz's masturbatory and oral sex gestures towards Hamilton and his requests for sex. He also caressed Hamilton's shoulder as she drove. Hamilton was again assigned to work with Paz on November 2 and 3, 2016. Paz continued his sexually charged advances toward Hamilton throughout the workday.

Paz's conduct, and Gaitan's disregard, caused Hamilton to feel embarrassed, cheap, degraded, and depressed. As a result, she has feared that other men similarly regard her as a sexual object. Since the time of Paz's harassment, she has worn baggy clothing to conceal her appearance. She also now slouches when she walks to make her breasts less prominent. She has become emotionally distant, suffered from low self-esteem, and become distrustful of men.

On Friday November 4, 2016, while driving an unfamiliar route in Carroll County with a helper from a different company, Hamilton and the helper argued over whether a garden hose could be taken to the recycling facility. The helper was unwilling to finish the route, so Hamilton called Gaitan who criticized her and told her to finish the route. On the following workday, Monday November 7, 2016, Hamilton notified Gaitan that she would be late to work that day. Upon her arrival, Gaitan issued her a written discipline for lateness. Gaitan also revisited Hamilton's argument over the garden hose. Hamilton responded that Gaitan's anger over a garden hose and tardiness was unfair in light of his unwillingness to stop Paz's harassment. Following this discussion, Gaitan advised Hamilton that her helper that day would be Paz. Hamilton responded that she would not work alone with Paz, after which Gaitan directed her to go home. Hamilton left the yard and sent Gaitan a text message confirming that she quit.

Shortly after leaving the Frederick yard, Hamilton called Defendant's offices and left a message stating that she had been sexually harassed. Two days later Robin Reach at Cordoba

returned Hamilton's call. Hamilton told Reach about the harassment. Reach then sent an email to Margaret Gibbs, the Director of Human Resources, informing her that Hamilton had reported sexual harassment. The email left out many of the details Hamilton had provided to Reach. Gibbs discussed the matter with Gaitan but did not otherwise investigate the harassment. Paz was not interviewed or disciplined and continued to work with female employees.

Leaving Defendant to protect herself from further harassment caused Hamilton to suffer a loss of income. Hamilton worked for Defendant from May 25, 2016 until November 7, 2017, and in those five and a half months earned $16,920, or $3,076.36 a month. Hamilton immediately went to work as a cab driver but earned at most $1200 a month for the months of November and December 2016. She lined up an opportunity to work for Chris Duran, a subcontractor for United Van Lines, but there was a delay in commencing work while the owner of the company sought insurance. The job offered a signing bonus which Hamilton hoped would be paid by Christmas 2016, but the bonus never materialized. Duran was able to operate by January 2017, but Hamilton earned at most $1600 a month and by mid-February, based on the delays and inconsistent workload, Hamilton stopped working with Duran. Hamilton earned $500 working with Duran in early February 2017. During this period Page Looney, Hamilton's friend and Defendant's former office manager, helped Hamilton find work by texting her suggestions for places to look. By mid-February of 2017 Hamilton secured a position as a truck driver with Truck Movers. Work with Truck Movers was not available until March, and Hamilton's March earnings totaled only $1294.76. Her April earnings were comparable to her wages with Defendant ending the backpay period. Her total back pay is:

| Period | Lost Wages | Offsetting Earnings | Backpay Amount | Interest |
|---|---|---|---|---|
| November 2016 [4Q 2016] | $2,307.27 [$3,076.36 x .75] | $900 [$1,200 x .75] | $1,407.27 | $305.35 |
| December 2016 [4Q 2016] | $3,076.36 | $1,200 | $1,876.36 | $407.14 |
| January 2017 [1Q 2017] | $3,076.36 | $1,600 | $1,476.36 | $302.56 |
| February 2017 [1Q 2017] | $3,076.36 | $500 | $2,576.36 | $527.98 |
| March 2017 [1Q 2017] | $3,076.36 | $1,294.76 | $1,781.60 | $365.11 |

Backpay = $9,117.95
Interest on Backpay = $1,908.14
**Total Award = $11,026.09**

### B. Legal Theories

### 1. Hostile Work Environment Sexual Harassment

Defendant subjected Kristen Hamilton to a sexually hostile and offensive work environment, in violation of Section 703(a) of Title VII, 42 U.S.C. § 2000e-2(a). Title VII forbids an employer from discriminating on the basis of sex with respect to terms, conditions, or privileges of employment. *See* 42 U.S.C. §§ 2000e-2(a)(1). Such discrimination includes subjecting an employee, because of a protected characteristic such as the employee's sex, to a workplace permeated with unwelcome "discriminatory intimidation, ridicule, and insult" that is "sufficiently severe or pervasive to alter the conditions of [the victim's] employment and create a[] [hostile or] abusive working environment." *Meritor Sav. Bank, FSB, v. Vinson*, 477 U.S. 57, 65-67 (1986); *see also Harris v. Forklift Sys., Inc*., 510 U.S. 17, 22 (1993). To establish a claim for hostile environment sexual harassment under Title VII, a plaintiff must prove that (1) the conduct was unwelcome; (2) it was based on the sex of the plaintiff; (3) it was sufficiently severe

7

or pervasive to alter the plaintiff's conditions of employment and to create an abusive working environment; and (4) it was imputable on some factual basis to the employer. *See Spicer v. Virginia,* 66 F.3d 705, 710 (4th Cir. 1995). The evidence presented at trial will establish each of these elements.

a.    <u>The conduct was unwelcome</u>.

The Plaintiff meets its burden of proving unwelcomeness by demonstrating that the harassment victim indicated that the conduct was unwelcome. *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 68, 106 S. Ct. 2399, 2406, 91 L. Ed. 2d 49 (1986). Simply indicating to managers or co-workers that the conduct is offensive is sufficient evidence of unwelcomeness. *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 314 (4th Cir. 2008) (holding that the victim's complaints to management and co-workers were sufficient evidence of unwelcomeness). Hamilton repeatedly expressed to Paz that his conduct was unwelcome by telling him to stop and by slapping and punching him. She also reported his conduct to Gaitan and requested that Gaitan take actions to stop the harassing conduct. This is more than adequate evidence that the conduct was unwelcome.

b.    <u>The conduct was based on sex</u>.

Courts have held that comments on female body parts are sufficient evidence that the conduct is based on sex. *Miller v. Washington Workplace, Inc.*, 298 F. Supp. 2d 364, 374 (E.D. Va. 2004) (holding that harasser's comments about female body parts demonstrated that conduct was based on sex); *Smith v. First Union Nat. Bank*, 202 F.3d 234, 242 (4th Cir. 2000) (holding that Plaintiff sufficiently alleged that harassment was based on gender by pleading that harasser's comments had derogatory and explicit references to women). Indecent exposure and urinating in

8

the presence of female employees has also been held to be conduct based on sex. *Von Gunten v. Maryland Dep't of Env't*, 68 F. Supp. 2d 654, 660 (D. Md. 1999), *aff'd sub nom. Von Gunten v. Maryland*, 243 F.3d 858 (4th Cir. 2001) (holding that conduct was based on sex where harasser urinated in the presence of a female co-worker). Paz's touching of Hamilton's breasts and buttocks as well of his offers to pay her for sex, further demonstrate that the conduct is based on sex.

      c.      <u>Paz's Conduct was Sufficiently Severe or Pervasive to Alter Hamilton's Conditions of Employment and Create an Abusive Working Environment</u>.

"A court must look at all the circumstances to determine whether a work environment is hostile or abusive. These circumstances include: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance." *Smith v. First Union Nat. Bank,* 202 F.3d 234, 242 (4th Cir. 2000), *citing Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 23 (1993). All four factors are present in this case.

      Courts have held that conduct of the type engaged in by Paz - repeated sexual comments, repeated offers for sex, groping and indecent exposure - constitute severe or pervasive harassment. *See Okoli v. City of Baltimore*, 648 F.3d 216, 221 (4th Cir. 2011) (repeated propositioning, physical touching); *Mosby–Grant v. City of Hagerstown,* 630 F.3d 326, 336 (4th Cir.2010) (gender-based language, songs, and comments; *Smith v. First Union Nat'l Bank,* 202 F.3d 234, 243 (4th Cir.2000) (repeated remarks that belittled employee because she was a woman). "Furthermore, exposing oneself in public not only falls well outside the bounds of common decency, but also borders the criminal." *Franklin v. King Lincoln-Mercury-Suzuki, Inc.*, 51 F. Supp. 2d 661, 665 (D. Md. 1999); *EEOC v. The Winning Team, Inc.*, No. CIV 1:07CV310,

2008 WL 4596251, at *4 (W.D.N.C. Oct. 14, 2008) (holding that exposing genitals is severe for the purposes of sexual harassment analysis).

      d.     <u>Paz's Conduct is Imputable to Defendant</u>.

Paz was Hamilton's co-worker. When the harasser is a co-worker, an employer may be found liable "for [its] own negligence in failing, after actual or constructive knowledge [of the harassment], to take prompt and adequate action to stop it." *Mikels v. City of Durham, N.C.,* 183 F.3d 323, 332 (4th Cir.1999). An employer is charged with actual notice of harassment when the harassment is reported to a supervisor. *Carson v. Giant Food, Inc.*, 187 F. Supp. 2d 462, 480 (D. Md. 2002), *aff'd sub nom. Skipper v. Giant Food Inc.*, 68 F. App'x 393 (4th Cir. 2003) (holding that employer had actual knowledge of co-worker harassment even though the harassment was reported to a supervisor and not a specified officer of the company as required by company policy); *Harris v. L & L Wings, Inc.*, 132 F.3d 978, 982 (4th Cir. 1997) (holding that report to harasser's manager is sufficient to charge defendant with actual knowledge).

Defendant's harassment policy provides that employees should report harassment to their supervisor. Hamilton first reported harassment to Gaitan, her supervisor, after the first exposure incident. Although Cordoba's practice is to separate the complainant from the harasser pending an investigation, Gaitan took no action and continued to assign Hamilton to work with Paz. Paz did not relent and continued to make sexual comments and gestures, touched Hamilton's breast and again exposed himself and forced Hamilton's hand onto his penis. Hamilton complained to Gaitan a second time on October 21, 2016. Gaitan again took no action and continued to assign Hamilton to work with Paz, who continued the harassment.

2.      **Constructive Discharge**

Hamilton quit because of the harassment. She reported the harassment to Gaitan twice, but he took no action while instead holding her strictly accountable for a mistaken belief about recycling a garden hose and a late arrival — matters far less serious than the sexual harassment directed against her. Further, Hamilton quit only after being directed to go home precisely because she had refused still another assignment to work alone with Paz. Also, the day Hamilton quit she elevated her reports of harassment to Human Resources.

