IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION<br>Plaintiff, | * * * * | |
| vs. | * * | Civil Action No. ADC-18-1065 |
| ECOLOGY SERVICES, INC.<br>Defendant. | * * * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## **MEMORANDUM OPINION**

Plaintiff, the United States Equal Employment Opportunity Commission filed a Complaint on behalf of the employee Kristen Hamilton alleging the employer Ecology Services Inc. ("Ecology or ESI") violated Title VII of the Civil Rights Act of 1964 by subjecting Ms. Hamilton to a hostile work environment. Plaintiff alleged a co-worker sexually harassed Ms. Hamilton who gave notice to her employer, but the employer failed to correct the hostile environment. Plaintiff alleged the employee was constructively discharged and that her resignation was due to the sexual harassment. A four-day bench trial was conducted virtually using the platform ZOOMGOV.com. For the reasons set forth below, I find in favor of Defendant Ecology Services Incorporated and enter judgment accordingly.

## I.   THE FACTS AT TRIAL

### **Plaintiff EEOC**

#### Kristen Hamilton

Kristen Hamilton was the first witness called by Plaintiff to testify. She holds a Class B truck driver's license which permits her to operate vehicles up to 26,000 pounds. She has been a truck driver for four years and was a bus driver from 2007 until 2015. As a truck driver she travels

the East coast and has made trips to certain areas of the West coast as well. Prior to those employments she worked as a security guard and a prison guard.

Hamilton started working for Ecology Services on May 25, 2016. She was employed as a trash truck driver at the Frederick Maryland yard. Her supervisor was Marvin Gaitan. She operated a Mack Truck and there were either one or two helpers assigned. Helpers ride inside the truck from the yard to the route and from the route back to the yard. While on the route they stood on platforms at the rear of the truck and held on to handles. Some helpers were Spanish speakers.

About a month after she started working at Ecology, Hamilton testified a Spanish speaking helper named Carlos Paz started making sexual comments about her body. The comments included "nice ass" "I like a big butt" "I like big boobs and want to play with them". She also testified he would look at her and say "umm umm" in a sexual way. These comments were made while she would prepare her truck in the morning and sometimes when Paz was in the cab of the truck. She claimed there were co-workers present but never identified any in her testimony.

Hamilton also testified Paz made gestures towards her, grabbing his crotch and motions to simulate masturbating and oral sex. Hamilton stated he would smile when gesturing. Hamilton testified she was financially struggling before Ecology. She stated that Paz offered her money for sex – specifically "$20 for a blow job and $50 for sex". She testified Paz offered her money for sex 3-5 times during her employment. She refused. Despite being offered money for sex, she asked Paz to loan her money on two occasions which he did. Hamilton also testified that Paz (1) smacked her butt (2) brushed his hand across her butt several times (3) squeezed her left breast and on another occasion reached from the passenger seat – over the hump and tried to touch her right breast. She wasn't sure if he did touch her breast. She did not report this conduct right away

2

because she was embarrassed and humiliated. She did not want to lose her job and thought she could stop it.

She also testified that Paz exposed himself after climbing up on the "hump" between the driver and passenger seats, grabbed her hand off the steering wheel while she was driving 45-50 miles per hour in traffic and made her touch his penis. This act happened twice. On the first occasion she punched Paz and pushed him back into the passenger seat. The second occasion she slapped his face, pushed him and said "Don't fucking do that again you asshole". She testified he laughed. She claims she told Gaitan, her supervisor about it and he said he would talk to Paz and take care of it. She stated she did not report it right away because she was embarrassed. After the second incident she testified she did not report it the same day to Gaitan since nothing happened the first time. She testified the comments continued.

On September 15, 2016 a yard supervisor who filled in as a helper, Videll (or Vidal, he was never properly identified on the record by name) was working with Hamilton. Hamilton testified that Videll climbed into the back of her truck through a side door on the driver's side and urinated in the back of the truck. She did not see Videll expose himself but testified she saw a stream of urine. She texted Gaitan right away that Videll had peed in her truck and it was disgusting. She did not tell Gaitan anything about Paz. A few days later she requested an in-person meeting with Gaitan. She also asked not to work with Paz alone.

Hamilton testified she knew Zoe Hicks and Randy Sellers. She helped them get jobs with Ecology Services. She testified that on October 19, 2016 Sellers was working with her and Paz and on this date, Paz was sitting on the passenger seat and reached behind Sellers who was riding on the engine cover, "the hump", and touched either on or near her right breast. She testified she told Gaitan a few days after that. When she reported it to Gaitan, he was in the office and they

3

were behind closed doors. Both Hicks and Sellers were outside the closed office waiting for a ride home from Hamilton. She testified Gaitan said he was sorry and would talk to Paz again and take care of it. She complained Paz was mean on the route and was an "asshole".