Constructive discharge is established by showing that the defendant's discrimination made the employee's working conditions "so intolerable that a reasonable person in the employee's position would have felt compelled to resign." *Green v. Brennan*, ⸺ U.S. ⸺, 136 S. Ct. 1769, 1776 (2016) (quoting *Pa. State Police v. Suders*, 542 U.S. 129, 148 (2004)). The test is whether a reasonable person in the employee's position would have felt compelled to resign. *Green*, 136 S. Ct. at 1777. "In assessing intolerability, the frequency of the conditions at issue is important." *Evans v. Int'l Paper Co.*, 936 F.3d 183, 193 (4th Cir. 2019) (citing *Amirmokri v. Balt. Gas & Elec. Co.*, 60 F.3d 1126, 1132 (4th Cir. 1995)). "The more continuous the conduct, the more likely it will establish the required intolerability. On the other hand, when the conduct is isolated or infrequent, it is less likely to establish the requisite intolerability." *Evans*, 936 F.3d at 193. Hamilton experienced harassment continuously between late June through November 7, 2016. This matter is analogous to *Lopez v. BMA Corp.*, where the plaintiff suffered sexual harassment from a co-worker who repeatedly made sexual advances toward her. No. CIV.A. DKC 13-2406, 2013 WL 6844361, at *2 (D. Md. Dec. 24, 2013). She complained to her managers, but no action was taken. *Id.* The defendant also managed the plaintiff's assignments

in a way that continued her required interaction with the harasser. *Id.* The Court held that these facts supported a claim for constructive discharge. *Id.*

### 3.   Damages

a.   <u>An Award of Back Pay for Hamilton is Warranted</u>.

Hamilton suffered a loss of income when she quit working for Defendant to avoid further harassment. The plaintiff in a Title VII case is generally entitled to back pay "as a matter of course." *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 420 (1975). The purpose of Title VII is to combat discrimination and "to make persons whole for injuries suffered on account of unlawful employment discrimination." *Id.* at 417-18. Back pay is an equitable remedy and it is "the historic purpose of equity to secur[e] complete justice." *Id.* at 418 (internal citations omitted). The provisions of Title VII "are intended to give the courts wide discretion exercising their equitable powers to fashion the most complete relief possible." *Id.* at 421 (citing 118 Cong. Rec. 7168 (1972)). "[B]ack pay should be denied only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination." *Albemarle supra*, 422 U.S. at 421. Further, "in awarding back pay damages, exactitude is not required" and the Court may rely on the testimony of the Plaintiff. *EEOC v. Ecology Servs., Inc.*, 447 F. Supp. 3d 420, 447 (D. Md. 2020) (quoting *Hairston v. McLean Trucking Co.*, 520 F. 2d 226, 233 (4th Cir. 1975)). Further, there is a strong presumption in favor of awarding prejudgment interest on the backpay award. *Booker v. Taylor Milk Co.*, 64 F.3d 860, 868 (3d Cir. 1995). The interest should be compounded quarterly at the IRS underpayment rate. *EEOC v.*

*FLC & Bros. Rebel*, 663 F. Supp. 864, 869 (W.D. Va. 1987) (collecting cases), *aff'd,* 846 F.2d 70 (4th Cir. 1988).

Defendant has pled the affirmative defense of failure to mitigate alleging that Hamilton's efforts at finding replacement employment were too meager to warrant an award of back pay. Defendant bears the burden of proving the affirmative defense of failure to mitigate. *EEOC v. CTI Glob. Sols., Inc.*, 815 F. Supp. 2d 897, 911 (D. Md. 2011); *EEOC. v. FLC & Bros. Rebel*, 846 F.2d 70 (4th Cir. 1988); *Edwards v. School Bd. of Norton, Va.,* 658 F.2d 951, 956 (4th Cir.1981). The defendant must prove not only that an employee's attempts to find work were insufficient but also the amount the plaintiff would have earned had she used reasonable efforts to find work. *Chace v. Champion Spark Plug Co.*, 732 F. Supp. 605, 610 (D. Md. 1990). Here, the defense must fail because upon losing her job, Hamilton immediately went to work as a cab driver, pursued an opportunity as a an independent contractor with United Van Lines, looked for work with the help of her friend Page Looney and ultimately found comparable work by February 17, 2017, for which paid assignments began the following month. The positions with the cab company and United Van paid less than Defendant but a claimant "may accept a lower paying job or a job in another field when her search for similar employment proves futile and the choice is made in good faith." *EEOC v. Consol Energy, Inc.*, 151 F. Supp. 3d 699, 704 (N.D.W. Va. 2015), *aff'd,* 860 F.3d 131 (4th Cir. 2017); *CTI Glob. Sols., Inc.*, *supra* at 912 ("Where a claimant does obtain employment in another field, even if only part-time, that claimant "satisfies [her] obligation to mitigate damages absent a showing by [the employer] that this action was not in good faith.") (citing *Xiao–Yue Gu v. Hughes STX Corp.,* 127 F.Supp.2d 751, 760 (D.Md.2001)). An award of backpay in the amount of $11,026.09 is therefore appropriate.

b.      Compensatory and Punitive Damages are Warranted in this Matter.

In an action brought under Title VII "the complaining party may recover compensatory and punitive damages." 42 U.S.C.A. § 1981a(a)(1). The Court may award up to $200,000 in compensatory and punitive damages. 42 U.S.C. § 1981a(b)(3)(C).  In a jury trial the jury is not to be informed of the statutory cap on damages. § 1981a(c)(2). A jury may enter an award in excess of the statutory cap which would then be subject to remittitur. *Moussa v. Commonwealth of Pennsylvania Dep't of Pub. Welfare*, 289 F. Supp. 2d 639, 665-666 (W.D. Pa. 2003) (W.D. Pa. 2003). This court is therefore able to acknowledge Hamilton's actual damages by making an award in excess of the $200,000 statutory cap and then reducing the award in conformity with the statute.

1.      Compensatory Damages

Compensatory damages include *inter alia* emotional pain, suffering, inconvenience, mental anguish and loss of enjoyment of life. 42 U.S.C.A. § 1981a(b)(3). A plaintiff's testimony, standing alone, can support an award of compensatory damages for emotional distress. *Bryant v. Aiken Reg'l Med. Centers Inc.*, 333 F.3d 536, 546–47 (4th Cir. 2003); (citing *Price v. City of Charlotte,* 93 F.3d 1241, 1251 (4th Cir. 1996)). In 2017 EEOC obtained a $150,000 compensatory damages verdict in a religious accommodation case where the emotional distress was comparable, if not less severe. The verdict was based solely on the testimony of the charging party and his wife regarding the denial of his religious accommodation and constructive discharge. They testified that he suffered emotional strain, depression and a loss of relationships with former co-workers. *EEOC v. Consol Energy, Inc.*, 860 F.3d 131, 147 N. 6 (4th Cir. 2017), *cert. denied sub nom. CONSOL Energy Inc. v. EEOC*, 138 S. Ct. 976, 200 L. Ed. 2d 246 (2018).

14

Here, Hamilton, who is the victim of several sexual assaults by Paz, will testify that his harassment caused her to feel depressed, degraded, embarrassed and cheap and also, from the time of the harassment to the present, has caused her to fear that, similar to Paz, other men look at her as merely a sexual object. Her distress is so severe that she dresses in baggy clothing to conceal her body and avoid further degradation.

2.      Punitive Damages

"A complaining party may recover punitive damages under [Title VII] against a respondent (other than a government, government agency or political subdivision) if the complaining party demonstrates that the respondent engaged in a discriminatory practice or practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C.A. § 1981a(b)(2). The Court may award punitive damages when the evidence is sufficient to make four findings:

> (1) That the employer's decision maker discriminated in the face of a perceived risk that the decision would violate federal law;
>
> (2) That the decision maker was a principal or served the employer in a managerial capacity;
>
> (3) That the decision maker acted within the scope of his employment in making the challenged decision; and
>
> (4) That the employer failed to engage in good-faith efforts to comply with the law.

*EEOC v. Fed. Express Corp.*, 513 F.3d 360, 372 (4th Cir. 2008). EEOC will demonstrate the first three elements at trial. The employer bears the burden of proof regarding the fourth element, good faith.

First, Gaitan discriminated against Hamilton in the face of a perceived risk that the decision would violate federal law, by perpetuating a hostile work environment committed by

Paz against Hamilton. Gaitan knew that all of the conduct reported to him by Hamilton constituted sexual harassment, and that sexual harassment is a violation of federal law, yet he failed to take effective corrective action and continued to assign Hamilton to work with Paz. In *Fed. Express, supra* at 373-374 the Fourth Circuit held that the Commission had adequately proven its case for punitive damages by demonstrating that the Defendant's decisionmaker repeatedly failed to grant a deaf employee's request for an accommodation under the ADA. Thus, the Fourth Circuit has held that a supervisor's ongoing failure to correct violations of the law will give rise to a claim for punitive damages

Second, the commission must show that Gaitan was a principal or served the employer in a managerial capacity. Gaitan is an acknowledged supervisor and managerial employee, and he was designated by Defendant to receive complaints of sexual harassment. The Fourth Circuit has held that employees who have the power to hire, fire and discipline are managerial employees. *Ward v. AutoZoners, LLC*, 958 F.3d 254, 265 (4th Cir. 2020).

Third, EEOC must show that Gaitan acted within the scope of his employment when failing to act on Hamilton's harassment complaints and assigning Hamilton to work with Paz. This showing is easily met. It is undisputed that employees were directed to make their harassment complaints to Gaitan, whom Defendant charged with receiving and processing such complaints. It is also undisputed that Gaitan was responsible for day-to-day operations of the Frederick yard and it was his responsibility to assign drivers and helpers to their routes.

Finally, it is Defendant who bears the burden of demonstrating good faith efforts to comply with the law. *Golson v. Green Tree Fin. Servicing Corp.*, 26 F. App'x 209, 214 (4th Cir. 2002) (holding that defendant's promulgation of an anti-harassment policy was insufficient to

meet its burden of proving good faith and affirming award of punitive damages) (citing *Romano v. U-Haul, Int'l,* 233 F.3d 655, 670 (1st Cir. 2000), *cert. denied,* 534 U.S. 815 (2001); *Passantino v. Johnson & Johnson Consumer Prods., Inc.,* 212 F.3d 493, 516 (9th Cir. 2000); *Deffenbaugh-Williams v. Wal-Mart Stores, Inc.,* 188 F.3d 278, 286 (5th Cir. 1999)); (*See also Gallina v. Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C.*, 123 F. App'x 558, 564 (4th Cir. 2005); *Zimmermann v. Associates First Capital Corp.,* 251 F.3d 376, 385 (2d Cir. 2001)). Defendant will not be able to meet its burden to prove good faith efforts to comply with the law.