Hamilton testified she was depressed and felt like she did something to bring this on. She did not know how to stop it. She felt powerless and embarrassed. She testified she stopped working on November 7, 2016 because of harassment. On November 7, 2016, she called in late and spoke to Gaitan. When she arrived Gaitan was in the office and told her that her lateness was an issue. Even though she had 4 prior warnings and could have been fired after the third warning, he gave her another chance. Gaitan brought up another issue regarding a garden hose which Hamilton refused to allow on the truck since she believed it would not be accepted at the recycling center. That incident occurred the Friday before and she stopped doing her route and had to make up time once it was resolved. She became argumentative with Gaitan and he told her to take two days off, suspending her and she was to return on November 9, 2016. This was documented by Gaitan. Shortly after she left the yard she texted Gaitan "I QUIT". She testified she quit because Gaitan was going to make her work with Paz that day. Thirty minutes later, Hamilton texted Chris, a former coworker and said she quit because Gaitan was an asshole. DX 34.

Following her text to Gaitan, she testified she called Robyn Reach in Human Resources and left a voicemail. She called Page Looney and briefly told her about the harassment. They exchanged texts.

At Ecology Services she was earning $150 per day. During her employment there she earned $16,920. After she quit, she worked for Community Taxi and said she made about $1200 per month until the end of December 2016. She was paid in cash and had no records. She worked for Chris Duran and made $100 per day for 21 days total. She had no records. She enrolled in West

4

Virginia Works to search for work. She asked Page Looney to help her search for work. Ultimately, she got a job delivering new and used trucks.

On cross examination Hamilton testified she had no experience driving a garbage truck. She had no experience with helpers and Paz had to help her on her route. She testified she asked Paz for the first loan on either June 3 or June 6 because Ecology held back her first check. She borrowed $100 from him. She initially denied a second loan but then admitted a second loan after being shown her deposition testimony. She said Paz began the sexual conduct around the end of June. She found it frustrating Paz did not speak English and told Gaitan they should all speak English and she preferred English speaking people.

Hamilton was shown DX19, a text from her to Gaitan on September 21, 2016 complaining about Paz. She stated she did not want to work with him because he was a "meanie". There was no mention of any sexual harassment. She was shown DX 20B, a text to Page Looney on October 6, 2016 where she stated she was still at Ecology and Paz was still being his "a-hole self" but she treated it as a joke. There was no mention of sexual harassment. She was asked about her deposition testimony where she did not mention any touching incident regarding Paz or his slapping her buttocks.

She testified the first incident where Paz made her touch his penis was in the first week of September. She was driving 40-50 mph. Paz climbed up on the hump. He pulled her hand off the wheel and made her touch his penis. She punched him and shoved him back into the seat. The second incident was about the second week of October when they were on Route 15 going to Clover Hill. There was steady traffic. Again, he climbed up on the hump. He pulled her hand off the wheel and pulled it to his penis. She slapped and pushed him back into the passenger seat. Both times she maintained control of the truck.

In terms of her sexual harassment complaints to Gaitan, she testified the first time was in September a few days after she complained of another employee urinating in the back of her truck on September 15, 2016. The second time she complained to Gaitan was around the third week of October. She met Gaitan in his office and spoke in conversational tones. Sellers and Hicks were outside the office and the door was closed. She never put any of these complaints about sexual harassment by Paz in writing. She texted other complaints to Gaitan such as DX18 and DX19. She never told anyone else at Ecology about sexual harassment by Paz. She admitted that she had a chronic tardiness problem which was not always written up by Gaitan.

When asked about Sellers and Hicks, she testified Hicks was like a daughter to her and was a friend of Hamilton's daughter. Hicks took care of Hamilton's son who lived with Hicks. The Defendant showed Hamilton many emails between her and Hicks over the time period before and after her employment at Ecology. Hamilton also knew Sellers, who was Hicks' fiancé. Hamilton lived with them for five months. She helped Sellers get a job at Ecology Services and later hired him to be a "chaser" for Truck Movers where Hamilton is still employed.

Hamilton was also asked about several texts, DX52 and 53. In those texts Hamilton told Hicks she wanted to talk to her because an EEOC investigator was going to call her. Hicks wanted to borrow Hamilton's truck and Hamilton complained that Hicks did not pay for gas the last time. Hicks responded "I havent any money. And we covered the ecology situation".

Zoe Hicks

Zoe Hicks worked for Ecology Services for two weeks and was fired due to a positive drug test. She testified that while working there she saw Paz make sexual gestures and he made comments to her about Hamilton. When asked if she spoke Spanish she said no but she was trying to learn Spanish so she knew Carlos was talking sexually about Hamilton. Only she and Randy

6

Sellers saw Paz make sexual gestures towards Hamilton. Initially Hicks said she never spoke to Hamilton about Paz but now said Hamilton told her about Paz exposing his penis to her.