Maintaining an anti-discrimination policy, as did Defendant, is some evidence of good faith, but "to avoid liability for the discriminatory acts of one of its management officials, an employer maintaining such a compliance policy must also take affirmative steps to ensure its implementation." *Fed. Express Corp.*, *supra* at 374. Defendant takes no steps to avoid discrimination beyond promulgating the policy and displaying a poster. Defendant's policy is only available in English, despite the fact that many of its employees have a limited understanding of written English. Spanish. Paz, the harasser, never saw the policy and would be unable to read it even if he had. Tellingly, Defendant does not provide training on sexual harassment, either to employees or to managers with a role in the complaint process. *EEOC v. Optimal Sols. & Techs., Inc*., 422 F. Supp. 3d 1037, 1048 (D. Md. 2019) ("[T]he record reflects that OST did not provide any training to its employees on the ADA generally or its policy more specifically, raising the inference that OST had no real interest in educating its employees as to the protections afforded under the statute."); *Golson supra* at 214 (affirming award of punitive damages where there was no evidence that defendant provided follow up training). Bad faith is also evidenced by the fact that Defendant did not provide the contact information for its human

17

resources department (Cordoba) and did not investigate Hamilton's complaint once it was received by Robin Reach at Cordoba.

      c.      <u>EEOC Seeks a Permanent Injunction</u>.

Section 706(g)(1) of Title VII specifically authorizes the issuance of injunctions when a district court has found that an employer has committed a violation of the Act. 42 U.S.C. § 2000e-5(g)(1). EEOC seeks a three-year permanent injunction enjoining Defendant from permitting the sexual harassment of its employees and all individuals who perform work directly for Defendant as Human Resources managers, Human Resources staff, managers, drivers, mechanics or helpers, whether or not such prospective individuals are employed by Defendant. To comply with this injunction Defendant must:

      1.      Provide sexual harassment training to all employees and other individuals covered by this injunction in a language they understand.

      2.      Provide all employees and other individuals covered by this injunction with a written sexual harassment policy in a language they understand, and which contains the name, physical address, phone number and email address of all company officials to whom sexual harassment may be reported. The policy must also state in bold type that an employee or other individual who reports sexual harassment will not be fired, disciplined or punished in any way.

      3.      Administer a test or quiz to all employees and other individuals covered by this injunction, which verifies that they: understand what sexual harassment is; understand that sexual harassment will not be tolerated; understand that sexual harassment should be reported to a supervisor or human resources official; and can identify the management officials to whom it should be reported.

4.      Provide all human resources and other management employees and other individuals covered by this injunction Title VII training which includes investigative techniques.

5.      Display a notice regarding this lawsuit at all facilities utilized by Defendant's employees and other individuals covered by this injunction.

6.      For a period of three years permit EEOC, upon 14 days' notice, access to its records and permission to interview its employees and other individuals covered by this injunction, to determine if it has complied with the injunction and no further incidents of sexual harassment have occurred.

In *Albemarle Paper Co. v. Moody*, 422 U.S. 405 (1975), the Supreme Court held that Section 706(g)(1) not only permits the issuance of injunctions, but in fact imposes upon district courts a "duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future." Id. at 418 (emphasis added). In keeping with this directive, the Fourth Circuit has held that "when a plaintiff has prevailed and established the defendant's liability under Title VII, there is no discretion to deny injunctive relief completely." *United States v. Gregory*, 871 F.2d 1239, 1246 (4th Cir. 1989); *Consol Energy, Inc.*, 151 F. Supp. 3d 699, 711-12 (N.D.W.Va. 2015), *aff'd,* 860 F.3d 131 (4th Cir. 2017). An injunction must be granted unless defendant demonstrates that future discrimination will not occur. *Consol Energy, Inc.*, *supra* at 712 ("This Court finds that a permanent injunction is required in this action and that the defendants have not met their heavy burden of proving that future discrimination will not occur.")

Defendant will not be able to meet its burden of demonstrating that the conduct will not reoccur. Sexual harassment is a pervasive societal problem which can manifest itself in any

workplace. Defendant did not investigate Hamilton's complaint of discrimination and continues to maintain a primarily male workforce while assigning women to work in isolation with males without a supervisor present. This is not an extraordinary case where an injunction should be denied.

There is no requirement that the proven discrimination be on-going in order to warrant an injunction. See *Gregory*, 871 F.2d at 1246. Rather, in exercising its discretion to determine the extent of injunctive relief, the district court must be guided by the purposes of Title VII, a primary purpose being prophylaxis, i.e., deterrence of future violations of law. See, e.g., *Spencer v. General Elec. Co*., 894 F.2d 651, 660 (4th Cir. 1990), abrogated on other grounds, *Farrar v. Hobby*, 506 U.S. 103 (1992); *Evans v. Harnett Cty. Bd. of Educ*., 684 F.2d 304 (4th Cir. 1982) (citing *Albemarle Paper*, holding district court erred by not enjoining unlawful practices, and stating, "[Plaintiff] and other black applicants are entitled to be considered for future appointments free of the taint of the invidious discrimination that the district court found"); *EEOC v. Conn-X, LLC*, Civil Case No. L-09-2881, 2012 WL 456870, at *1-2 (D. Md., Feb. 9, 2012) (citing prophylactic purpose of Title VII and the public interest in preventing future discrimination, enjoining defendant from any further religious harassment or discrimination though victims no longer employed).

Therefore, the fact that no other violations are known to have occurred since the challenged conduct is not a basis for denial of injunctive relief. See, e.g., *Evans supra* at 306 ("An injunction warranted by a finding of unlawful discrimination is not prohibited merely because it confers benefits upon individuals who were not plaintiffs or members of a formally certified class"); *EEOC v. Northwest Airlines, Inc.*, 188 F.3d 695, 702 (6th Cir. 1999) (holding district court may enter

injunction in EEOC litigation based on single proven violation and proof of policy of discrimination not required). This is consistent with both the prophylactic purposes of the Act and the traditional principle of equity that voluntary cessation of unlawful activity does not moot requested injunctive relief. "The request for injunctive relief will be moot only where there is no reasonable expectation that the conduct will recur, or where interim events have 'completely and irrevocably eradicated the effects of the alleged violation[.]'" *Bundy v. Jackson*, 641 F.2d 934, 946, n.13 (D.C. Cir. 1981) (citing *United States v. W.T. Grant Co.*, 345 U.S. 629 (1953), and quoting *County of Los Angeles v. Davis*, 440 U.S. 625 (1979)).

### II. Defendant Ecology's Statement of Facts and Legal Theories

### A. Statement of Facts

Ecology Services, Inc. ("Ecology")  provides residential and commercial refuse, recycling, and yard waste collection services to governmental, business, and community association customers.  Ecology employs CDL-licensed drivers who drive collection trucks along specified routes. Other employees, known as helpers, ride on the truck and collect the trash from each residence and facility.

Ecology is an equal opportunity employer and has a comprehensive anti-discrimination policy, including an unlawful harassment policy set forth in its Employee Handbook. The anti-harassment policy explains what sexual harassment is and that such behavior will not be tolerated by the company. Employees are instructed to bring complaints of sexual and other unlawful harassment to their supervisor or, if they prefer, Ecology's Human Resources Manager. The policy further assures employees that it forbids retaliation against any employee who has raised a harassment complaint. The Handbook is given to all employees at the outset of their employment.

The Handbook is only available in English; however, the Yard Manager Marvin Gaitan (identified further below) describes the policies to non-English speaking employees, and an application is made available to translate the policies from English to Spanish.

Hamilton began her employment as a driver at Ecology's Frederick, Maryland yard on May 25, 2016.  Her direct supervisor was the Frederick Yard Manager, Marvin Gaitan. The Frederick Yard provided refuse and recycling collection services to residents of Frederick County pursuant to a county contract. Hamilton worked with different helpers each day depending on the route she was assigned.  Hamilton's employment ended on November 7, 2016, when she quit in anger upon being reprimanded and suspended by Gaitan.

During her brief tenure with Ecology, Hamilton was frequently late for work. Lateness is particularly problematic at Ecology, where time is of the essence. Under Ecology's contract with Frederick County and other customers, trucks must begin their routes by 7:00 a.m., which means they must leave the yard by no later than 6:30 a.m.. Hamilton often arrived at work long after the trucks had left the yard.  Gaitan repeatedly warned Hamilton about her continuous and excessive tardiness. Hamilton also was disciplined for other violations of company rules, including failing to show up to work without calling out (referred to as "no call/no show"), failing to pick up missed trash, and receiving a speeding citation. Thus, Hamilton, who appeared unable to adapt her behavior to the requirements of the job, was well aware of the fact that her frequent lateness and transgressions were jeopardizing her continued employment with Ecology.  In fact, while typically a suspension was warranted after three written warnings, Gaitan issued Hamilton additional written warnings without suspending or terminating her, in an effort to give Hamilton, as a new employee, an opportunity to conform her behavior to company expectations. She failed to do so.

22

On Friday, November 4, 2016, Hamilton stopped her truck over a dispute with her assigned helper. The helper had put a garden hose in the collection unit, which Hamilton thought was forbidden and for which they could be fined by the collection station. When Hamilton refused to continue the route, the helper walked off to a convenience store to get food and beverage. Hamilton then spoke with Gaitan. Gaitan scolded Hamilton for refusing to continue the route and allowing her helper to walk off. Gaitan directed her to complete the route, explaining that the hose was permitted by the collection station. After a significant delay, Hamilton completed her route late that afternoon.

On the next workday, Monday, November 7, 2016, Hamilton was again late. She called Gaitan at 6:07 a.m. to inform him that she had overslept and would arrive in thirty minutes.  Gaitan instructed her to come in, believing that she should be able to complete her route if she arrived by 6:40 a.m..  Hamilton, however, did not arrive at the yard until 7:40 a.m., over 1½ hours late. By this time, the trucks already had left the yard. Gaitan reprimanded Hamilton for once again being excessively late, and told her that he was giving her a fifth and final warning. He then began discussing Hamilton's decision to stop her route on the preceding workday (Friday). Hamilton became argumentative and complained to Gaitan that helpers were not doing their jobs correctly. Hamilton was angry and yelled at Gaitan. In response to her rude behavior, Gaitan told Hamilton that she should go home and return on Wednesday—he was suspending her for two days. Hamilton expressed her anger over the suspension and told Gaitan that she quit. Shortly thereafter, believing that her two-day suspension was unfair, Hamilton sent Gaitan a text message notifying him again that she quit.

38757471.2

Two days later, on November 9, Hamilton spoke with Human Resources Assistant, Robin Reach. Hamilton relayed to Reach the events of November 4 and 7, and that she was upset and angry over Marvin's decision to suspend her, which she described as "unfair." She told Reach that because of this incident she had decided to quit her job. Hamilton went on to comment to Reach, as an aside, that, on numerous occasions, a helper, Carlos Paz, made sexual comments and gestures to her. She stated that she told Gaitan about this but Paz continued to be assigned to her truck. She also told Reach about an incident that occurred in September when she saw another employee, Vidal, urinating in the truck's collection unit, which she had previously complained to Gaitan.