### Randy Sellers

Randy Sellers worked for Ecology Services for two weeks and was fired after failing a drug test. Sellers testified he had no good recollection of how he got the job and no memory of how often he was paid. However, he clearly remembered the day he worked with Paz and Hamilton. It was a Wednesday and he was riding on the back of the truck. He testified he saw Paz in the passenger side mirror motioning like he was masturbating towards Hamilton who was driving. Sellers said he asked Hamilton to stop and ran up to the cab and saw Paz reach over to grab Hamilton's breast. Sellers stated Paz spoke some English but could not recall any conversations he had. Sellers said he never talked to Hicks, Gaitan or Hamilton about what happened. On the day Hamilton met with Gaitan in the office and Sellers and Hicks were outside the closed door, Sellers said he did not know what Hamilton and Gaitan discussed. Sellers testified he worked in all different locations and was not with Hamilton or Paz most of the time.

### Candace Brace

Candace Brace, an employee of EEOC was called to testify regarding PX48 and PX50.

### **Defendant Ecology Services**

### Margaret Gibbs

Margaret Gibbs was called to testify by Defendant. She was the Human Resource Director for Ecology Services from March 2009 until September 2020. She testified employees were paid weekly by check and the first paycheck was withheld. In 2016, all employees were given an employee handbook at the time of hire which she identified as DX1. Bilingual managers such as Gaitan and Mel Morales assisted non English speaking employees with the handbook. There were

7

posters by the time clock and at other locations that were posted in both English and Spanish with employee rights enumerated in 2016, including sexual harassment. She testified Robin Reach was her assistant who dealt with day to day HR issues. Ms. Reach had 12.5 years of HR experience in 2016 and left Ecology Services in July 2017. She was shown DX35, which is an email to her from Reach where Reach recounted a conversation she had with Hamilton on November 9, 2016, two days after Hamilton quit. The email has detailed information regarding Hamilton quitting her position. At the end of the email there is a statement that Hamilton told Reach in her phone conversation about sexual misconduct by Paz. This was the first time Hamilton had ever notified anyone about any sexual misconduct by Paz. Gibbs was shown DX36 which is an email to Reach and Mel Morales another supervisor. In that email Gibbs stated, "Marvin never received any complaints about Carlos Paz from her – he has no knowledge of any sexual comments and doesn't believe Carlos speaks enough English to say those things".

Mel Morales

Defendant next called Mel Morales to testify. Morales has been with Ecology for 16 years. He is the operations manager and reports directly to Pete Osbourne the owner. Morales oversees operation, manages the supervisors and deals with the county contracts. He stated the manager of the Frederick yard was Marvin Gaitan who reported directly to him. Morales hires drivers and gives them a road test. He did so with Hamilton. He was familiar with the Mack truck driven by Hamilton and said it would be hard to climb up onto the hump between the driver and passenger and you could not extend your legs because of the windshield. He described Gaitan as a dedicated manager and had no problems with him. He described Paz as an employee of 15-16 years and had no problem with him. Paz was a helper on the trucks.

8

Morales first met Hamilton at the Frederick yard and he did her first route with her which took about 4-5 hours. He visited the Frederick yard frequently in 2016, almost daily to support the manager since they had just acquired the Frederick county contract. He said Hamilton talked a lot and he mentioned to her she needs to concentrate on driving. He told her she could call him if she had any problems. She never contacted Morales. He was aware of her chronic lateness. Gaitan told him Hamilton had resigned and he was notified in an email from Margaret Gibbs that Hamilton had mentioned sexual misconduct by Paz. He emphasized how difficult it is to turn on the rear platform and face the driver. It was dangerous.

Carlos Paz

With the services of a translator, Defendant called Carlos Paz to testify. Paz has been employed by Ecology for over 16 years. He was a helper and currently is a driver for Ecology. Paz speaks very little English and cannot read English. If he received documents, he would seek help from a nephew interpreting them and has an app on his phone to translate. He understood sexual harassment. He knew the rules at Ecology regarding sexual harassment. He worked in the Frederick yard and was supervised by Marvin Gaitan. In 2016 he was a helper and Gaitan would assign him to different drivers. He had a regular route in the neighborhood of Clover Hill, which he did on Mondays and Thursdays. He handled other routes on the other days of the week.

He identified DX11,12 as one of the trucks used to do the Clover Hill route. When working as a helper, he stood on the platform facing the truck with his hands on the handles. His feet faced the truck. To signal to the driver he turned his body to the left or right. Paz is 5 foot 7 or 5 foot 7.5 inches tall. He is 54 years old now. If standing on the floor of the truck the passenger seat comes up to his chest. When sitting his feet do not touch the floor. He testified you could not reach over

9

and touch the driver – it was a very long distance. If he stood he still could not reach the driver because the hump was in the way. There is a seat belt for the passenger seat.