Reach reported the substance of this conversation to Margaret Gibbs, Human Resources Manager, who, in turn, met with Gaitan to discuss the events surrounding Hamilton's resignation and her allegations regarding Paz. Gaitan stated that Hamilton quit because she was angry over being reprimanded and suspended. He was stunned by Hamilton's allegations against Paz and her claims that she had complained to him about Paz's alleged behavior. At no time had Hamilton ever told Gaitan that Paz had made sexual comments or gestures to her or that he had engaged in any other sexual or inappropriate behavior. Had she done so, he would have addressed the claim, including by notifying his manager and Human Resources so the matter could be investigated. Gaitan explained that Hamilton was not reticent and was fully capable of raising complaints. Indeed, Gaitan addressed Hamilton's complaint about Vidal urinating in the back of the garbage truck, by speaking with Vidal and disciplining him for that incident.

Ecology will prove that Hamilton never complained to Gaitan that Paz engaged in inappropriate sexual behavior toward her, or anyone else. Further, no other employee notified

24

Gaitan that Paz had engaged in any inappropriate sexual behavior to Hamilton, or anyone else. Gaitan never saw Paz engage in any inappropriate sexual behavior.

Ecology will prove that Hamilton's allegations that Paz harassed her, and that Hamilton complained to Gaitan about Paz's alleged conduct, are neither credible nor supported by the evidence. Hamilton asserts that Paz engaged in the sexual behavior while they were outside of the presence of any managers or supervisors. Paz denies all of Hamilton's allegations against him, and will credibly testify to such at trial. Other employees who frequently worked and interacted with Hamilton and Paz also deny allegations regarding inappropriate sexual behavior towards Hamilton by Paz. The EEOC intends to offer the deposition testimony of two witnesses, Zoe Hicks and Randy Sellers, in support of Hamilton allegations.   As the evidence will clearly show, these witnesses are not worthy of belief.   Hamilton has known Hicks for over 15 years and is her "surrogate mother." Sellers is Hicks' fiancé.   Hamilton was instrumental in getting Hicks and Sellers jobs as helpers at Ecology, where they worked for 10 days in October 2016 until they were both terminated for failing a drug test. Hicks and Sellers, at separate times, were helpers with Paz on Hamilton's truck once. Amazingly, both claim that they saw Paz touch, make sexual gestures and comments to Hamilton.  Hicks further claims that she overheard Hamilton complain to Gaitan behind closed doors. Notably, Hicks' and Sellers' testimony conflict with Hamilton's deposition testimony.

Immediately following her resignation from Ecology, Hamilton chose not to look for comparable full time employment.  Instead, she decided to drive a taxi cab "for a while" for a local cab service in Charles Town, West Virginia. Hamilton had driven for the taxi service off and on both prior to and occasionally during her employment with Ecology. She drove the taxi until the

end of December 2016. Hamilton has no record of the actual dates she worked or how much she earned. She did not receive a Form 1099 or W-2 from the taxi service and never filed a tax return for tax year 2016, which was the year she also worked for Ecology.

Sometime in January 2017, Hamilton began working for a subcontractor for United Van Lines. She testified that she worked a couple of days a week, but the work was not steady and she never worked a full five-day work week. She was paid $100/day in cash, but does not have any records regarding the days she worked or pay received from this job. Hamilton did not receive a Form 1099 for this work, and did not file a tax return for 2017.

In mid-February 2017, Hamilton applied for two positions—a driver job with a trash collection company and an independent contractor driver position with Dealers Choice Truckaway System t/a TruckMovers ("TruckMovers"). These were the first and only jobs Hamilton applied for since she quit Ecology in November 2016. Within one week of applying, TruckMovers offered Hamilton the position and she signed an Independent Contractor Agreement on February 17, 2017. She began working for TruckMovers on March 9, 2017, earning more than she earned at Ecology.

B.   **Legal Theories**

1.   **Hamilton Was Not Sexually Harassed.** To prevail on its sexual harassment hostile work environment claim, the EEOC must establish that there was: (1) unwelcome conduct; (2) that is based on Hamilton's sex; (3) which was sufficiently severe or pervasive to alter Hamilton's conditions of employment and to create an abusive work environment; (4) which is imputable to the Ecology.  The evidence does not established that Hamilton was subjected to severe or pervasive unwelcome conduct.

2.   **No Unlawful Conduct Can be Imputed to Ecology.**  Where the harasser is a coworker, a negligence standard applies. To satisfy that standard, the complainant must show that the employer *knew or should have known* of the offensive conduct but failed to take appropriate corrective action.  Assuming *arguendo* that the Court finds that severe and pervasive unwelcome sexual conduct occurred, no liability for unlawful sexual harassment can be imputed to Ecology because Ecology did not have actual or constructive knowledge of the offensive conduct. Specifically, Hamilton never notified Gaitan or anyone else at Ecology of the alleged harassment until after she quit her position. As such, Ecology was not afforded the opportunity to take effective action to stop any alleged harassment of Hamilton.

3.   **Hamilton Was Not Constructively Discharged.** To prove constructive discharge under Title VII, a plaintiff must show objectively that she worked in an abusive work environment that was so intolerable that her resignation qualified as a fitting response, and that the employer's actions were motivated by the plaintiff's membership in a protected class. To prevail on a constructive discharge claim, the employer's actions essentially must force the plaintiff to resign. The EEOC cannot meet its burden. The weight of the evidence establishes that Hamilton resigned because she was angry with Gaitan for reprimanding and suspending her for the garden hose incident, and being late and inappropriately argumentative when he was reprimanding her for her transgressions.

4.   **Hamilton is Not Entitled to an Award of Backpay Because She Failed to Mitigate Her Damages.**  A Title VII claimant has a statutory duty to mitigate

damages resulting from her employer's discriminatory adverse employment actions. The duty to mitigate damages requires that the claimant be reasonably diligent in seeking and accepting substantially equivalent employment to her former employment from which she claims she was constructively discharged. An employee cannot remain idle after an unlawful discharge and receive back pay for that period where she was not actively seeking employment. After Hamilton quit her job with Ecology on November 7, 2016, she made absolutely no effort to obtain comparable employment until mid-February 2017. Therefore, she is not entitled to backpay damages for the period from November 7, 3016 until mid-February, 2017.

5. **The EEOC Cannot Sustain its Burden of Proving the Existence and Amount of Hamilton's Backpay Damages.** Back pay damages are determined by computing the difference between a Title VII claimant's actual interim earnings during the period after her termination and what she would have earned had the wrongful conduct not occurred. Under this formula, before a court may award damages, plaintiff must first establish that she has, in fact, sustained an economic loss from the defendant's discrimination. A Title VII plaintiff has the burden of proving the existence and amount of damages by a preponderance of the evidence. The EEOC is unable to carry this burden because Hamilton has no record of the days she worked and compensation she received until she began her employment with TruckMovers on March 9, 2017.

6. **Hamilton is Not Entitled to an Award of Compensatory Damages.** To prove an entitlement to compensatory damages for emotional distress, the Plaintiff must

28

present objective evidence that demonstrates the presence of genuine injury, the need for medical or psychological attention (including counseling), loss of income by reason of depression or anxiety, the context of the events surrounding the emotional distress, and the nexus between the conduct and the emotional distress. Conclusory statements by plaintiff and by any other party indicating the claimant's anger, distress, frustration, or unhappiness, do not constitute the objective evidence required.

7.     **An Award of Punitive Damages is Not Warranted.** A plaintiff may recover punitive damages under Title VII against a defendant employer if the plaintiff shows that: (1) the employer engaged in unlawful intentional discrimination, *and* (2) the employer engaged in the discriminatory practice with malice or with reckless indifference to the federally protected rights of an aggrieved individual. The EEOC is unable to sustain its burden of proving that Ecology engaged in intentional unlawful discrimination, and further that Ecology acted with malice or with reckless indifference to Hamilton's rights under Title VII.

**III. Statements as to any Counterclaim, Crossclaim or Third-Party-Claim**

No crossclaims or third-party claims have been asserted by any party.

**IV. Any Issue in the Pleadings that is to be Abandoned**

The parties are not abandoning any issues at this time.

**V. Stipulations of Fact and/or Requested Stipulations of Fact**

**A. Joint Stipulations of Fact**

1.      The United States District Court for the District of Maryland (the "Court") is an appropriate venue and the Court has subject matter jurisdiction over this action and personal jurisdiction over the Parties.

2.      All conditions precedent to the institution of the EEOC's lawsuit have been fulfilled.

3.      The Parties stipulate to the authenticity, but not the admissibility, of Plaintiff's Exhibit Nos. ("PX") 1-59 and Defendant's Exhibit Nos. ("DX") 1-50.

4.      The parties will introduce text messages as exhibits. Some text messages will be produced as cell phone screenshots, while others will be produced as spreadsheets. The organization of text messages produced as screenshots is self-explanatory. For the text messages produced as spreadsheets, most, but not all, spreadsheets display the text messages with the most recent text message sent at the top of the spreadsheet and the earlier messages sent in descending order below the most recent, with the oldest message at the bottom of the spread sheet. The other spreadsheets are organized in the reverse order (i.e. – oldest sent message at the top followed by the subsequent messages with the most recent at the bottom). Every text message produced in spreadsheet form is numbered with an individual entry number, as well as the date and time, which identifies the specific text messages the parties intend to introduce as evidence.

5.      The text message spreadsheets that list the text messages with the most recent message at the top, set forth the time the message was sent in Universal Coordinated Time (UTC). UTC is 5 hours ahead of time in Maryland, which

Eastern Standard Time, except during Daylight Savings Time when UTC is only 4 hours ahead.[1] Therefore, because all of the messages that are being introduced as exhibits were sent in the Eastern time zone, to ascertain the time the respective message was sent, either 5 or 4 hours must be subtracted from the UTC listed time, depending on the date of the message (either EST or EDT). The text message spreadsheets that list the messages with the earliest message at the top, record the time the message was sent using Greenwich Mean Time minus 5 (GMT-5). GMT-5 is equivalent to Eastern Standard time, except during Daylight Savings time when GMT is 1 hour behind, and the time is reflected as GMT-4. Text messages produced as screenshots reflect time sent in Eastern Standard Time or Eastern Daylight Time.