Paz testified helpers do not sit on the hump when inside the cab. It is impossible because it is very hot and narrow. He has never tried to get up on the hump. He could not stretch out on the hump because it was too narrow. He demonstrated narrow with his hands indicating the distance from the back wall of the cab to the windshield. He demonstrated how it would look if he got on the hump – pulling his knees up to his chest. If there were two helpers, one would stand and one would sit in the passenger seat.

Paz testified he was assigned to work with Hamilton because the Clover Hill route was a "soft route" and she could learn to drive the truck. He directed her on the route by using hand signals. She could see him in the mirror when he was on the platform or the ground. In the cab he would give her directions with hand signals. He doesn't speak English. He never had other conversations with Hamilton. She had difficulty with the signals and her driving was a problem. He tried to correct her but she would not react to him. She smoked in the cab and he tried not to get in the cab. Paz complained to Gaitan about Hamilton – she took too long and smoked a lot and she never understood the signals. He asked Marvin to assign him to someone else.

Hamilton asked Paz for a loan on three occasions. He loaned her the money and never asked for anything in return. Ultimately he stopped loaning her money because "it was too much". She got more aggressive after he stopped loaning her money. He first became aware of the sexual harassment complaint from Gaitan when he was called to the office to be told what was going on. He said it was impossible and he doesn't speak English. He denied each allegation of misconduct by Hamilton. He stated he could not make gestures while riding on the back of the truck. He said while working as a helper he did not joke around. He also stated it was impossible to get on the

10

hump or to reach around the hump and touch a driver. Paz worked with other women at Ecology and never had a complaint. Hicks testified Paz hugged her and Paz denied ever hugging any women at Ecology. He also stated he was not attracted to Hamilton.

On cross-examination, he testified he lived in the United States for 17 years but never heard the words "fuck" "ass" or "blowjob". He stated he heard the word "stop" and demonstrated the hand signal of a closed fist held up. While I find it difficult to believe that after living in the United States for 17 years, these slang words were a stranger to him, the burden is on Plaintiff, not Defendant to prove its case by a preponderance of the evidence. While credibility is clearly the issue, this aspect of his testimony had no impact on my decision in this case. He testified he asked to be removed from working with her a few days after she started. He doesn't think he was assigned much to work with her towards the end of her employment. He was shown PX12 which showed Paz worked with her in October and November. When asked on re-direct about his deposition testimony that Hamilton was aggressive, he testified that there was no room for aggressiveness for men or women.

### Marvin Gaitan

Defendant called Marvin Gaitan the Frederick yard manager to testify. Gaitan started as a driver at Ecology in 2011 and became a yard manager for 5 years. He left and then came back as a driver in 2018. Gaitan managed the daily operations at Frederick yard. He hired and fired employees. Upon hiring he provided the employee handbook with the policy regarding sexual harassment. An employee could report sexual harassment to their supervisor, another supervisor, or Human Resources. If anyone complained to him, he would notify his supervisor Mel Morales. Contrary to Hicks' testimony, Paz was always a helper in 2016 and not a mechanic's assistant. Paz was an excellent employee and always on time. People on the routes loved him. He never heard

11

any complaints about Paz who was very good with everybody. Never received any complaints from any women about Paz.

Gaitan assigned Hamilton to routes that were easy so she could learn them. He assigned Paz to those routes because Paz knew the routes. Gaitan identified DX12 as the truck Hamilton drove. After the first month, Gaitan assigned other helpers because Hamilton and Paz did not get along. Gaitan identified DX19 as a text from Hamilton calling Paz a "meanie". Gaitan testified Hamilton never told him about any sexual comments made by Paz. She never told him Paz propositioned her for sex, any touching by Paz, or Paz exposing himself to her. There were never any complaints to him by Hamilton regarding sexual misconduct by Paz. Based on other complaints he tried to assign them separately where he could but sometimes had to assign them together because they were busy. If Hamilton would have made sexual harassment complaints, Gaitan would have separated them. Hamilton complained to him about other things every day.

When Hamilton complained about Videll urinating in the truck, Gaitan spoke to Videll who denied it but Gaitan wrote it up. Hamilton was often late. Gaitan gave her a fourth warning and then when she was late again on November 7 he gave her a break. On that day Hamilton became argumentative when Gaitan brought up the issue of the garden hose from the preceding Friday. Gaitan suspended her for two days and told her to come back to work on November 9, 2016. She left the yard and shortly after texted "I QUIT" to Gaitan. The morning of November 7, Paz had already left to do the route with another driver, so he was not at the yard when Hamilton arrived. The runs sheets were shown to Gaitan and he confirmed that Paz was already assigned to Wayne, another driver for the Clover Hill route.