6.    The parties stipulate that the documents found at Plaintiff and Defendant Exhibit Nos. referenced below are true and correct copies of Defendant's business records and were made at or near the time of the activity, by someone with knowledge of the activity, were kept in the course of a regularly conducted business activity and making the records was a regular practice of that activity. Such documents constitute records of a regularly conducted activity under FRE 803(6):

    a.    Plaintiff Exhibit No. 2 [ESI_01019]
    b.    Plaintiff Exhibit No. 3 [ESI_01020]
    c.    Plaintiff Exhibit No. 12 [ESI_00407-00543]
    d.    Plaintiff Exhibit No. 13 [ESI_00380-00390]
    e.    Plaintiff Exhibit No. 14 [ESI_00391-00404]
    f.    Plaintiff Exhibit No. 15 [ESI_00405]
    g.    Plaintiff Exhibit No. 16 [ESI_00406]
    h.    Plaintiff Exhibit No. 17 [ESI_00109]

---

[1] http://ww2010.atmos.uiuc.edu/(Gh)/guides/maps/utc/frutc.rxml

i.      Plaintiff Exhibit No. 23 [ESI_00110-00111]
j.      Plaintiff Exhibit No. 24 [ESI_00253-00255]
k.      Plaintiff Exhibit No. 36 [ESI_00344]
l.      Plaintiff Exhibit No. 37 [ESI_00010]
m.      Plaintiff Exhibit No. 38 [ESI_00019]
n.      Plaintiff Exhibit No. 39 [ESI_00738-00765; also at ESI_00054-00081]
o.      Plaintiff Exhibit No. 41 [ESI_00224]
p.      Plaintiff Exhibit No. 42 [ESI_00214]
q.      Plaintiff Exhibit No. 43 [ESI_00162]
r.      Plaintiff Exhibit No. 44 [ESI_00039]
s.      Plaintiff Exhibit No. 45 [ESI_00042]
t.      Plaintiff Exhibit No. 58 [ESI_00474]
u.      Defendant Exhibit No. 1 [ESI_00054-81]
v.      Defendant Exhibit No. 2 [ESI_001015]
w.      Defendant Exhibit No. 3 [ESI_00766-789]
x.      Defendant Exhibit No. 16 [ESI_00050-53]
y.      Defendant Exhibit No. 17 [ESI_00100-102]
z.      Defendant Exhibit No. 18 [ESI_00103]
aa.     Defendant Exhibit No. 19 [ESI_00104]
bb.     Defendant Exhibit No. 20 [ESI_00105]
cc.     Defendant Exhibit No. 21 [ESI_00106]
dd.     Defendant Exhibit No. 22 [ESI_00107]
ee.     Defendant Exhibit No. 23 [ESI_001028-29]
ff.     Defendant Exhibit No. 24 [ESI_00108]
gg.     Defendant Exhibit No. 25 [ESI_00109]
hh.     Defendant Exhibit No. 30
ii.     Defendant Exhibit No. 33 [ESI_00110-11]
jj.     Defendant Exhibit No. 34 [ESI_00253-55]
kk.     Defendant Exhibit No. 36 [ESI_00407-543]
ll.     Defendant Exhibit No. 37 [ESI_00380-00390]
mm.     Defendant Exhibit No. 38 [ESI_00405]
nn.     Defendant Exhibit No. 39 [ESI_00406]
oo.     Defendant Exhibit No. 48 [ESI_00224]

7.      During the relevant period, Defendant Ecology Services, Inc. has continuously

been a Maryland Corporation doing business within Maryland and performs

curbside trash and recycling collection as well as other environmental services.

8.      Ecology Services, Inc. is wholly owned by Peter Osborne and Timothy Osborne,

who are also the sole members of Ecology Services, Inc.'s Board of Directors

with Timothy Osborne serving as Chairman of the Board and Peter Osborne

serving as a Director and both Chief Executive Officer and Chief Financial

Officer of the company.

9.  During the period of Kristen Hamilton's employment Ecology Services, Inc.

operated from a yard located in Frederick in Frederick County, Maryland and

provided collection services to residents of Frederick County under an agreement

with the County government.

10.  Timothy Osborne supervises the personnel who perform Defendant's Human

Resources functions.

11.  At all relevant times, Defendant has continuously been an employer engaged in an

industry affecting commerce within the meaning of Sections 701(b),(g) and (h) of

Title VII, 42 U.S.C. § 2000e(b)(g), and (h).

12.  At all relevant times, Defendant employed Kristen Hamilton within the meaning

of Sections 701(g) and (h) of Title VII, 42 U.S.C. § 2000e(g) and (h).

13.  Defendant hired Kristen Hamilton as a garbage truck driver ("driver"), and she

began work on May 25, 2016 at the yard in Frederick, Maryland.

14.  Kristen Hamilton's job duties included completing route sheets and other required

documentation, conducting pre-route checks of her truck, and driving the garbage

truck on established "routes" to collect trash, recyclables or yard waste and dump

the material at a transfer station, or to run "misses" to collect such material from

specific homes/residential addresses who claimed they were missed during their

normal route collection.

15. Kristen Hamilton's employment with Defendant ended effective November 7, 2016.

16. During her employment Defendant assigned Kristen Hamilton to drive the Mack truck.

17. Defendant also employed persons in the position of helper ("helper"), who accompany drivers on routes and are generally responsible for loading trash, recyclables and yard waste into the garbage truck.

18. Defendant employed Carlos Paz as a helper at its yard in Frederick, Maryland during the entire period of Hamilton's employment, and he remains currently employed by Defendant as a helper.

19. Defendant hired Zoe Hicks as a helper at its yard in Frederick, Maryland, and after completing her application and new-hire paperwork on October 17, 2016, she began work on October 18, 2016.

20. Zoe Hicks's employment with Defendant ended effective October 28, 2016.

21.  Defendant hired Randy Sellers as a helper at its yard in Frederick, Maryland, and after completing his application and new-hire paperwork on October 17, 2016, he began work on October 18, 2016.

22. Randy Sellers' employment with Defendant ended effective October 28, 2016.

23. From at least May 25, 2016 through January 2018, Marvin Gaitan supervised Kristen Hamilton and all other drivers, helpers and mechanics at the yard in Frederick, Maryland, all of whom were employed by Ecology Services, Inc.

38757471.2

24.     From at least May 25, 2016 through January 2018, Marvin Gaitan was directly
        supervised by Mel Morales.

25.     At all times during and since 2016 Mel Morales has been employed by Ecology
        Services, Inc. and reported directly to Peter Osborne.

26.     Marvin Gaitan assigned Carlos Paz to work with Kristen Hamilton on multiple
        occasions, some of which required Hamilton and Paz to work on routes alone.

27.     Defendant was aware that it was governed by the provisions of Title VII
        throughout its employment of Kristen Hamilton.

28.     During the entire period of Kristen Hamilton's employment Defendant and its
        supervisors, including Marvin Gaitan, were aware that sexual harassment is a
        violation of federal law.

29.     Defendant's sexual harassment policy in effect during Kristen Hamilton's
        employment is set forth in its employee handbook

30.     The employee handbook is in English, and Defendant never made Spanish or
        other language versions available.

31.     Defendant's office manager provides the employee handbook to new-hires along
        with other onboarding paperwork, such as tax and payroll forms.

32.     Defendant did not provide Kristen Hamilton with training on sexual harassment.

33.     Defendant's policy directs employees to report sexual harassment to their
        supervisor or, if they are not comfortable speaking with their supervisor, to notify
        the human resources manager.

38757471.2

34. On November 9, 2016 Robin Reach called Kristen Hamilton in response to a message Hamilton had left.

35. For the purposes of compensatory and punitive damages Defendant is subject to 42 U.S.C. § 1981a(b)(3)(C).

36. If the Court should determine that EEOC is entitled to an injunction, the parties stipulate that the injunction shall apply to Defendant's employees and all individuals who perform work directly for Defendant as Human Resources managers, Human Resources staff, managers, drivers, mechanics or helpers, whether or not such prospective individuals are employed by Defendant.

37. Kristen Hamilton's period of employment with Defendant was May 25, 2016 through November 7, 2016, and during that five and one-half month period she earned $16,920.

38. Prior to Hamilton's resignation, Defendant did not provide Carlos Paz with training on sexual harassment.

39. Defendant did not provide Marvin Gaitan with training on sexual harassment.

40. Kristen Hamilton applied for a position as an independent contractor driver with Dealers' Choice Truckaway System, Inc. dba TruckMovers ("TruckMovers") in mid-February 2017.

41. TruckMovers engaged Kristen Hamilton as a truck driver and Kristen Hamilton executed an Independent Contractor Agreement on February 17, 2017.

42. After completing training, Kristen Hamilton began paid work for TruckMovers on March 9, 2017.

43.     The Court may take judicial notice of the accuracy of Plaintiff's Exhibits 11 and
        49, and Defendant's Exhibits 26 and 50, pursuant to Fed. R. Evid. 201, because
        the information contained therein can be determined from sources whose accuracy
        cannot be reasonably questioned.

**B. EEOC's Requested Stipulations of Fact**

1.      Ecology Services, Inc. primarily used two types of garbage trucks at its Frederick
        yard during Kristen Hamilton's employment, one manufactured by International
        and another, smaller truck manufactured by Mack.

2.      Defendant's sexual harassment policy does not identify or provide contact
        information for the human resources manager.

3.      Without conceding backpay is owed, the applicable backpay period is November
        7, 2016 to March 31, 2017, at which time Kristen Hamilton secured fully
        offsetting income.

4.      Kristen Hamilton's average monthly pay rate with Defendant was $3,076.36
        ($16,920 / 5.5 months).

5.      If the Court should determine that Kristen Hamilton is entitled to backpay, the
        Parties stipulate that calculation of her total backpay award is $11,026.09,
        comprising $9,117.95 in backpay and $1,908.14 in interest.  Defendant does not
        waive its right to challenge Hamilton's entitlement to backpay damages.

6.      Without conceding backpay or interest is owed or EEOC's backpay calculation,
        the interest figures found in EEOC's backpay calculation table and proposed total
        award in Plaintiff's Exhibit 48 reflect an accurate calculation of interest on

37

EEOC's claimed backpay when using the IRS' underpayment rates pursuant to

IRC 6621(a)(2), found at Plaintiff's Exhibit 49, compounded monthly.

## C. Defendant Ecology's Requested Stipulations of Fact

1.      During her 24 weeks of employment with Ecology, Kristen Hamilton earned a

total of $16,920. Her average weekly rate of pay was $705 ($16,920 ÷ 24 weeks).

2.      For the year 2017, Kristen Hamilton worked for TruckMovers for a total of 42.4

weeks, and earned a total of $48,890.45. Hamilton's average weekly pay at

TruckMovers was $1,153.08.

3.      Defendant's Exhibit 49 is a compilation of advertisements taken from the

Frederick News Post, a newspaper in public circulation. Defendant's Exhibit 49 is

self-authenticating pursuant to Fed. R. Evid. 902(6).