Gaitan was surprised to find out about the sexual harassment complaint when he spoke to Ms. Gibbs. Gaitan never received any complaints from Hamilton regarding Paz and sexual

harassment before he found out from Ms. Gibbs. He has never received any complaints about Paz and sexual misconduct before or after finding out about it from Ms. Gibbs after Hamilton quit. Both Hicks and Sellers were terminated on October 28, 2016 at or around 6:18 am for having positive drug tests when they reported to work.

On cross examination Gaitan stated he did not think that reporting problems would get him in trouble or that he would lose his job. He was aware to forward any complaint of sexual harassment to Mel Morales his supervisor. He did not plan on suspending Hamilton on November 7 when she arrived. He did so because of her behavior and her attitude. Records show that on that day Wayne was the driver and Paz was the helper already on the route before Hamilton ever appeared at the yard.

Page Looney

Defendant called Susan Page Looney to testify. She was employed at the Frederick yard as the office manager from March 23, 2016 until September 15, 2016.She dealt with applications, vehicle registrations, accidents and insurance issues. She also dealt with hiring and firing. If she had issues she went to Ms. Gibbs for assistance. If an employee needed any contact information she would supply it. She interacted with employees every day. Some were not fluent in English and she used a phone app to help translate.

She knew Paz as a driver or helper and communicated the basics with him. He was always respectful towards her and never made any sexual references or touched or hugged her. She never saw Paz do anything towards other females. She never saw Paz with Hamilton. She told Gaitan not to hire Hamilton. Hamilton broke the rules and she told Gaitan what she thought about that. She did not recall whether Hamilton ever complained to her about Paz. She stayed in touch with Hamilton after Looney left employment. Looney was shown DX20, the text from Hamilton on

13

October 6, 2016 where Hamilton complained about Paz being an "a-hole" but she [Hamilton] took it as a joke. Looney stated there was no complaint about sexual harassment by Hamilton in that email. Hamilton never told her about sexual gestures, advances, comments or exposure regarding Paz. Looney said she would joke around with Paz, never heard him use swear works and he never said anything offensive.

John Cade

Defendant presented John Cade by video deposition. Cade testified he was employed by Ecology in 2016 before Hamilton and was employed at the time of the March 2019 deposition. He said everybody received a handbook and there was one-on-one training for him regarding sexual harassment and other topics of employment such as leave policies, discipline, and tardiness. Cade did not remember if he was told what to do if another co-worker complained about sexual harassment.

As a helper he rode inside the cab going to and from the route. There were rules against 2 helpers inside the truck, but drivers break the rules. He testified he is 6 foot 5 inches tall and if he was seated in the passenger seat it was not possible for him to reach across the hump and touch the driver. Even if he stood it would be difficult especially if the truck is moving. If there are two helpers, one stands and one sits.

Cade worked with Hamilton. She was the driver and drove the Mack truck. He never witnessed Paz ask Hamilton for sex. He testified that if Marvin (Gaitan) would find out he would fire you on the spot – he didn't tolerate much. Hamilton called or texted Cade – she wanted Cade to talk to an EEOC investigator. Cade testified that he wouldn't go on to say things to the investigator that Hamilton wanted him to say, but they were friends so he wanted to help her. She helped him out by testifying for him in his unemployment case.

14

Cade testified Paz stated he would never touch Hamilton, she was too big for him. Cade was confronted with a previous statement he gave the EEOC that Carlos wanted to have sex with Hamilton. His response was that if he said that it was a lie. Cade said he lied to try and help her out. He never saw Paz hug Hamilton. Paz never told him he was having sex with Hamilton and he did not believe Paz was having sex with Hamilton. Cade said he never joked around with Paz because Marvin would fire him.

Cade testified that Marvin's treatment of Hamilton was tough on her and that is what Cade meant when talking about harassment, not sexual harassment. Marvin was a tough supervisor and would not put up with any nonsense.

On cross examination he denied having a romantic relationship with Hamilton. He said he was trying to help Hamilton out when he spoke to the EEOC investigator. He exaggerated certain things to the EEOC investigator because she helped him out and he figured that he owed her. He never witnessed anything inappropriate said by Paz in front of Hamilton.

## II.    LEGAL STANDARD

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex ...." 42 U.S.C. § 2000e-2(a)(1). Title VII is violated "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victims' employment and create an abusive work environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal citations omitted).

To establish a *prima facie* case of sexual harassment based on a hostile work environment, a plaintiff must prove (1) unwelcome conduct; (2) based on the plaintiff's sex; (3) sufficiently severe or pervasive to alter the plaintiff's conditions of employment and create an abusive work

environment; and (4) that is imputable to the employer. *Okoli v. City of Baltimore*, 648 F.3d 216, 220 (4th Cir. 2011). "Conduct is 'unwelcome' when it continues after the employee sufficiently communicates that it is unwelcome." *Albero v. City of Salisbury*, 422 F. Supp. 2d 549, 557–58 (D. Md. 2006) (citing *Scott v. Ameritex Yarn*, 72 F. Supp. 2d 587, 591 (D.S.C. 1999)). "Establishing the third element requires that the plaintiff show that the work environment was not only subjectively hostile, but also objectively so." *Bonds v. Leavitt*, 629 F.3d 369, 385 (4th Cir. 2011).