## VI. Details of the Damages and other Relief Sought by EEOC

## A. Monetary Relief

1. Backpay

2. Nonpecuniary Compensatory Damages: to be determined at trial

3. Punitive Damages: to be determined at trial

## B. Non-Monetary Relief

EEOC seeks a three-year permanent injunction enjoining Defendant from tolerating or

facilitating the sexual harassment of its employees. To comply with this injunction Defendant

must:

38757471.2

1.      Provide sexual harassment training to all employees in a language they understand.

2.      Provide all employees with a written sexual harassment policy in a language they understand, and which contains the name, physical address, phone number and email address of all company officials to whom sexual harassment may be reported. The policy must also state in bold type that an employee who reports sexual harassment will not be fired, disciplined or punished in any way.

3.      Administer a test or quiz to all employees which verifies that they: understand what sexual harassment is; understand that sexual harassment will not be tolerated; understand the sexual harassment should be reported to a supervisor or human resources official; and can identify the management officials to whom it should be reported.

4.      Provide all human resources and other management employees Title VII training which includes investigative techniques.

5.      Display a notice regarding this lawsuit.

6.      For a period of five years permit EEOC, upon 14 days' notice, access to its records and permission to interview its employees to determine if it has complied with the injunction and no further incidents of sexual harassment have occurred.

**VII. Exhibits**

**A.  EEOC Exhibits**

1.      Letter to EEOC / Charge of Discrimination [EEOC-00028]

2.      ESRR/ESI06 Safety Meeting Agenda dated 6/23/2016 [ESI_01019]

3.      Safety Training Meeting Form dated 10/7/2016 [ESI_01020]

39

4.      Photograph of truck Exhibit 3 to the Deposition of Kristen Hamilton

5.      Photograph of truck Exhibit 4 to the Deposition of Kristen Hamilton

6.      Photograph of truck Exhibit 5 to the Deposition of Kristen Hamilton

7.      Photograph of truck Exhibit 7 to the Deposition of Kristen Hamilton

8.      Photograph of truck Exhibit 8 to the Deposition of Kristen Hamilton

9.      Photograph of truck Exhibit 9 to the Deposition of Kristen Hamilton

10.     Photograph of truck Exhibit 10 to the Deposition of Kristen Hamilton

11.     2016 Calendar Exhibit 23 to the Deposition of Kristen Hamilton

12.     Route Sheets [ESI_00407-00543]

13.     Kristen Hamilton Time Cards [ESI_00380-00390]

14.     Carlos Paz Time Cards [ESI_00391-00404]

15.     Randy Sellers Time Card [ESI_00405]

16.     Zoe Hicks Time Card [ESI_00406]

17.     Disciplinary Form dated 11/7/2016 [ESI_00109] Exhibit 25 to the Deposition of
        Kristen Hamilton

18.     SMS Text messages between Kristen Hamilton and Marvin Gaitan dated
        9/15/2016 2:01:51 PM(UTC+0) to 9/15/2016 3:18:18 PM(UTC+0) entry numbers
        330-346 [EEOC_000635-000717]

19.     SMS Text message between Kristen Hamilton and Marvin Gaitan dated
        11/7/2016 12:52:06 PM(UTC+0) entry number 1 [EEOC_000635-000717]

20.     SMS Text messages between Kristen Hamilton and Page Looney dated 11/7/2016
        8:43:19 PM(UTC+0) to 11/7/2016 9:22:40 PM(UTC+0) entry numbers 857-943
        [EEOC_000718-000777]

21.     SMS Text messages between Kristen Hamilton and Page Looney dated 11/7/2016
        9:39:32 PM(UTC+0) entry 868 [EEOC 000718-000777]

38757471.2

22.     SMS Text messages between Kristen Hamilton and John Cade dated 11/8/2016
        2:12:44 PM(UTC+0) to 11/9/2016 12:00:52 AM(UTC+0) entries 529-537
        [EEOC_000883-000926].

23.     Email from Robin Reach to Margaret Gibbs dated 11/10/16 [ESI_00110-00111]
        Exhibit 3 to the Deposition of Margaret Gibbs

24.     Email from Margaret Gibbs to Robin Reach dated 11/15/16 [ESI_00253-255]
        Exhibit 4 to the Deposition of Margaret Gibbs

25.     SMS Text message from Hamilton to Page Looney dated 11/21/2016 8:45:03
        PM(UTC+0) entry 726 [EEOC_00718-00777]

26.     SMS Text message from Hamilton to Page Looney dated 12/21/2016 12:00:23
        AM(UTC+0) entry 469 [EEOC_00718-00777]

27.     SMS Text message from Hamilton to Page Looney dated 12/21/2016 12:11:53
        AM(UTC+0) entry 452 [EEOC_00718-00777]

28.     SMS Text messages between Hamilton and Page Looney dated 12/21/2016
        12:14:31 AM(UTC+0) to 12/21/2016 12:19:54 AM(UTC+0) entries 443-
        449[EEOC_00718-00777]

29.     SMS Text messages between Kristen Hamilton and Page Looney dated
        12/25/2016 8:03:36 PM(UTC+0) to 12/25/2016 8:09:29 PM(UTC+0) entry 423
        [EEOC_00718-00777]

30.     SMS Text message from Hamilton to Page Looney dated 2/6/2017 6:03:50
        PM(UTC+0) entry 324 [EEOC_00718-00777]

31.     SMS Text messages between Kristen Hamilton and Page Looney dated 2/8/2017
        11:36:53 PM(UTC+0) to 2/8/2017 11:45:51 PM(UTC+0) entries 268-276
        [EEOC_00718-00777]

32.     SMS Text messages between Hamilton and Page Looney dated 2/9/2017 12:22:22
        AM(UTC+0) to 2/9/2017 12:26:10 AM(UTC+0) entries 241-242
        [EEOC_000718-000777]

33.     SMS Text message to Page Looney dated 2/10/2017 6:28:37 PM(UTC+0) Entry
        234 [EEOC_000718-000777]

34.     Contract with Truck Movers dated February 17, 2017 [TKM_000020-000026]
        Exhibit 27 to the deposition of Kristen Hamilton

41

35.    Truck Movers Settlement Sheets for March of 2017 [TKM_000086_000092] Exhibit 29 to the Deposition of Kristen Hamilton

36.    Ecology Services, Inc. 2016 W-2 for Kristen Hamilton [ESI_00344].

37.    Employee Time Off Form dated 7/17/17 [ESI_00010]

38.    Carlos Paz Employee's Acknowledgement of Receipt dated 2/27/12 [ESI_00019]

39.    Employee Handbook for Ecology Services Refuse and Recycling, LLC and Ecology Services, Inc dated 2/20/2013 [ESI_00738-00765] Exhibit 24 to the Deposition of Timothy Osborne; also at ESI_00054-00081.

40.    Defendant Ecology Service, Inc.'s Answers to Plaintiff's First Set of Interrogatories dated 8/13/2018

41.    Jose Urias-Beltran (Vidal) Discipline Form [ESI_0224]

42.    Marvin Gaitan Discipline Form [ESI_00214]

43.    Marvin Gaitan Employee Change Form [ESI_00162]

44.    Carlos Paz Termination Form [ESI_00039]

45.    Ecology Services Helper Training Form [ESI_00042]

46.    Photographs of Truck Exhibits 6A-6D to the Deposition of Zoe Hicks

47.    Defendant Ecology Services, Inc's Position Statement in Response to Hamilton's Charge [EEOC_000030-000074]

48.    EEOC Backpay Assumptions and Calculations Worksheet

49.    IRS Table of Underpayment Rates

50.    EEOC PAYCALC Report

51.    EEOC's Amended Complaint [ECF No. 19]

52.    Defendant's Answer to Amended Complaint [ECF No. 20]

53.    Photograph of Truck Exhibit 4 to the Deposition of Zoe Hicks

38757471.2

54.  Photograph of Truck Exhibit 5 to the Deposition of Zoe Hicks

55.  SMS Text messages between Kristen Hamilton and John Cade dated 11/9/2016
     1:50:08 AM to 11/09/2016 3:09:59 (UTC+0) entries 466-499 [EEOC_000883-000926].

56.  Statement of John Cade 12/18/17 Exhibit 2 to the Deposition of John Cade
     [EEOC_000027]

57.  Excerpts from Exhibit 3 to the Deposition of John Cade entries 28046-28012
     [ESI_000571-00569]

58.  Route Sheet for 9/7/16 Exhibit 9 to the Deposition of John Cade [ESI_00474].

59.  EEOC Investigator's Notes of Interview of John Cade 12/18/2017
     [EEOC_000027]

60.  Any exhibit identified by Defendant

61.  EEOC reserves the right to supplement this exhibit list up to and including the
     time of trial.

**B.  Defendant Ecology's Exhibits**

1.  Ecology Services Refuse & Recycling, LLC & Ecology Services, Inc. Employee
    Handbook, Revised Feb. 20, 2013, Exhibit 2 to Deposition of K. Hamilton
    [ESI_00054-81]

2.  Kristen Hamilton Signed Employee Acknowledgment of Receipt Form
    [ESI_001015]

3.  Ecology Services Handbook [ESI_00766-789]

4.  Photograph of truck, Exhibit 3 to the Deposition of K. Hamilton

5.  Photograph of truck, Exhibit 4 to the Deposition of K. Hamilton

6.  Photograph of truck, Exhibit 5 to the Deposition of K. Hamilton

7.  Photograph of truck, Exhibit 6 to the Deposition of K. Hamilton

8.  Photograph of truck, Exhibit 7 to the Deposition of K. Hamilton

9.      Photograph of truck, Exhibit 8 to the Deposition of K. Hamilton

10.     Photograph of truck, Exhibit 9 to the Deposition of K. Hamilton

11.     Photograph of truck, Exhibit 10 to the Deposition of K. Hamilton

12.     Photograph of truck, Exhibit 11 to the Deposition of K. Hamilton

13.     Photograph of truck, Exhibit 12 to the Deposition of K. Hamilton

14.     Photograph of truck, Exhibit 13 to the Deposition of K. Hamilton

15.
    A.      Screenshots of 9/15/16 text message conversation between K. Hamilton and M. Gaitan, Exhibit 14 to Deposition of K. Hamilton [EEOC_000075-76]

    B.      SMS Text messages between Kristen Hamilton and Marvin Gaitan dated 9/15/16 2:01:51 PM(UTC+0) to 3:18:18 PM (UTC+0) entry numbers 330-346- [EEOC 000661-63]

16.     7/13/16 Disciplinary Letter to K. Hamilton, Exhibit 15 to Deposition of K. Hamilton [ESI_00050-53]

17.     6/25/16 Employee Disciplinary Form, Exhibit 16 to Deposition of K. Hamilton [ESI_00100-102]

18.     7/9/16 Employee Disciplinary Form, Exhibit 17 to Deposition of K. Hamilton [ESI_00103]

19.     7/15/16 Employee Disciplinary Form, Exhibit 18 to Deposition of K. Hamilton [ESI_00104]

20.     8/11/16 Employee Disciplinary Form, Exhibit 19 to Deposition of K. Hamilton [ESI_00105]

21.     8/16/16 Employee Disciplinary Form, Exhibit 20 to Deposition of K. Hamilton [ESI_00106]