To determine whether an environment is hostile, the Court must look at all the circumstances, which "may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23. And as to the fourth element, an employer may be found vicariously liable to an employee when a supervisor "with immediate (or successively higher) authority" over him creates an "actionable hostile environment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 807–08 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998). The employer "may be liable in negligence if it knew or should have known about the harassment and failed to take effective action to stop it." *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 335 (4th Cir. 2011). "Knowledge of harassment can be imputed to an employer if a reasonable person, intent on complying with Title VII, would have known about the harassment." *Ocheltree v. Scollon Prod., Inc.*, 335 F.3d 325, 334 (4th Cir. 2003). Once the employer has notice, it must respond with remedial action reasonably calculated to stop the harassment. *See Amirmokri v. Balt. Gas & Elec.*, 60 F.3d 1126, 1131–32 (4th Cir. 1995).

## III.     ANALYSIS OF THE EVIDENCE

This case is one that simply comes down to the credibility of the witnesses. Of course, it is the

16

Plaintiff EEOC's burden to prove a violation by a preponderance of the evidence. Here, Plaintiff has failed to do so. Plaintiff from the start painted the picture that Ms. Hamilton was a tough woman, "...no shrinking violet...as a prison guard, security guard, as a truck driver, she can withstand a lot and speak up for herself as well". Ms. Hamilton recounted the incidents of sexual harassment she alleged were committed by co-worker Carlos Paz. The Court finds her testimony simply to not be credible.

Hamilton stated Paz made inappropriate comments about her breasts and buttocks every time they worked together. Although she said these were made while co-workers were present, she failed to name any co-workers at any specific time the comments were made. There is a suggestion that maybe it was Sellers or Hicks present, but that is only a suggestion and not evidence. Hamilton never identified anyone. In fact, other witnesses testified to the contrary. Page Looney who knew Paz and Hamilton and who actually recommended Hamilton not be hired, testified she never heard Paz ever make any sexual comments. John Cade testified he never heard Paz make any sexual comments to Hamilton. Marvin Gaitan who worked closely with Hamilton and Paz never heard Paz ever make any comments regarding Hamilton.

Both sides presented evidence regarding the platform helpers stood on at the back of the truck and the handles where the workers held on. Defendant painted a picture that helpers were basically hugging the truck and could not turn easily towards the driver, therefore other than the required signals, it was not possible for a helper to make sexual gestures so the driver could see them. I find little merit to this position. It is obvious from the photographs and even from the testimony that the helpers had to jump on and off the truck to retrieve trash bins and do their job. It would not be impossible for any helper to make gestures to the driver or gestures from the ground and be seen in the side mirrors. In this case however, the evidence does not support that Paz

17

engaged in any such activity toward Hamilton and I don't credit Hamilton's testimony that any such gesturing occurred.

With respect to propositioning her for sex, Hamilton's testimony makes little sense. She testified Paz propositioned her around the end of July or August. Her testimony was during her employment Paz propositioned her three to five times. She was vague about the details, much like her other allegations. Despite what she alleged was an offensive offer to pay her for sex, Hamilton asked to borrow money from Paz which she initially testified she did once. Her memory was refreshed when she was shown her deposition testimony where she actually borrowed money from him twice. Paz testified he loaned her money on three occasions and then told her that was enough. It makes little sense that Hamilton was subjected to this hostile environment, was so intimidated that she felt she could not report it and then approached the harasser and asked for a loan. I find her allegations regarding the propositioning of sex for money to be incredible.

Likewise, the allegations that he "smacked her butt" once and "rubbed his hand against her butt" on another occasion and once squeezed her left breast, do not support her then approaching the alleged groper and asking for a loan. This does not support the argument that she was a woman who was subjected to a hostile environment and was so embarrassed and powerless she could not report the conduct to her supervisor. The Plaintiff has failed to show by a preponderance of the evidence that any illegal or inappropriate touching ever occurred between Hamilton and Paz.

There was an abundance of testimony about the "hump" or engine cover of the truck. The hump was where the engine was located between the driver and passenger. It is visible in the exhibits and separates the driver side of the cab from the passenger side. Paz testified when he stood in the cab the hump came up to about his shoulder. He is at best 5 foot and 7.5 inches tall. Hamilton testified that when she was seated in the driver's seat she could rest her arm on the hump.

18

There are no pictures of any persons standing next to the hump or attempting to sit on the hump and no measurements of the height of the hump were provided. However, the testimony of the witnesses and the photographs provide the Court with sufficient perspective of the height and width of the hump.