22.     9/1/16 Employee Disciplinary Form, Exhibit 21 to Deposition of K. Hamilton [ESI_00107]

23.     9/28/16 Employee Disciplinary Form [ESI_001028-29]

24.     9/30/16 Employee Disciplinary Form, Exhibit 22 to Deposition of K. Hamilton [ESI_00108]

25.     11/7/16 Employee Disciplinary Form, Exhibit 25 to Deposition of K. Hamilton [ESI_00109]

26.     2016 Calendar, Exhibit 23 to Deposition of K. Hamilton

27.     02/17/17 Independent Contractor Agreement Between K. Hamilton and Dealers' Choice Truckaway System, Inc d/b/a Truckmovers, Exhibit 27 to Deposition of K. Hamilton [TKM_000020-26]

28.     K. Hamilton 2017 Form 1099-MISC from Dealers Choice Truckaway System, Exhibit 30 to Deposition of K. Hamilton [TKM_000346]

29.     K. Hamilton 2017 1099 Detail from TruckMovers, Exhibit 31 to Deposition of K. Hamilton [TKM_000347-60]

30.     10/17/16 Z. Hicks Employee Information Form, Exhibit 2 to Deposition of Z. Hicks

31.
        A.      Screenshot of text message from S. Looney to K. Hamilton, Excerpt of Exhibit 1 to Deposition of S. Looney [EEOC_00084]

        B.      SMS Text message from S. Page Looney to Kristen Hamilton dated 11/7/16 9:40:00 PM(UTC+0) entry 865 [EEOC 000769]

32.     8/19/16 E-mail from M. Gibbs to S. Looney, Exhibit 2 to Deposition of S. Looney

33.
        A.      Screenshot of 10/6/16 text message from K. Hamilton to S. Looney, Exhibit 3 to Deposition of S. Looney

        B.      MMS Text message from K. Hamilton to S. Looney dated 10/6/16 7:49:59 PM(UTC+0) entry 6 [EEOC 000598]

34.     11/10/16 E-mail from R. Reach to M. Gibbs, Exhibit 24 to Deposition of K. Hamilton [ESI_00110-11]

35.     11/15/16 E-mail from M. Gibbs to R. Reach, Exhibit 4 to Deposition of M. Gibbs [ESI_00253-55]

36.     Ecology Route Sheets [ESI_00407-543][2]

37.     Kristen Hamilton Time Cards [ESI_00380-00390]

38.     Randy Sellers Time Card [ESI_00405]

39.     Zoe Hicks Time Card [ESI_00406]

40.     SMS Text messages between Kristen Hamilton and Chris [Last Name Unknown] dated 11/7/16 8:30:51(GMT-5) to 7/11/16 8:40:49 (GMT -5) entries 8172-8176 [EEOC_000930-32]

41.     SMS Text messages between Kristen Hamilton and Zoe Hicks dated 12/17/17 8:12:28(GMT -5) to 12/17/17 13:06:00 (GMT -5) entries 15222-15231 [EEOC 000928-000929]

42.     SMS Text messages between Kristen Hamilton and Marvin Gaitan dated 9/9/16 3:14:15 PM(UTC+0) to 3:18:50 PM (UTC+0) entry numbers 354-352 [EEOC 00663 ]

43.     SMS Text message from Kristen Hamilton to Marvin Gaitan dated 9/21/16 3:50:36 PM (UTC+0) entry number 317 [EEOC 00660]

44.     SMS Text messages between Kristen Hamilton and Marvin Gaitan dated 11/2/16 8:05:46 PM(UTC+0) to 8:11:22 PM (UTC+0) entry numbers 29-33 [EEOC 00639-00640]

45.     SMS Text messages between Kristen Hamilton and Marvin Gaitan dated 11/4/16 2:24:07 PM(UTC+0) to 7:21:24 PM(UTC+0) entry numbers 2-12 [EEOC 00637-00638]

46.     SMS text message from Kristen Hamilton to Marvin Gaitan dated 11/7/16 12:52:06 PM(UTC+0) entry number 1 [EEOC 00637]

47.     Text Message Conversation Between K. Hamilton and J. Cade, Excerpt of Exhibit 3 to Deposition of J. Cade [ESI_00554-00555] entry numbers 7007, 6689

48.     10/13/16 Employee Discipline Form (Urias-Beltran, José) [ESI_00224]

---

[2] Ecology intends to rely upon only select route sheets, which at the time of trial will be admitted as sub-exhibits (e.g., Exhibit 36.A, 36.B, etc.).

49.   Frederick News Post Employment Advertisements (11/16/16, 11/13/16, 11/17/16, 12/11/16, 12/18/16, 1/3/17, 1/22/17, 1/29/17, 2/8/17, 2/19/17, 2/28/17) [also found as ECF No. 52-22]

50.   Calendar for Year 2017

51.   Any exhibits identified by the EEOC

52.   Ecology reserves the right to supplement this exhibit list up to and including the time of trial

**C.  Authenticity Objections to Plaintiff's Exhibits**

**D.  Authenticity Objections to Defendant's Exhibits**

**VIII. Pending Motions**

Ecology intends to file a motion *in limine* to exclude testimony and documents concerning EEOC's investigation of Hamilton's charge of discrimination.

**IX. Fact Witnesses**

**A.  Plaintiff's List of Witnesses**

1.   Kristen Hamilton (will call)
     c/o Eric Thompson, EEOC

2.   Zoe Hicks (will call)[3]
     current address and phone unknown

3.   Randy Sellers (will call)[4]
     current address and phone unknown

4.   Cassandra Brace, Paralegal (may call)
     EEOC Baltimore Field Office
     31 Hopkins Plaza, Suite 1432
     Baltimore, MD 21201
     1 800-669-4000

---

[3] EEOC sought but could not procure Zoe Hicks' attendance by subpoena and will offer Hicks' video deposition testimony at trial consistent with Fed. R. Civ. P. 32.  Deposition designations for Hicks are set forth in Section XI.

[4] EEOC sought but could not procure Randy Sellers' attendance by subpoena and will offer Sellers' video deposition testimony at trial consistent with Fed. R. Civ. P. 32.  Deposition designations for Sellers are set forth in Section XI.

(only to be called if the parties fail to reach an agreement regarding calculating backpay).

5. EEOC Custodian of Records (may call)
c/o EEOC Eric Thompson
(to be called if the parties fail to reach an agreement on the admissibility of EEOC records)

6. Any witness identified by Defendant (may call)

**B. Defendant Ecology's List of Witnesses**

1. Margaret Gibbs (will call)
8168 Bell Towers Crossing
Pasadena, MD 21122
410-844-1806

2. Marvin Gaitan (will call)
258 Frederick Street
Hagerstown, MD 21740
443-307-6478

3. Mel Morales (will call)
c/o Ecology Services Inc.
9135 Guilford Road
Suite 200
Columbia, MD 21046

4. Carlos Paz (will call)
c/o Ecology Services Inc.
9135 Guilford Road
Suite 200
Columbia, MD 21046

5. Jon Cade (will call)[5]
300 Chapel Court, Apt. 103
Walkersville, MD 21793
301-331-9495

---

[5] Ecology attempted to serve J. Cade with a trial subpoena, but was unsuccessful. As such, Ecology will offer the videotaped deposition testimony of J. Cade at trial consistent with Fed. R. Civ. P. 32. Depositions designations for J. Cade are set forth in Section XI.

38757471.2

6.      Susan Page Looney (will call)
        19332 Keep Tryst Road
        Knoxville, MD 21758
        240-367-4898

7.      Timothy Osborne (may call)
        c/o Ecology Services Inc.
        9135 Guilford Road
        Suite 200
        Columbia, MD 21046

8.      Kristen Hamilton (may call)
        c/o Eric Thompson, EEOC

9.      Any witness identified by Plaintiff (may call)

## X. Expert Witnesses

        None

## XI. Deposition Designations

### Witnesses Called by EEOC

**EEOC Deposition Designations for Zoe Hicks w/ any Objections and Responses**

| EEOC Designation | Objection | Response to Objection |
|---|---|---|
| Pg: 5 Ln: 4 - Pg: 6 Ln: 12 | | |
| Pg: 19 Ln: 11 - Pg: 21 Ln: 7 | | |
| Pg: 39 Ln: 18 - Pg: 42 Ln: 18 | | |
| Pg: 44 Ln: 5 - 15 | | |
| Pg: 45 Ln: 21 - Pg: 46 Ln: 24 | | |
| Pg: 47 Ln: 1 - Pg: 48 Ln: 2 | | |
| Pg: 50 Ln: 7 - Pg: 52 Ln: 9 | | |
| Pg: 59 Ln: 2 - 4 | | |
| Pg: 59 Ln: 6 - Pg: 70 Ln: 24 | | |
| Pg: 71 Ln: 20 – Pg: 79 Ln: 10 | | |
| Pg: 79 Ln: 11 - Pg: 84 Ln: 5 | | |
| Pg: 84 Ln: 18 - Pg: 94 Ln: 23 | | |
| Pg: 96 Ln: 7 - Pg: 111 Ln: 10 | Pg: 103 Ln. 13-17 – Objection: Witness' opinion without foundation & speculation | Witness testified she was with Paz on numerous occasions, including when employees congregated each morning and |

49

| | | |
|---|---|---|
| | as to another individual's state of mind; in furtherance of these objections, Ecology designates Pg. 93 Ln. 6-8, where witness states she only worked with Paz twice. | had meetings [104:24-105:13], and when she worked with him directly for two days, and testimony on his English proficiency reflects first-hand observation, not opinion.  If opinion, it is based on her own perceptions and concerns a fact in issue under FRE 701 |
| Pg: 111 Ln: 19 -  Pg: 113 Ln: 7. | | |
| Pg: 113 Ln: 24 – Pg: 116:14 | | |
| Pg: 116 Ln: 21 - Pg: 117 Ln: 1 | | |
| Pg: 117 Ln: 13 - Pg: 118 Ln: 13 | | |
| Pg: 121 Ln: 4 - Pg: 122 Ln: 5 | | |
| Pg: 123 Ln: 8 - Pg: 125 Ln: 23 | | |
| Pg: 129 Ln: 3 - Pg: 130 Ln: 2 | 129:5-20 – Objection: hearsay & speculation | Not offered for truth of matter asserted but to demonstrate awareness of witness and other employees of harassing conduct |
| Pg: 133 Ln: 3 - Pg: 135 Ln: 9 | | |
| Pg: 136 Ln: 2 - Pg: 141 Ln: 9 | (i) Pg 140 Ln. 5-6 – Objection: hearsay; (ii) Pg. 136 Ln 24 – Pg. 141 Ln. 19 – Objection: the following questions are leading, and as such the questions and responses should be disregarded: (A) "Did you ever see Paz grab his crotch around Hamilton?"; (B) "Do [sic] you ever see him and grab her or try to touch her?"; (C) "Did Kristen Hamilton ever tell you that she found Carlos's behavior to be disgusting and that she wanted him to stop?"; (D) "Did you | (i) admission; verbal act constituting part of unlawful harassment; and further not offered for truth of matter asserted but existence of statement (ii)  the questions are not leading or improper and develop testimony, and any such objection as to form was not made during the deposition and is waived per FRCP 32(d)(3)(B) |

| | | |
|---|---|---|
| | hear Hamilton telling Marvin that Carlos would make obscene gestures to her?"; (E) "Did you hear Kristen Hamilton tell Marvin that Carlos grabbed her?"; (F) "Did you hear her tell Marvin that Paz exposed himself?" | |