Hamilton alleged that on two occasions, Paz climbed up onto the hump, exposed his penis to her, grabbed her right hand off the steering wheel while she was driving at 40-50 miles an hour and made her touch his exposed penis. Hamilton testified that the first time, she punched him and pushed him back into the passenger seat. She testified that on a second occasion sometime around or near October 19, 2016 Paz again climbed up onto the hump and repeated the conduct. She stated she slapped him in the face and pushed him into the passenger seat. Based upon the evidence the Court has before it, I find that Hamilton's story regarding Paz exposing his penis to her and making her touch it, is not credible. First, the witnesses all testified the engine compartment is hot and even if someone tried to climb onto it, the heat alone would make it difficult. Secondly, it does not appear physically possible for a man of Paz's size to climb up and somehow alter his clothing to expose himself to her. There is little to no room for a person's legs and Hamilton could not recall how Paz was positioned on the hump. There is insufficient space to commit such an act. The last aspect of this allegation where I find Hamilton again to not be credible is the grabbing by Paz of her hand off the steering wheel while she is driving a Mack truck in traffic at 40 to 50 miles an hour. She testified that she never lost control of the truck. She also testified she punched him and pushed him which would again require one or both hands to be off the steering wheel. On the second occasion, she slapped and pushed him. Slapping would require her right hand, which was in Paz's control or her left hand which would cause no hands to be on the wheel. The entire scenario lacks credibility and defies logic.

19

What also strikes the Court is the fact that if Paz had committed the act once already, would not Hamilton be on high alert or somehow noticing he was again climbing up onto the hump and taking down his pants? She indicated she did not notice him climbing up a second time. She did not report the incidents when they happened. Again, her story defies logic and I find that the evidence contradicts her testimony.

Hamilton testified that on one occasion she was driving, Sellers was sitting on the hump holding a cooler or some kind of bag. Paz was seated in the passenger seat and reached behind Sellers while seated and touched her near or on her right breast. Sellers, a witness called by Plaintiff did not support these facts. Sellers testified he was on the rear passenger side of the truck, not in the cab, and saw in the passenger mirror that Paz was making masturbating gestures towards Hamilton while Hamilton was driving. Sellers said he asked Hamilton to stop the truck and he saw Paz reach over to her to try to grab her breast. He said nothing to Paz. Sellers did not testify he was on the hump. Even if he got in the cab and was seated on the hump which again appears to be an acrobatic move even for smaller people, Hamilton never testified that Sellers was outside the truck and signaled her to stop. Their testimony is inconsistent but consistent with my prior rulings, Hamilton's allegations were not credible. John Cade testified that he is 6 foot 5 inches tall and even he cannot reach over the hump and touch the driver whether he was seated or standing. Paz too testified that reaching across the hump to touch the driver was not possible because it was "a long way". Hamilton and her witness Sellers just could not get their stories straight. Therefore, I find that the evidence presented by Plaintiff EEOC fails to prove by a preponderance of the evidence that a hostile environment existed that was severe and pervasive and impacted her employment as alleged by Hamilton.

20

Assuming arguendo that one could find a hostile environment based upon sexual misconduct, Plaintiff EEOC failed to produce credible evidence that Hamilton reported the conduct to her supervisors in order to correct the sexual harassment. As I indicated in the beginning, Plaintiff EEOC painted the picture that Ms. Hamilton was a strong woman, a survivor who had been a prison guard, security guard, and truck driver. Yet Hamilton claimed she was afraid to report the incidents to Gaitan. The evidence does not support Plaintiff's position. Hamilton had regular contact with Gaitan. Gaitan testified she complained regularly about other work matters. The record is replete with emails and texts where Hamilton contacted not only Gaitan but complained to others about Paz and how he was a "meanie" an "a-hole" and an "asshole". She failed to ever mention any allegations of a hostile environment based upon sex. When Videll allegedly urinated in her truck, Hamilton texted Gaitan immediately. While the Court is absolutely sensitive to the difficulty a victim of sexual harassment in the workplace would have in reporting such conduct, that does not appear to be the case with Hamilton. Hamilton also had other persons she confided in with respect to Paz, like Page Looney. In the text to Looney about Paz, she did not mention any sexual harassment allegations.

Hamilton testified she advised Gaitan of Paz's sexual misconduct on two occasions. She did not testify to dates or any details but stated she told Gaitan about Paz following the incident where Paz first exposed himself to her on the hump of her truck. She testified Gaitan said he would talk to Paz and take care of it. Hamilton said the conduct continued. She said after Paz exposed himself a second time on the hump, she did not report it to Gaitan immediately. That alone gives the Court pause since she alleged she had already reported it once. If she was intimidated, arguably it would be easier to report it a second time. So several days later she testified she reported the second incident to Gaitan and he said he was sorry it happened again and he would take care of it.