**Defendant Ecology Deposition Designations for Zoe Hicks w/ any Objections and Responses**

| Ecology Designation | Objection | Response to Object |
|---|---|---|
| Pg: 53 Ln: 13-21 | | |
| Pg: 93 Ln: 6-8 | | |
| Pg: 118 Ln: 14-15 | | |
| Pg: 119 Ln: 10-12 | | |
| Pg: 121 Ln: 2-3 | No – but EEOC further designates Pg: 121 Ln: 4-7 for completeness | |
| Pg: 143 Ln: 7-15 | | |
| Pg: 143 Ln 20-21 | | |
| Pg: 143 Ln: 23 – Pg: 144 Ln: 22 | | |
| Pg: 146 Ln: 23 – Pg: 147 Ln: 1 | | |
| Pg: 147 Ln: 7-9 | | |

**EEOC Deposition Designations for Randy Sellers w/ any Objections and Responses**

| EEOC Designation | Objection | Response to Objection |
|---|---|---|
| Pg: 5 Ln: 4 - Pg: 6 Ln: 11 | | |
| Pg: 17 Ln: 17 - Pg: 18 Ln: 14 | | |
| Pg: 24 Ln: 23 - Pg: 27 Ln: 5 | | |
| Pg: 31 Ln: 1 - Pg: 35 Ln: 11 | | |
| Pg: 36 Ln: 24 - Pg: 65 Ln: 13 | Pg: 58 Ln: 12 – Pg: 60 Ln: 14 – Objection: speculation & hearsay | Not speculation, testifies to his own impressions and understandings of events and from information acquired. Not hearsay, statements are verbal acts establishing |

| | | |
|---|---|---|
| | | unwelcomeness and further offered for their effect on the listener/witness. Witnesses' own lay concept of hearsay is irrelevant. |
| Pg: 67 Ln: 7 - Pg: 67 Ln: 24 | Pg: 67 Ln: 7 – Pg. 67 Ln: 24 – Objection: hearsay | Not hearsay as it doesn't involve content of statements or matters asserted, only the existence of events/communications. |
| Pg: 68 Ln: 5 - Pg: 70 Ln: 4 | | |
| Pg: 71 Ln: 21 - Pg: 72 Ln: 14 | | |
| Pg: 80 Ln: 16 - Pg: 83 Ln: 1 | | |

**Defendant Ecology Deposition Designations for Randy Sellers w/ any Objections and Responses**

| Designation | Objection | Response to Objection |
|---|---|---|
| Pg: 27 Ln: 11-20 | | |
| Pg: 28 Ln: 8 – Pg: 29 Ln: 19 | | |
| Pg: 68 Ln: 1-4 | | |
| Pg: 70 Ln: 5-8 | | |

**<u>Witness Called by Ecology</u>**

**Defendant Ecology Deposition Designations for Jon Cade w/ any Objections and Responses**

| Designation | Objection | Response to Objection |
|---|---|---|
| Pg: 1 Ln: 1 – Pg: 7 Ln: 13 | | |
| Pg: 11 Ln: 10 – Pg: 12 Ln: 10 | | |
| Pg: 13 Ln: 9 – Pg: 14 Ln: 4 | | |
| Pg: 21 Ln: 18-22 | | |
| Pg: 24 Ln: 1-6 | | |
| Pg: 24 Ln: 10-11 | | |
| Pg: 26 Ln: 14 – Pg: 27 Ln: 20 | | |
| Pg: 28 Ln: 2 – Pg: 31 Ln: 8 | | |
| Pg: 33 Ln: 13-17 | | |
| Pg: 34 Ln: 5-10 | No but EEOC further designates Pg: 34 Ln: 11-22 for completeness | |

| Pg: 34 Ln: 17-20 | No but EEOC further designates Pg: 34 Ln: 11-22 for completeness | |
|---|---|---|
| Pg: 35 Ln: 7-14 | | |
| Pg: 35 Ln: 21 – Pg: 37 Ln: 14 | | |
| Pg: 37 Ln: 21 – Pg: 38 Ln: 19 | | |
| Pg: 40 Ln: 4-15 | | |
| Pg: 50 Ln: 13-20 | Objection to Pg: 50 Ln: 15-20 speculative; Should the testimony be admitted EEOC designates Pg: 50 Ln: 21 to Pg: 52: Ln: 1 for completeness | The witness' response is not speculative, but is rather describing his experience working with Gaitan and Gaitan's leadership style. |
| Pg: 54 Ln: 19 – Pg: 59 Ln: 13 | | |
| Pg: 65 Ln: 12 – Pg: 66 Ln: 6 | | |
| Pg: 66 Ln: 9-14 | | |
| Pg: 67 Ln: 22 – Pg: 68 Ln: 17 | No but EEOC designates Pg: 66 Ln: 7 – Pg: 67 Ln: 19 for completeness. (i) Pg. 66 Ln: 20 – Pg 67 Ln 4 contains statement adopted by witness. Writing is itself admissible as a government record of regularly conducted activity and public record, and further was used to refresh witness' recollection; (ii) Pg: 67 Ln: 5 – 19 is testimony based on witness' experience. | Objection: The EEOC's counter-designations are improper. (i) Pg: 66 Ln: 20 – Pg: 67 Ln: 4 is inadmissible hearsay; (ii) Pg: 67 Ln: 5 – 19 calls for speculation. Concerning objection (ii), EEOC's counter-designation is further inconsistent with EEOC's above-stated objection to Ecology's designation of Pg: 50 Ln: 13-20. Ecology further incorporates its objection to EEOC's designation of  Pg: 59 Ln: 14 – Pg: 65 Ln: 9, *infra*. |
| Pg: 81 Ln: 9 – Pg: 82 Ln: 8 | | |
| Pg: 83 Ln: 4 – Pg: 85 Ln: 18 | (i) Pg: 83 Ln: 9 – 13 speculative and lack of foundation; (ii) Pg: 85 Ln 4 – 18 speculative and lack of foundation | This designation is offered in response to EEOC's identification of Plaintiff's Exhibit 22, to explain the context of that conversation from J. Cade's perspective. This designation shall only be offered to the extent the Court permits Plaintiff's Exhibit 22 |

| | | and/or testimony related to the same to be offered into evidence. |
| --- | --- | --- |

**EEOC Deposition Designations for Jon Cade w/ any Objections and Responses**

| EEOC Designation | Objection | Response to Objection |
| --- | --- | --- |
| Pg: 11 Ln: 12 - Pg: 12 Ln: 10 | | |
| Pg: 21 Ln: 18-22 | | |
| Pg: 34 Ln: 11-22 | | |
| Pg: 37: Ln: 18-20 | | |
| Pg: 38 Ln: 15- Pg: 39 Ln: 3 | | |
| Pg: 40 Ln: 16 – Pg: 41 Ln: 18 | | |
| Pg: 45 Ln: 11-20 | | |
| *Conditional on objection:* Pg: 50 Ln: 21 - Pg: 52: Ln: 1 | | |
| Pg: 59 Ln: 14 – Pg: 64 Ln:19 | (i) Pg: 59 Ln: 19 – Pg: 61 Ln: 5 - Objection: hearsay; counsel's questions, and the witness's responses, are all reading from the notes of an EEOC investigator, which are inadmissible as hearsay. The witness does not testify to any matters independent of the investigator's notes in the above-cited provisions, and as such this testimony is inadmissible; (ii) Pg: 61 Ln: 19 – Pg: 62 Ln: 3 – Same objection as (i); (iii) Pg: 63 Ln: 21-22 – Objection: Counsel's question reads from inadmissible hearsay, without a separate substantive response from the witness; (iv) Pg 64 Ln: 20 – Pg: 65 Ln: 3 – Same objection as (iii). | (i & ii) Writing is itself admissible as a government record of regularly conducted activity and public record. The witness in many instances adopted the statement. In cases where the witness did not adopt the statement it is also a prior inconsistent statement. The witness repeatedly testifies to questions independent of the investigators notes. The witness testified to a lack of memory and the testimony is admissible pursuant to Evid. R. 803(5). (iii) The following line is a question independent from the investigator's notes. (iv) withdrawn. |
| Pg: 65:4 – 65:9 | | |
| Pg: 66 Ln: 7 – Pg: 67 Ln: 19 | (i) Pg: 66 Ln: 7-8 – Objection: Counsel's question reads from | (i) Writing is itself admissible as a government record of regularly conducted activity |

| | inadmissible hearsay, without a separate substantive response from the witness; (ii) Pg: 66 Ln: 20 – Pg: 67 Ln: 3 – Same objection as (i) | and public record. Prior inconsistent statement. The statement from the notes is immediately followed by a separate question independent of the notes. The witness earlier testified to a lack of memory and the testimony is admissible pursuant to Evid. R. 803(5). (ii) The witness adopted the statement. |
|---|---|---|
| Pg: 73 Ln:13 – Pg: 74:8 | | |
| Pg: 78 Ln: 5 – 16 | | |

/s/ Harriet E. Cooperman* _____
Harriet E. Cooperman (Bar No. 00729)
Erik P. Pramscufer (Bar No. 19858)
Saul Ewing Arnstein & Lehr LLP
500 East Pratt St., 8th Floor
Baltimore, Maryland 21202-3133
Telephone:  (410) 332-8974
Facsimile:   (410) 332-8973
Harriet.Cooperman@saul.com
Erik.Pramscufer@saul.com

*Attorneys for Defendant Ecology Services, Inc.*

/S/ _____
Eric S. Thompson, Trial Attorney
United States Equal Employment Opportunity Commission
George H. Fallon Federal Building
31 Hopkins Plaza, Suite 1432
Baltimore, Maryland 21201
Telephone (410) 801-6696
Eric.Thompson@EEOC.GOV

/S/ _____
Thomas D. Rethage
EEOC Trial Attorney
Philadelphia District Office
801 Market St., Ste. 1000
Philadelphia, PA 19107
267.589.9756
thomas.rethage@eeoc.gov

*Attorneys for Plaintiff U.S. Equal Employment Opportunity Commission*

*Electronically Signed with Email Permission 7/19/2021*

38757471.2

56