21

She testified since nothing happened the first time, she did not report it right away. This second meeting occurred around October 19, 2016. It happened behind closed doors in the office with Sellers and Hicks outside the door. Hamilton said they spoke in conversational tones. Hicks testified she heard the discussion although she did not testify to what she heard but Sellers who was with Hicks testified he did not hear anything.

Gaitan testified he was surprised when he was notified by Margaret Gibbs that Hamilton made allegations of sexual harassment involving Paz. Gaitan testified he first heard about it at that time. He denied that Hamilton ever told him that Paz had acted inappropriately towards her. If she had alleged a sexual harassment complaint he would have told his supervisor Mel Morales. Gibbs testified she was made aware of the allegations after receiving an email from Robin Reach, her assistant in HR. Morales testified he first learned of the sexual harassment allegations on November 15, 2016 from an email from Gibbs. The testimony of Defendant's witnesses was consistent that they had no notice of the sexual harassment allegations until after Hamilton quit her position as truck driver on November 7, 2016.

The Court places no weight upon the testimony of either Zoe Hicks or Randy Sellers. Zoe Hicks testified that Paz was a mechanic's helper and always gave her hugs. She testified that Paz was always hugging women. She said she was a hugger too. No one else testified that Paz hugged anyone. Paz was never a mechanic's helper. She stated she once borrowed money from Paz. She indicated initially that she never spoke to Hamilton about Paz but later testified Hamilton told her about Paz exposing himself. She indicated she overheard Hamilton telling Gaitan about Paz when they met privately behind closed doors and she sat outside. Sellers said he did not hear anything and he was there with Hicks. Hicks also testified she heard Paz talking in Spanish about Hamilton and she knew what he was saying because she was trying to learn Spanish. Hicks did not testify to

22

any content she claims she heard. Hicks' testimony was contrived, inconsistent, and appeared to be an attempt to prop up Hamilton. I found her to not be credible.

Sellers began by saying he had no good recollection about how he got the job or how often he was paid. Despite his vague recollection of everything else he "clearly" remembered the incident where he was riding on the back of the truck and saw Paz in the passenger mirror gesturing towards Hamilton. Sellers said he never reported it because he didn't care yet testified he was outraged by what he said he saw in the mirror and immediately signaled Hamilton to stop the truck so he could get in the cab. Despite being upset over what he said he saw, he testified he never talked to Hicks or Gaitan about what he observed. He also said specifically that he did not know what Hamilton spoke to Gaitan about when he and Hicks were sitting outside the door. Sellers' attitude of not caring about what happened was inconsistent with the testimony of how he reacted. Both Sellers and Hicks were fired from their employment with Ecology for failing a drug test. They were friends of Hamilton and Hamilton lived with them for about 5 months. Hamilton's son was still living with Hicks. Sellers was Hicks' fiancé. There is apparent bias and sufficient inconsistencies in Sellers' testimony. He did not appear to the Court to be a credible witness. I find that the witnesses Sellers and Hicks were untruthful in their testimony in order to support Hamilton's otherwise unsupported allegations. This I find was confirmed in the text DX52. Hicks asked to borrow Hamilton's truck and Hamilton was reluctant to loan it to her because Hicks did not fill it with gas last time. Hicks replied "I havent had money. *And we covered the ecology situation.*" After considering the evidence and their testimony, that email suggests a *quid pro quo* that "we" (Sellers and Hicks) helped Hamilton out because they "covered the ecology situation" (statements to EEOC investigator) and were calling in the favor to use the truck in return.

23

In reviewing all of the evidence submitted along with the testimony, I find that the EEOC failed to prove by a preponderance of the evidence that Kristen Hamilton was subjected to a sexually hostile environment that was so severe and pervasive to justify the constructive discharge of Hamilton. She quit of her own accord after having chronic lateness issues and after being suspended for two days. Under Ecology's progressive discipline policy, she could have been terminated for lateness after her third warning. On November 7, 2016, she received her fifth warning and was suspended not for her tardiness that day but because she became argumentative with her supervisor about the prior performance. She did not quit because she was going to be assigned to work with Paz on November 7 . The records indicated clearly that Paz was already assigned to a driver and was out completing the route before the tardy Hamilton even appeared at the yard.

The testimony and facts do not support any of her allegations and in fact contradict the physical possibility that certain acts like the illegal touching in the cab of the truck could have even occurred. While I believe that there was something going on between Hamilton and Paz, which could have been an inability to work together, the evidence does not rise to the level of a hostile work environment that was so severe and pervasive it caused the constructive discharge of Hamilton.

WHEREFORE, this Court enters Judgment in favor of Defendant Ecology Services, Inc. on the Complaint filed by the EEOC. A separate Judgment Order will follow.

Date: 11 August 2021

A. David Copperthite
United States Magistrate Judge

24